**Part 1 of 5**

ACCEPTED
05-18-00647-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
6/4/2018 2:25 PM
LISA MATZ
CLERK

No. 05-18-00647-CV

In the Court of Appeals

Fifth District of Texas at Dallas

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS

6/4/2018 2:25:47 PM

LISA MATZ
Clerk

**In re JOHN CALCE**
*Relator*

# RECORD FOR PETITION FOR WRIT OF MANDAMUS

Relator John Calce submits this record of trial court proceedings in support of his petition for writ of mandamus.

## Index of Documents

| # | Date | Description | Record Pages |
|---|------|-------------|--------------|
| 1 | 6/26/16 | Plaintiff's Original Petition | 001-023 |
| 2 | 7/31/17 | John Calce's Original Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC | 024-172 |
| 3 | 11/22/17 | John Calce's First Amended Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC | 173-321 |
| 4 | 11/22/17 | John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 322-393 |

| 5 | 11/27/17 | John Calce's Supplemental Evidence in Support of Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 394-405 |
|---|---|---|---|
| 6 | 12/8/17 | Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 406-858 |
| 7 | 12/12/17 | John Calce's Reply Brief in Support of Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 859-865 |
| 8 | 12/15/17 | Notice of Trial Setting | 866 |
| 9 | 5/2/18 | Plaintiffs' Second Amended Petition | 867-903 |
| 10 | 5/21/18 | Order Denying John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Againt Centurion Logistics LLC | 904-905 |

# Declaration of Chase J. Potter

STATE OF TEXAS          §
COUNTY OF DALLAS      §

My name is Chase J. Potter. My date of birth is May 12, 1986. My address is 901 Main Street, Suite 6000, Dallas, Texas 75202. I hereby declare under penalty of perjury as follows:

1.     I am over eighteen years of age and am fully competent to make this declaration. I am an attorney licensed by the Supreme Court of Texas and am counsel for Relator John Calce in this case.

2.     The factual statements contained within this instrument are within my personal knowledge and are true and correct.

3.     The copies of pleadings, motions, and other documents included in this Record for Petition for Writ of Mandamus are true and correct copies of these documents as filed in the trial court.

Executed in Dallas County, Texas, on June 4, 2018.

*/s/ Chase J. Potter*
Chase J. Potter, Declarant

10000280.1/SP/38371/0105/060118

FILED
DALLAS COUNTY
6/27/2016 11:01:53 AM
FELICIA PITRE
DISTRICT CLERK

DC-16-07706

Freeney Anita

CAUSE NO. -_____

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, individually and derivatively on behalf of CENTURION PECOS TERMINAL LLC, a Texas Limited Liability Company, | § § § § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs | § § | DALLAS COUNTY, TEXAS |
| | § | |
| vs. | § § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE INTERESTS, LLC, JOHN CALCE, STAMPEDE TX ENERGY, LLC, CENTURION MIDSTREAM GROUP, LLC, CENTURION TERMINALS, LLC | § § § § § § | |
| | § | |
| Defendants, | § § | B-44TH |
| | § | _____ JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL LLC, a Texas Limited Liability Company | § § § | |
| | § | |
| Nominal Defendant. | § | |

### PLAINTIFF'S ORIGINAL PETITION

Plaintiff Centurion Logistics LLC ("Centurion Logistics") files this *Original Petition* individually and derivatively on behalf of Centurion Pecos Terminals LLC ("Centurion Pecos") against James Ballengee ("Ballengee"), Ballengee Interests, LLC ("Ballengee Interests"), John Calce ("Calce"), Stampede TX Energy, LLC ("Stampede"), Centurion Midstream Group, LLC ("Centurion Midstream"), and Centurion Terminals, LLC ("Centurion Terminals"), bringing claims directly and derivatively on behalf of Centurion Pecos LLC for: breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, money had and received (unjust enrichment), fraudulent concealment, aiding and abetting fraudulent concealment, and declaratory judgment. Accordingly, Plaintiff would respectfully show the Court as follows:

**PLAINTIFF'S ORIGINAL PETITION**
307338_1

MR.001

# I.

## DISCOVERY CONTROL PLAN

1. Pursuant to Texas Rules of Civil Procedure 190.1-190.6, Plaintiff hereby designates that discovery will be conducted under Level 3. Pursuant to Rule 47 of the *Texas Rules of Civil Procedure,* at this time, Plaintiffs seek monetary relief, exclusively in the form of interest, costs, and attorneys' incurred or to be incurred in excess of $1,000,000.

# II.

## PARTIES

2. Plaintiff Centurion Logistics is a Texas limited liability company, with its principal office in Dallas, Texas. Centurion Logistics is a member and manager of Centurion Pecos. The members of Centurion Logistics are: Marc Marrocco ("Marrocco"), Antonio Albanese ("Albanese"), and TXC Energy LLC, an affiliate of Calce.

3. Nominal Defendant Centurion Pecos is a Texas limited liability company, with its principal office in Dallas, Texas. The current member and manager of Centurion Pecos is Centurion Logistics. Stampede was a member and manager of Centurion Pecos until June 13, 2016. Centurion Pecos may be served through service on its registered agent, John Calce, at 15851 Dallas North Parkway, Suite 650, Addison, TX 75001.

4. Defendant Ballengee is an individual residing in Dallas County, Texas. He may be personally served at 3838 Oak Lawn Avenue, Suite 1150, Dallas, Texas 75219 or wherever he may be found. Ballengee is a member and manager of Defendant Ballengee Interests.

5. Defendant Ballengee Interests is a Louisiana limited liability company. Ballengee is a managing member of Ballengee Interests. Ballengee Interests may be served by serving its

Texas registered agent, National Registered Agents, Inc., at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

6. Defendant Calce is an individual residing at 5601 Preakness Lane, Plano, TX 75093. He may be served at this residence or wherever he may be found. .

7. Defendant Stampede is a Texas limited liability company, with its principal place of business in Dallas, Texas. Stampede was a manager and member of Centurion Pecos, but was removed as a manager and member on June 13, 2016. Stampede may be served, by serving its registered agent, Blumberg Excelsior Corporate Services, Inc., at 814 San Jacinto Boulevard, Suite 303, Austin, TX 78701.

8. Defendant Centurion Midstream is a Texas limited liability company, formed on October 20, 2015, with its principal place of business in Dallas County, Texas. Calce is the manager of Centurion Midstream. Centurion Midstream may be served, by serving its registered agent, John Calce, at 15851 Dallas North Parkway, Suite 650, Addison, TX 75001.

9. Defendant Centurion Terminals is a Texas limited liability company, with a principal place of business in Dallas County, Texas. By information and belief, Centurion Terminals is an entity controlled by Defendant Calce. The manager of Centurion Terminals is 58C, LLC, a Texas limited liability company, whose manager is LV III, LLC, whose manager is Calce.[1] Centurion Terminals may be served, by serving its registered agent, John Calce, at 15851 Dallas North Parkway, Suite 650, Addison, TX 75001.

---

[1] The repeated use of the number 58 in these entities is evidence that they are the creation of Calce: Calce is very proud of having lettered as an offensive lineman on a Football Championship Subdivision team, where his jersey number was 58.

307338_1

MR.003

# III.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this case because the amount in controversy is in excess of the Court's minimum jurisdictional limits.  Moreover, Defendants have engaged in sufficient conduct in the State of Texas to confer jurisdiction over them.  The Court has jurisdiction over the subject matter of the action because a substantial portion of the events giving rise to Plaintiffs' claims occurred in Dallas County, Texas.

11.     Venue is proper in Dallas County, Texas, pursuant to Texas Civil Practice and Remedies Code Sections 15.002-15.007, because it is the county where all or a substantial part of the events or omissions giving rise to the claims occurred as detailed in the following paragraphs.

# IV.

## BACKGROUND FACTS

A.     **Creation of Centurion Logistics and Centurion Pecos**

12.     Several years ago, Marrocco and Albanese were looking for ways to use their expertise in real estate to invest in projects related to the booming oil and gas industry.  During their investigations, Marrocco became better acquainted with Calce, who worked in the oil and gas industry, and whom Albanese happened to know from outside his business dealings.  After some investigation, Marrocco, Albanese and Calce decided to pursue a project to purchase real estate and to develop a railway terminal for the shipping of crude oil.  In order to pursue that project, Marrocco, Albanese and Calce formed Centurion Logistics on September 16, 2013. Centurion Logistics is manager-managed and its managers are Marrocco, Albanese and Calce. Under the company agreement of Centurion Logistics, a majority of the managers are required to take any action.

13    Calce concluded that the geology in the area surrounding Pecos, Texas made it likely that there would be significant demand for a crude shipping terminal there. Albanese used his connections to obtain the interest of a possible anchor tenant who might want to ship hydraulic-fracturing sand through a terminal in that area, as a way to build Centurion Logistics' credibility with oil companies and the railroad. Marrocco identified, and placed under contract, an approximately 177-acre parcel in Reeves County, Texas (the "First Parcel") to use for the terminal, and obtained a contract for Centurion Logistics to purchase it.

14.    In order to obtain funds to purchase the First Parcel, Calce, Marrocco and Albanese discussed bringing an equity partner into the Pecos project to contribute cash. Calce offered two potential investors from the oil and gas industry with whom he was acquainted. Because Marrocco had already begun to hear rumors that Calce had a reputation for self-dealing, Marrocco proposed that Centurion Logistics work with the investor to whom he believed Calce had fewer ties, namely Ballengee. Additionally, Ballengee's company was already trucking crude oil in the vicinity. Centurion Logistics and a predecessor of Stampede (which was an ostensibly unrelated entity Ballengee used as a conduit for his investment, in order to conceal any activities that might appear to compete with his current business) formed Centurion Pecos, on September 11, 2014, and Centurion Logistics assigned to Centurion Pecos the contract to purchase the First Parcel.

15.    Ballengee agreed to contribute cash to Centurion Pecos, in order to purchase the First Parcel without any liens or encumbrances. Shortly before the closing of the sale of the First Parcel, however, Ballengee announced to Centurion Logistics that he would not simply contribute cash, as he had represented, but would require that Centurion Pecos grant a deed of trust to Texas Capital Bank ("TCB"), to secure payment of the loan that Ballengee would use to

MR.005

fund his contribution. Because Centurion Logistics had no other way to fund the purchase of the First Parcel before the required closing date, and because the seller was already threatening to sell to another purchaser, Centurion Logistics had no choice but to grant the deed of trust Ballengee demanded, and the proceeds of the loan by TCB to Ballengee Interests were contributed by Ballengee, through Stampede's predecessor, and used to purchase the First Parcel on September 19, 2014.

16.     Centurion Logistics has since learned that Ballengee's purpose in having Centurion Pecos grant a deed of trust to TCB, was to create a mechanism by which Ballengee could cause the property to be removed from Centurion Pecos through foreclosure; Ballengee had more than adequate cash to fund the purchase of the First Parcel without taking a loan from TCB.

17.     Centurion Logistics determined that the terminal project could be expanded by acquiring an approximately 300-acre parcel adjacent to the First Parcel (the "Second Parcel"). Marrocco obtained a contract for an entity he controlled, in order to purchase the Second Parcel. Marrocco was increasingly concerned about Calce's reputation for underhandedness, and, as a condition to assigning the purchase agreement to Centurion Pecos, insisted that Centurion Logistics and Stampede amend and restate the company agreement of Centurion Pecos, in order to remove Calce as the sole manager of Centurion Pecos, as of November, 2014.

18.     Under the amended and restated company agreement of Centurion Pecos, Centurion Logistics and Stampede were the members and managers of Centurion Pecos. Centurion Pecos is manager-managed, and, under the amended and restated company agreement, any action requires the consent of all managers.

19.     Again, at the closing of the Second Parcel, Ballengee insisted that Centurion Pecos grant a deed of trust to the Second Parcel to TCB to secure a loan to Ballengee, rather than fulfilling his representation to make a contribution of cash to purchase the Second Parcel without liens or encumbrances. Again, Ballengee's purpose, in causing Centurion Pecos to grant a deed of trust, was to create a mechanism to remove the Second Parcel from Centurion Pecos. The purchase of the Second Parcel closed on August 21, 2015. The First Parcel and the Second Parcel are collectively referred to as the "Reeves County Property".

20.     Again, Ballengee did not provide the funds for the Second Parcel directly to Centurion Pecos. Rather, he funneled the funds through Stampede because his participation in the Centurion Pecos venture was circumscribed by a non-compete agreement related to one of his previous businesses.

21.     Both deeds of trust, granted at the closings of the Reeves County Property, contain a cross-collateralization clause pledging the Reeves County Property as collateral for all obligations of Ballengee Interests to TCB, even obligations not involving Centurion Pecos. Purportedly, Calce signed both deeds of trust in his capacity as manager of Centurion Pecos, although he was not a manager of Centurion Pecos at the time he signed the deed of trust to the Second Parcel, and had no other authority to sign the second deed of trust for Centurion Pecos.

**B.      Defendants' Fraudulent Scheme Unfolds**

22.     In late 2015, Calce began communicating to Marrocco that Calce and Ballengee wanted to bring other participants into the project, and wanted Marrocco and Albanese to take a more passive role and a reduced share of the profits. In particular, Calce expressed a desire to force Albanese out as a manager of Centurion Logistics, and to require Albanese to sell his membership interest in Centurion Logistics for less than its fair value. Calce threatened that if

MR.007

Marrocco did not cooperate in removing Albanese from Centurion Logistics, Calce and Ballengee would conspire to exclude Marrocco from participation in the terminal project, as well; namely by removing the Reeves County Property from Centurion Pecos through foreclosure. Marrocco refused to participate in removing Albanese from Centurion Logistics. Calce and Ballengee subsequently asked for a meeting with Marrocco to negotiate a fair price for Marrocco's interest in Centurion Logistics, but the proposal proved to be a ruse to trick Marrocco into attending an uncalled meeting of the managers of Centurion Pecos to approve an "assignment and assumption agreement" with Ballengee Interests. Marrocco refused to attend the meeting.

23.     The actions of Ballengee and Calce demonstrate a scheme to move the Reeves County Property out of Centurion Pecos and into an entity in which Marrocco and Albanese have no interest, in order to deprive Marrocco and Albanese of their interests in the terminal project. In addition to his affiliation with Centurion Logistics, Calce is President of Centurion Midstream, an entity unrelated to either Centurion Logistics or Centurion Pecos. Centurion Midstream, or another entity affiliated with Calce, has attempted to negotiate directly with Union Pacific Railroad ("Union Pacific") for the establishment of rail service to the Reeves County Property, initially holding itself out as owning or representing the owner of the property and, after Centurion Logistics notified Union Pacific that Centurion Midstream had no affiliation with Centurion Pecos, by telling Union Pacific that Marrocco and Centurion Logistics were no longer involved in the project, and that Centurion Midstream would own the Reeves County Property "within a few weeks." On its website, Centurion Midstream claims to own the property purchased by Centurion Pecos and purports to be creating a terminal at Pecos, Texas. Calce, as President of Centurion Midstream, receives a salary and other benefits.

24.     In furtherance of this scheme, Calce, Ballengee and/or Stampede have, in addition to the deeds of trust executed at the closings of the Reeves County Property, created a number of unauthorized and/or fraudulent documents purporting to pledge the Reeves County Property or create obligations of Centurion Pecos.  These unauthorized transactions and documents were not only concealed from Plaintiff, but, on information and belief have been created recently and backdated.

25.     In a transaction unrelated to the purchase of the Reeves County Property, Ballengee Interests granted a promissory note to TCB dated January 6, 2015 for a line of credit in the amount of $750,000.  In order to secure the note, Calce executed a deed of trust to the First Parcel, purportedly on behalf of Centurion Pecos as its manager.  The January 6, 2015 deed of trust also contained a cross-collateralization clause pledging the First Parcel as collateral for all obligations of Ballengee Interests to TCB, even obligations not involving Centurion Pecos.  Calce was not a manager of Centurion Pecos in January, 2015, and had no other authority to sign the January 6, 2015 deed of trust.  The proceeds of the line of credit were not used for any purpose related to the business of Centurion Pecos.  Upon information and belief, they were largely used to fund a different terminal project in Brownsville, Texas, owned by Calce.  Centurion Logistics was unaware of the January 6, 2015 deed of trust, and only discovered it during a record search of Reeves County conducted in May 2016.

26.     In October, 2015, around the time Calce began expressing a desire to remove Albanese from Centurion Logistics, and shortly after Centurion Midstream was formed, Ballengee Interests extended the term of the note to TCB, and filed an extension of the deed of trust on the First Parcel to secure the note.  Again, that extension was signed by Calce, as manager of Centurion Pecos, although he was not a manager of Centurion Pecos at the time, and

MR.009

had no other authority to act on behalf of Centurion Pecos. Centurion Logistics and Centurion Pecos were not aware of the extension of the deed of trust on the First Parcel, and only discovered it during a record search of Reeves County conducted in May 2016. Ballengee's and Calce's purpose in extending the deed of trust was to preserve the Ballengee Interests note as a means to remove the First Parcel from Centurion Pecos.

27. In April 2016, without authority to act for Centurion Pecos, Stampede and Calce created documents that purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes from Ballengee Interests to TCB used to obtain the funds contributed to purchase the Reeves County Property, and to grant Ballengee Interests a deed of trust to secure the assumption. Centurion Pecos was unaware of these documents or the purported unauthorized assumption until it received a "notice of default" dated April 28, 2016 from Ballengee Interests for its purported failure to make interest payments under the assumption agreement. Neither Centurion Pecos nor Centurion Logistics has ever been provided with copies of the purported assumption agreement and deed of trust.

28. In addition, Calce created a note, dated on or about November 15, 2015, purporting to obligate Centurion Pecos to make payments to Centurion Terminals, another entity controlled by Calce. Centurion Pecos first learned of this note in a demand letter dated May 27, 2016. No note of this description was ever authorized by Centurion Pecos, and neither Centurion Logistics nor Centurion Pecos has ever seen this purported note.

29. Ballengee Interests and Calce also created fraudulent notes by Centurion Pecos to Ballengee Interests, dated September 16, 2014 and August 17, 2015. Centurion Pecos first learned of these notes in demand letters dated May 25, 2016. Neither Centurion Logistics nor Centurion Pecos has ever seen these purported notes.

30. In furtherance of their scheme, Defendants are now threatening to use the unauthorized and fraudulent documents to foreclose on the Reeves County Property. Centurion Pecos has received letters from Ballengee Interests and Centurion Terminals demanding payment of purported obligations that Centurion Pecos never, in fact, agreed to assume.

**C.      Stampede's Violations of the Company Agreement**

31. Section 10 of the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC ("Company Agreement") sets forth the conditions under which a member may transfer its membership interest. Section 10.4 states that a transfer shall not be permitted unless:

> [t]he transferor and transferee have delivered to the Company any documents that the Board of Managers request to confirm that the transfer satisfies the requirements of this Agreement to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as Assignee.

32. Pursuant to Section 10.1(a) of the Company Agreement, "transfer" includes "a transfer by merger or other business combination." Stampede's predecessor, Stampede Energy, LLC, a Louisiana limited liability company ("Stampede Louisiana") was a member of Centurion Pecos at the time that the Company Agreement was adopted. On January 20, 2016, Stampede Louisiana was converted to Stampede. Stampede then engaged in mergers with Stampede Energy, LLC, a Delaware limited liability company on March 2, 2016, and with Centurion Brownsville Terminal, LLC, a Texas limited liability company, on February 4, 2016.

33. On April 30, 2016 and again on May 4, 2016, Centurion Logistics expressly requested that Stampede and Centurion Brownsville Terminal, LLC provide the information required by Section 10.4 of the Company Agreement. Stampede and Centurion Brownsville Terminal, LLC failed and refused to provide the information required by the Company Agreement.

## D. Centurion Pecos Votes to Expel Stampede as Member and Manager

34. In order to address Stampede's violations of the Company Agreement, Centurion Logistics, on behalf of Centurion Pecos, on May 31, 2016, called a meeting of managers and members of Centurion Pecos, which was held on June 13, 2016. At the meeting, Centurion Logistics moved to remove Stampede as a member of Centurion Pecos based on Stampede's prohibited transfer of its membership interest. Because the motion involved removing Stampede as a member, Stampede was an interested manager and not eligible to vote. Centurion Logistics, the only manager eligible to vote on the motion, voted to remove Stampede as a member.

35. Subsequently, a meeting of the members of Centurion Pecos met to determine whether Stampede should be removed as a manager because it had transferred its membership interest in a prohibited transfer and engaged in other wrongful conduct that materially affected the business of Centurion Pecos and its members, and had also engaged in conduct that had made it not reasonably practicable to carry on the company business with Stampede. Centurion Logistics, the only remaining member, voted to remove Stampede as a manager of Centurion Pecos.

## V.

## CAUSES OF ACTION

### A. First Cause of Action: Breach of Fiduciary Duty as to Calce

36. Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

37. As a manager of Centurion Logistics, Calce had a duty of loyalty to the company. The duty of loyalty requires Calce to act in good faith and not allow personal interests to take precedence over the interests of Centurion Logistics.

38. Calce also had a duty to disclose all important information concerning any transaction, including any matters that might influence them to act in a manner prejudicial to Centurion Logistics.

39. In violation of his fiduciary duties, Calce colluded with Stampede, Ballengee and Ballengee Interests to engage in a series of fraudulent transactions which were contrary to the interests of Centurion Pecos and Centurion Logistics. This pattern of misconduct is intended to further Defendants' plan, namely, to remove the Reeves County Property from Centurion Pecos for use in their competing development, and to deprive Centurion Logistics of its share of any profits from the terminal project. The entire scheme is an egregious breach of Calce's duty of loyalty and full disclosure.

40. By secretly encumbering Centurion Pecos' assets, Calce has damaged the ability of Centurion Logistics to conduct business and impaired the value of those assets.

41. Calce's breaches of fiduciary duty proximately caused Centurion Logistics to suffered damage and Calce has obtained benefits, which Calce should be required to forfeit. The benefits Calce should be required to forfeit also include any remuneration he has received from Centurion Midstream.

42. Calce's breaches of fiduciary duty were intentional and, accordingly, Centurion Logistics seeks, and should recover, exemplary damages against Calce.

MR.013

**B.**     **Second Cause of Action:  Breach of Fiduciary Duty as to Stampede**

43.     Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

44,     As a manager of Centurion Pecos, Stampede owed Centurion Pecos a duty of loyalty.  Further, Stampede owed Centurion Pecos a duty of candor, including a duty to disclose information concerning its role in any transaction that would prejudice the interests of Centurion Pecos.

45.     Stampede violated its fiduciary duty by covertly engaging in a pattern of transactions designed to deprive Centurion Pecos of the Reeves County Property, as well as Centurion Pecos' interest in the terminal project.

46.     By secretly encumbering Centurion Pecos' assets, Stampede has damaged the ability of Centurion Pecos to conduct business and has impaired the value of those assets.

47.     Stampede's breaches of fiduciary duty have proximately caused Centurion Pecos to suffer damage and Stampede has obtained benefits which Stampede should be required to forfeit.

48.     Stampede's breaches of fiduciary duty were intentional and, accordingly, Centurion Pecos seeks, and should recover, exemplary damages against Stampede.

**C.**     **Third Cause of Action:  Aiding and Abetting Breach of Fiduciary Duty**

49.     Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

50.     Centurion Midstream and Centurion Terminals assisted with, encouraged and participated in breaches of fiduciary duty by Calce and Stampede.  As set forth above, Calce and Stampede had fiduciary duties of loyalty to Centurion Logistics and to Centurion Pecos and

fiduciary duties to disclose any transactions that would be prejudicial to the chief objectives of Centurion Logistics and Centurion Pecos.

51. Centurion Logistics and Centurion Pecos were created chiefly to purchase the Reeves County Property and to develop a railway terminal in order to transport petroleum and petroleum products. Rather than pursue these objectives with loyalty fiduciaries owe, Calce assisted in the creation of Centurion Midstream to thwart the efforts of Centurion Logistics and Centurion Pecos and to compete with these companies. Based on the content of the Centurion Midstream website, Centurion Midstream is covertly assisting Calce in his plan to take over the Reeves County Property, and to build the railway terminal for his own benefit and for the benefit of Centurion Midstream.

52. Based on its affiliation with Calce, Centurion Terminals was aware that Calce was not authorized to undertake any obligation to Centurion Terminals on behalf of Centurion Pecos. Nonetheless, Centurion Terminals entered into the note and has threatened to enforce it.

53. The breaches of fiduciary duty of Calce and Stampede, committed with the assistance of Centurion Midstream and Centurion Terminals, proximately caused Plaintiff to suffer actual damages in an amount exceeding the minimum jurisdiction of the Court.

54. As Centurion Midstream's and Centurion Terminals' participation in the breaches of fiduciary duty were intentional and exemplary damages are recoverable for the breaches of fiduciary duty, Plaintiff prays for exemplary damages against Centurion Midstream and Centurion Terminals.

**D.     Fourth Cause of Action: Money Had and Received (Unjust Enrichment)**

55. Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     A claim for money had and received arises when the defendant obtains money or a benefit that in equity and good conscience belongs to the plaintiff. It is an equitable doctrine applied to prevent unjust enrichment. A cause of action for money had and received is not based on wrongdoing but, instead, looks only to the justice of the case and inquires whether the defendant has received money that rightfully belongs to another. A claim for money had and received is based upon the doctrine of unjust enrichment.

57.     Further, where a defendant obtains a benefit from the plaintiff by fraud, duress, or taking undue advantage, the plaintiff may recover money or property under the theory of unjust enrichment.

58.     Ballengee and Ballengee Interests colluded with Calce to encumber property of Centurion Pecos to secure debts of Ballengee Interests, including the notes to purchase the Reeves County Property and the $750,000 line of credit.

59.     Ballengee and Ballengee Interests have, therefore, been unjustly enriched by pledges of property to secure Ballengee Interests' debt, including the $750,000 line of credit, and unauthorized assumption of the Ballengee Interests' obligations to TCB. Indeed, pursuant to the cross-collateralization clauses, the deeds of trust pledged the Reeves County Property to secure all Ballengee Interests' debts to TCB, not merely those related to Centurion Pecos. Defendants Ballengee and Ballengee Interests should be required to disgorge and to turn over to Centurion Pecos any benefits obtained through these transactions.

60.      By information and belief, Calce has received a salary and other benefits from Centurion Midstream, in exchange for effectuating his and Ballengee's plan, namely, to fraudulently obtain ownership of the Reeves County Property. This remuneration constitutes unjust enrichment.

61.     Centurion Midstream has developed, or plans to develop, a railway terminal in competition with the terminal planned by Centurion Pecos.  In so doing, Centurion Midstream, through its aiding and abetting of breaches of fiduciary duty, has obtained, or will obtain in the future, money that rightfully belongs to Centurion Pecos.  These funds should be disgorged and transferred to Centurion Pecos.

62.     Centurion Midstream has been—and will be—unjustly enriched by its interference with Plaintiff's efforts to secure the Reeves County Property and develop the Pecos terminal.

63.     In obtaining these benefits, Defendants have acted with fraud and malice. Accordingly, Plaintiff prays that these Defendants be found liable for exemplary damages.

**E.     Fourth Cause of Action:  <u>Fraudulent Concealment</u>**

64.     Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

65.     Ballengee and Ballengee Interests represented to Centurion Pecos that it would make a capital contribution by purchasing the Reeves County Property on behalf of Centurion Pecos.  At the 11th hour, Ballengee and Ballengee Interests demanded that Centurion Pecos agree to deeds of trust on the Reeves County Property.  Ballengee and Ballengee Interests did not disclose that the purpose of this demand was to eventually force a foreclosure on the Reeves County Property in order to cut off Centurion Pecos' interest in the terminal project.

66.     Centurion Pecos justifiably relied on Ballengee's and Ballengee Interests' professions that their purpose was to invest in, and to promote, the Centurion Pecos terminal project.

MR.017

67. Ballengee's and Ballengee Interests' failure to disclose their true intentions has injured Centurion Logistics and Centurion Pecos, in that Defendants are now attempting to use the TCB deeds of trust, as well as false and unauthorized documents, to complete their scheme to obtain the Reeves County Property for the competing entity, Centurion Midstream.

68. The wrongful fraudulent acts and omissions have proximately caused Centurion Logistics and Centurion Pecos to suffer damages. Because Defendants' wrongful fraudulent acts and omissions were conducted with intent, Plaintiff seeks both actual and exemplary damages.

**F.      Fifth Cause of Action:  Aiding and Abetting Fraudulent Concealment**

69. Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

70. Defendants Calce and Stampede provided knowing and intentional assistance to the fraud committed by Ballengee and Ballengee Interests. Calce and Stampede were aware of the fraudulent scheme and Stampede allowed itself to be used as a conduit through which Ballengee Interests made its payments for the Reeves County Property. As fiduciaries, Calce and Stampede had a heightened duty to disclose Ballengee's true intent, but they remained silent. Indeed, they actively furthered the scheme through their participation in the creation of false and unauthorized transactions and the creation of fraudulent documents.

71. Calce's and Stampede's assistance and encouragement constituted a substantial factor in causing the fraud. Without their participation, it is unlikely that Ballengee and Ballengee Interests could have attempted the scheme, given the limitations imposed on Ballengee by the non-compete agreement. Moreover, these Defendants, through a series of threatening communications, continue to push the fraudulent plan.

MR.018

72.    Calce's and Stampede's participation in the fraudulent scheme has proximately caused Centurion Logistics and Centurion Pecos to suffer damages.  Because these Defendants' participation in the wrongful fraudulent scheme was conducted with knowledge and intent, Plaintiff seeks both actual and exemplary damages.

**G.    Sixth Cause of Action:  <u>Declaratory Judgment</u>**

73.    Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

74.    A justiciable controversy exists between Centurion Pecos and Stampede regarding the status, rights, obligations and legal relations between Centurion Pecos and Stampede in connection with the Company Agreement.  The justiciable controversy concerns the right of members and managers of Centurion Pecos to expel Stampede as a member and manager.

75.    Pursuant to the terms of the Company Agreement, transfer of membership interests is prohibited unless certain conditions were met.  Among the conditions is the obligation of the transferor and transferee to provide information to assure that the transfer comported with the Company Agreement and the transferee agreed to be bound by the Company Agreement.  Transfer of a membership interest includes any transfer by merger or business combination.

76.    Stampede or its predecessor transferred of its membership interest within the definitions of the Company Agreement through one or more of three business transactions.  First, Stampede Energy, LLC, a Louisiana limited liability company, converted to Stampede.  Second, Stampede merged with Stampede Energy, LLC, a Delaware limited liability company.  Third, Stampede divided into two entities, Stampede and Centurion Brownsville Terminal, LLC, a Texas limited liability company.

MR.019

77. Subsequently, both the transferor and transferee companies expressly refused to provide information about the transactions, as required by the Company Agreement, for any transfer of a membership interest to be permitted. Centurion Pecos duly called a meeting of the managers and members of Centurion Pecos in order to discuss Stampede's violations and its removal as a member and manager.

78. At the June 13, 2016 meeting, Centurion Logistics, as manager of Centurion Pecos, voted to remove Stampede as a member of Centurion Pecos. As the party whose removal was at issue, Stampede was an interested manager excluded from voting. Accordingly, Stampede was removed as a member of Centurion Pecos.

79. Following the June 13, 2016 managers meeting, a meeting of members was held to determine whether Stampede should be removed as a manager of Centurion Pecos for cause. Centurion Logistics, the only remaining member, voted to expel Stampede, based on its prohibited transfer of membership interest, as well as its other misconduct, as set forth in this Petition.

80. In accordance with Tex. Civ. Prac. & Rem. Code § 37.001, et seq., Plaintiff seeks a declaratory judgment against Defendant Stampede, wherein the Court declares that following:

(a) The June 13, 2016 meeting was a valid meeting under the Company Agreement;

(b) The removal of Stampede as a member of Centurion Pecos was a valid, binding and enforceable action of the managers of Centurion Pecos;

(c) The removal of Stampede as a manager of Centurion Pecos was a valid, binding and enforceable action of the members of Centurion Pecos.

81. In addition, there is a real and justiciable controversy between Centurion Pecos, on the one hand, and Ballengee, Ballengee Interests, and Centurion Terminals, on the other hand, concerning the enforceability of certain financial obligations that Defendants purport were

entered into on behalf of Centurion Pecos. As set forth above, Calce, without authority to act for Centurion Pecos, and in violation of his fiduciary duties, created documents purporting to obligate Centurion Pecos to pay the notes that Ballengee Interests entered into with TCB and to make other payments to Ballengee Interests. Similarly, Calce, again without the authority to act for Centurion Pecos, and in violation of his fiduciary duties, apparently created a promissory note in favor of Centurion Terminals, purportedly obligating Centurion Pecos to make certain payments to Centurion Terminals.

82. In accordance with Tex. Civ. Prac. & Rem. Code § 37.001, et seq., Plaintiff seeks a declaratory judgment against Defendants Ballengee, Ballengee Interests, and Centurion Terminals, wherein the Court declares the following:

(a) Any assumption agreement purported to exist between Ballengee Interests and Centurion Pecos is invalid, void and unenforceable;

(b) Any agreement that purports to create an obligation of Centurion Pecos to Ballengee Interests is invalid, void and unenforceable;

(c) Any promissory note or other documents purported to create obligations between Centurion Pecos to Centurion Terminals is invalid, void and unenforceable.

83. In addition and cumulative of other relief sought herein, Plaintiff is entitled to declaratory judgment concerning the status of Stampede under the Company Agreement and the enforceability of certain financial obligations that Calce, without authority, and in violation of his fiduciary duties, purported to create on behalf of Centurion Pecos.

## VI.

### ATTORNEYS' FEES AND COSTS

84. Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

MR.021

85. As a result of Defendants' actions, Plaintiff was forced to retain the legal counsel of Shamoun & Norman, LLP ("S&N") to bring this lawsuit. Plaintiff retained the services of S&N to prosecute these claims and agreed to pay S&N its usual, customary and reasonable attorneys' fees. Such action and payment is necessary for the enforcement of Plaintiff's rights.

86. Plaintiff seeks the recovery of attorneys' fees and costs that it incurs in prosecuting the above-stated claims pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, or any other applicable law.

## VII.

## CONDITIONS PRECEDENT

87. All conditions precedent to Plaintiff's right to obtain the relief requested herein have been performed or have occurred.

## VIII.

## PRAYER

WHEREFORE, Plaintiff Centurion Logistics LLC, individually and on behalf of Centurion Pecos Terminal LLC, respectfully requests that upon final trial of this cause the Court enter judgment against James Ballengee, Ballengee Interests, LLC, John Calce, Stampede TX Energy, LLC, Centurion Midstream Group, LLC and Centurion Terminals, LLC as follows:

A. Against all Defendants and in favor of Plaintiff for the amount of actual damages sustained by Plaintiff;

B. Against all Defendants and in favor of Plaintiff for the disgorgement of unjust enrichment and money had and received;

C. Entering a declaratory judgment concerning the status of Stampede under the Company Agreement and the enforceability of certain financial obligations that Calce, without

MR.022

authority, and in violation of his fiduciary duties, purported to enter into on behalf of Centurion Pecos;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper, at law or in equity.

Respectfully Submitted,

_____*/s/ C. Gregory Shamoun*_____
**C. GREGORY SHAMOUN**
State Bar No. 18089650
**J. BLAIR NORRIS**
State Bar No. 24014515
**SHAMOUN & NORMAN, LLP**
1755 Wittington Place, Suite 200
Dallas, Texas  75234
Phone: (214) 987-1745
Fax:    (214) 521-9033
Email:  g@snlegal.com
Email:  bn@snlegal.com

**ATTORNEYS FOR PLAINTIFF**

FILED
DALLAS COUNTY
7/31/2017 5:52 PM
FELICIA PITRE
DISTRICT CLERK

Angie Avina

CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC, JOHN CALCE, | § | DALLAS COUNTY, TEXAS |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP, | § | |
| LLC, CENTURION TERMINALS, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| Nominal Defendant. | § | 44th JUDICIAL DISTRICT |

### DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC

John Calce ("Counter-Plaintiff" or "Calce") files his Original Counterclaim complaining of Centurion Logistics LLC ("Centurion Logistics") and Centurion Pecos Terminal LLC ("Centurion Pecos") (collectively, "Counter-Defendants") and, in support thereof, would respectfully show the Court as follows:

### I.
### DISCOVERY LEVEL

1. Discovery in this matter is to be conducted under Texas Rule of Civil Procedure 190.4 (Level 3).

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**     **PAGE 1**
9190395.1/SP/38371/0105/073117

MR.024

## II.
## MONETARY RELIEF

2. Calce seeks both monetary and non-monetary relief. The monetary relief sought by Calce is, at this time, $100,000 or less. But the monetary relief sought by Calce continues to increase as he is required to incur additional expenses in defending himself against the claims brought against him in this lawsuit.

## III.
## PARTIES

3. Plaintiff Calce is an individual residing in Collin County, Texas.

4. Counter-Defendant Centurion Logistics is a limited liability company organized under the laws of the State of Texas with its principal place of business in Dallas, Dallas County, Texas. Centurion Logistics has made an appearance in this matter.

5. Counter-Defendant Centurion Pecos is a limited liability company organized under the laws of the State of Texas with its principal place of business in Dallas, Dallas County, Texas. Centurion Pecos has made an appearance in this matter through Centurion Logistics bringing claims against Calce and the other Defendants derivatively on behalf of Centurion Pecos.

## IV.
## JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

7. Calce asserts that Dallas County is not a proper venue for this lawsuit pursuant to Section 15.011 of the Texas Civil Practice and Remedies Code. The bases for such assertion are set forth in Calce's Motion to Transfer Venue. The Motion to Transfer Venue has been denied and is an interlocutory order.

MR.025

## FACTUAL BACKGROUND

8.      On June 27, 2016, Centurion Logistics, individually and derivatively on behalf of Centurion Pecos, filed its Original Petition complaining of Calce and the other Defendants. Centurion Logistics has brought claims against Calce for (1) breach of fiduciary duty; (2) unjust enrichment; and (3) aiding and abetting fraudulent concealment.

9.      Plaintiff generally claims that Calce and the other Defendants carried out a scheme that resulted in Centurion Pecos and Centurion Logistics losing their interest in the Reeves County Property, thereby allegedly depriving such entities of the opportunity to construct a railway terminal for the shipping of crude oil on the Reeves County Property.[1] Among other things, Plaintiff alleges that Calce breached the fiduciary duties that he allegedly owed Centurion Logistics as a manager of the company. *See* Pl.'s Orig. Pet. ¶¶ 36 – 42. Plaintiff further claims that Calce took various allegedly unauthorized acts on behalf of Centurion Pecos. *See id.* ¶ 24.

10.      On September 20, 2016, Calce filed his Motion to Transfer Venue and Brief in Support Thereof and, Subject Thereto, Original Answer. Since the time of filing his Original Answer, Calce has incurred significant expenses in defending against the claims that have been brought against him in the lawsuit.

### CALCE'S RIGHT TO INDEMNIFICATION FROM CENTURION LOGISTICS

11.      Calce is a manager of Centurion Logistics. Section 1.1 of the Company Agreement of Centurion Logistics (the "Logistics Agreement") defines an "Indemnified Person" as follows:

> "Indemnified Person" means (a) a Member or Assignee; (b) ***a Manager***; (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a

---

[1] The term "Reeves County Property," when used herein, should be understood to have the same meaning as the term is used and defined in Plaintiff's Original Petition.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 3**
9190395.1/SP/38371/0105/073117

MR.026

Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1.

*See* Section 1.1 of the Logistics Agreement (emphasis added). A true and correct copy of the Logistics Agreement is attached hereto as Exhibit A.

12.     Section 6.2 of the Logistics Agreement is entitled "Indemnification by Company" and provides as follows:

To the fullest extent permitted by applicable law, and subject to Section 6.3, [Centurion Logistics] indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business or for any misconduct or negligence on the part of any other person that is an employee or agent of [Centurion Logistics]. ***An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.*** The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

*See* Ex. A § 6.2 (emphasis added).

13.     Under the terms of the Logistics Agreement, Centurion Logistics is required to reimburse Calce for any and all expenses paid or incurred by Calce in defending himself in this lawsuit—***as such expenses are paid or incurred***. If it is ultimately determined that Calce is not entitled to indemnification, the Logistics Agreement expressly provides Centurion Logistics with an appropriate remedy. *See* Ex. A § 6.3(c) (providing that "[a]ny payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to [Centurion Logistics].").

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 4**
9190395.1/SP/38371/0105/073117

MR.027

14.      To date, Centurion Logistics has not reimbursed Calce any amount for the expenses he has paid and incurred in defending himself against the claims brought against him in this lawsuit.

<u>**CALCE'S RIGHT TO INDEMNIFICATION FROM CENTURION PECOS**</u>

15.      When Centurion Pecos was initially formed, Calce was the sole manager of the company. *See* the Company Agreement of Centurion Pecos (the "Pecos Original Agreement"), which is dated effective September 12, 2014, a true and correct copy of which is attached hereto as Exhibit B. Calce was also appointed as the president of Centurion Pecos. Such appointment was effective as of September 11, 2014.

16.      In November 2014, the First Amended and Restated Company Agreement of Centurion Pecos (the "Pecos Amended Agreement") was executed. A true and correct copy of the Pecos Amended Agreement is attached hereto as Exhibit C. The First Amended and Restated Company Agreement removed Calce as a manager of Centurion Pecos, but Calce remained the duly appointed president of the company.

17.      Section 1.1 of both the Pecos Original Agreement and the Pecos Amended Agreement defines an "Indemnified Person" as follows:

> "<u>Indemnified Person</u>" means (a) a Member or Assignee; (b) *a Manager*; (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) *any governing person, officer, employee, agent, or owner of the [Centurion Pecos]*, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in <u>Article VI</u> or at the time any amendment to this Agreement is proposed under <u>Section 15.1</u>, provided such person had the status required to be an Indemnified Person at the time of the relevant actions referenced in the Proceeding.

*See* Ex. B § 1.1 (emphasis added); *see also* Ex. C § 1.1 (emphasis added).

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**                    **PAGE 5**
9190395.1/SP/38371/0105/073117

MR.028

18.     Moreover, Section 6.2 of both the Pecos Original Agreement and the Pecos Amended Agreement is entitled "Indemnification by Company" and provides as follows:

> To the fullest extent permitted by applicable law and subject to Section 6.3, [Centurion Pecos] indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Pecos'] business or to any act or omission by such Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of [Centurion Pecos'] business or for any misconduct or negligence on the part of any other person that is an employee or agent of [Centurion Pecos]. ***An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.*** The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, vote of Members, or otherwise.

*See* Ex. B § 6.2 (emphasis added); *see also* Ex. C § 6.2 (emphasis added).

19.     Like the Logistics Agreement, the terms of the Pecos Original Agreement and the Pecos Amended Agreement require Centurion Pecos to reimburse Calce for any and all expenses paid or incurred by Calce in defending himself in this lawsuit, ***as such expenses are paid or incurred***. Furthermore, also like the Logistics Agreement, both the Pecos Original Agreement and the Pecos Amended Agreement provide Centurion Pecos with an adequate remedy if it is ultimately determined that Calce is not entitled to indemnification. *See* Exs. B and C § 6.3(c) (providing that "[a]ny payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to [Centurion Pecos].").

20.     To date, Centurion Pecos has not reimbursed Calce any amount for the expenses that he has paid and incurred in defending himself against the claims brought against him in this lawsuit.

21.     The Pecos Amended Agreement identifies Centurion Logistics and Defendant Stampede TX Energy, LLC ("Stampede") as the only members of Centurion Pecos. Pursuant to the Pecos Amended Agreement, Stampede is the majority-in-interest member holding a 60%

MR.029

membership interest in Centurion Pecos, and Centurion Logistics holds the remaining 40% membership interest.

22. Stampede—on behalf of Centurion Pecos—has already agreed that Centurion Pecos will reimburse Calce for the amount of expenses that he has paid or incurred (or will pay and incur) in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos. But Centurion Logistics claims that Stampede was removed as a manager of Centurion Pecos on June 13, 2016. Stampede disputes the propriety of the alleged removal and does not recognize same. Accordingly, Calce's claim for contractual indemnification and funding of defense costs against Centurion Pecos is significantly intertwined with and dependent upon the outcome of the competing declaratory judgment claims of Stampede and Centurion Logistics regarding which entity has control of Centurion Pecos.

### VI.
### CAUSES OF ACTION

### COUNT 1: DECLARATORY JUDGMENT

23. Calce restates and incorporates the allegations contained in the preceding paragraphs.

24. As shown by the facts set forth above, Calce is entitled to indemnification from Centurion Logistics and Centurion Pecos pursuant to the terms of such entities' own company agreements. Calce is further entitled to reimbursement of the expenses he has paid and incurred (and those that he will pay and incur in the future), as such expenses are paid and incurred, in defending himself against the claims brought against him in this lawsuit.

25. Calce therefore seeks a judicial determination that:

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 7**
9190395.1/SP/38371/0105/073117

MR.030

(a)    Centurion Logistics is required to reimburse Calce the amount of expenses that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics;

(b)    Centurion Logistics is required to reimburse Calce the amount of expenses that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics;

(c)    In the unlikely event that any liability be found on the part of Calce, Centurion Logistics is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Logistics Agreement);

(d)    Centurion Pecos is required to reimburse Calce the amount of expenses that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos;

(e)    Centurion Pecos is required to reimburse Calce the amount of expenses that he pays or incurs in the future in defending himself against the claims brought

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 8**
9190395.1/SP/38371/0105/073117

MR.031

against him in this lawsuit that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos; and

(f)     In the unlikely event that any liability be found on the part of Calce, Centurion Pecos is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Pecos Original Agreement and Pecos Amended Agreement).

## COUNT 2: BREACH OF CONTRACT (CENTURION LOGISTICS)

26.     Calce restates and incorporates the allegations contained in the preceding paragraphs.

27.     The Logistics Agreement constitutes a valid and enforceable contract. Centurion Logistics breached the Logistics Agreement by failing to reimburse Calce the amount of expenses he has paid and incurred in defending himself against the claims brought against him in this lawsuit that relate to either (1) the business of Centurion Logistics and/or (2) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics. Calce performed, tendered performance of, or was excused from performing any of his obligations under the Logistics Agreement.

28.     As a result of Centurion Logistics' breach, Calce has suffered actual damages. Calce is entitled to recover such damages from Centurion Logistics.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 9**
9190395.1/SP/38371/0105/073117

MR.032

## COUNT 3: BREACH OF CONTRACT (CENTURION PECOS)

29.     Calce restates and incorporates the allegations contained in the preceding paragraphs.

30.     The Pecos Original Agreement and the Pecos Amended Agreement constitute valid and enforceable contracts.  Centurion Pecos breached the Pecos Original Agreement and the Pecos Amended Agreement by failing to reimburse Calce the amount of expenses he has paid and incurred in defending himself against the claims brought against him in this lawsuit that relate to either (1) the business of Centurion Pecos and/or (2) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos or as the president of Centurion Pecos.  Calce performed, tendered performance of, or was excused from performing any of his obligations under the Pecos Original Agreement and the Pecos Amended Agreement.

31.     As a result of Centurion Pecos' breach, Calce has suffered actual damages.  Calce is entitled to recover such damages from Centurion Pecos.

## VII.
## ATTORNEYS' FEES

32.     Calce restates and incorporates the allegations contained in the preceding paragraphs.

33.     Pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code, Calce seeks an award of his reasonable and necessary attorneys' fees and costs incurred in prosecuting his declaratory judgment claim and for any appeal.

34.     Calce is further entitled to and hereby requests judgment for his reasonable and necessary attorneys' fees incurred in bringing this counterclaim and for any appeal pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.  Calce either has or will present

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 10**
9190395.1/SP/38371/0105/073117

MR.033

his claim to Plaintiff or to a duly authorized agent of Plaintiff in accordance with Section 38.002 of the Texas Civil Practice and Remedies Code.

## VIII.
## CONDITIONS PRECEDENT

35.    All conditions precedent to maintaining this action have occurred and been satisfied or have been excused or waived.

## IX.
## PRAYER

Counter-Plaintiff John Calce requests that, upon final hearing, Calce have judgment against Counter-Defendants Centurion Logistics LLC and Centurion Pecos Terminal LLC as follows:

1.    A declaration that Centurion Logistics is required to reimburse Calce the amount of expenses that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics;

2.    A declaration that Centurion Logistics is required to reimburse Calce the amount of expenses that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics;

3.    A declaration that, in the unlikely event that any liability be found on the part of Calce, Centurion Logistics is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Logistics Agreement);

4.    A declaration that Centurion Pecos is required to reimburse Calce the amount of expenses that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of

MR.034

Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos;

5.  A declaration that Centurion Pecos is required to reimburse Calce the amount of expenses that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos;

6.  A declaration that, in the unlikely event that any liability be found on the part of Calce, Centurion Pecos is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Pecos Original Agreement and Pecos Amended Agreement);

7.  Judgment against Centurion Logistics for the amount of expenses, including attorneys' fees, paid or incurred by Calce in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics;

8.  Judgment against Centurion Pecos for the amount of expenses, including attorneys' fees, paid or incurred by Calce in defending himself against the claims brought against him in this lawsuit that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos;

9.  Judgment against Counter-Defendants for Calce's reasonable and necessary attorneys' fees incurred in pursuing this counterclaim;

10. Judgment against Counter-Defendants for pre- and post-judgment interest as provided by law;

11. Judgment against Counter-Defendants for Calce's costs of suit; and

12. Such other and further relief to which Calce may be justly entitled.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**      **PAGE 12**
9190395.1/SP/38371/0105/073117

MR.035

Respectfully submitted,

_/s/ David N. Kitner_

**DAVID N. KITNER**
State Bar No. 11541500
david.kitner@strasburger.com
**CHASE J. POTTER**
State Bar No. 24088245
chase.potter@strasburger.com
**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 6000
Dallas, TX 75202-3794
(214) 651-4300
(214) 651-4330 Fax

**ATTORNEYS FOR DEFENDANTS
JOHN CALCE, CENTURION MIDSTREAM
GROUP, LLC, CENTURION TERMINALS,
LLC, AND STAMPEDE TX ENERGY, LLC**

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 31st day of July, 2017, a true and correct copy of the foregoing was forwarded to all known counsel in compliance with the Texas Rules of Civil Procedure.

_/s/ Chase J. Potter_

Chase J. Potter

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S ORIGINAL COUNTERCLAIM
AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC** **PAGE 13**
9190395.1/SP/38371/0105/073117

MR.036

# EXHIBIT A

MR.037

COMPANY AGREEMENT

OF

Centurion Logistics LLC

a Texas Limited Liability Company

Effective September 16, 2013

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED ABSENT SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE TRANSFER OF MEMBERSHIP INTERESTS IS FURTHER RESTRICTED BY ARTICLE X OF THIS AGREEMENT.

CALMR.038

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................................... 1
    1.1.    Defined Terms ........................................................................................... 1
    1.2.    Usage ......................................................................................................... 4

ARTICLE II ORGANIZATIONAL MATTERS ......................................................................... 5
    2.1.    Formation .................................................................................................. 5
    2.2.    Name ......................................................................................................... 5
    2.3.    Registered Office and Agent; Principal Office ........................................ 5
    2.4.    Term ......................................................................................................... 5
    2.5.    Purposes ................................................................................................... 5
    2.6.    Powers ...................................................................................................... 5
    2.7.    Company Property .................................................................................... 5
    2.8.    Initial Members ........................................................................................ 6
    2.9    Options to Acquire Additional Units ....................................................... 6
    2.10    Consent of Managers ............................................................................... 6
    2.11.    Status of Managers and Members ............................................................ 6
    2.12.    Unit Certificates ...................................................................................... 6
    2.13.    No State Law Partnership ......................................................................... 6

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS .................................. 6
    3.1.    Initial Capital Contributions .................................................................... 6
    3.2.    Additional Capital Contributions ............................................................ 6
    3.3.    Capital Accounts ...................................................................................... 7
    3.4.    No Right to Return of or Interest on Capital Account ............................. 7
    3.5.    Member Loans .......................................................................................... 7
    3.6.    Member Notes .......................................................................................... 7

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS ......................................................... 8
    4.1.    Allocation of Profit or Loss .................................................................... 8
    4.2.    Distributions of Distributable Cash ......................................................... 8
    4.3.    Withholding ............................................................................................. 8
    4.4.    Limitation on Distributions ..................................................................... 8
    4.5.    No Right to Partition or Distributions in Kind ........................................ 9

ARTICLE V MANAGEMENT ................................................................................................... 9
    5.1.    Management and Control of Company Business ...................................... 9
    5.2.    Delegation of Authority ......................................................................... 10
    5.3.    Limitations on Manager Authority ........................................................ 10
    5.4.    Reliance .................................................................................................. 10
    5.5.    Compensation and Expenses of Members and Managers ...................... 10
    5.6.    Standards of Manager and Member Conduct ......................................... 10

CALMFR.039

| 5.7. | Resignation, Removal, and Replacement of Manager | 11 |

**ARTICLE VI LIABILITY AND INDEMNIFICATION** ... 13
| 6.1. | Limitation of Liability | 13 |
| 6.2. | Indemnification by Company | 13 |
| 6.3. | Conduct Not Protected | 13 |
| 6.4. | Insurance | 14 |
| 6.5. | Survival | 14 |

**ARTICLE VII BOOKS AND RECORDS; REPORTS** ... 14
| 7.1. | Maintenance of and Access to Books and Records | 14 |
| 7.2. | Fiscal Year | 14 |
| 7.3. | Financial and Operating Reports | 14 |
| 7.4. | Tax Reports | 15 |
| 7.5. | Transmission of Communications | 15 |

**ARTICLE VIII TAX MATTERS** ... 15
| 8.1. | Tax Classification | 15 |
| 8.2. | Company Returns | 15 |
| 8.3. | Tax Elections | 15 |
| 8.4. | Consistent Reporting | 16 |
| 8.5. | Tax Proceedings | 16 |
| 8.6. | Information and Documents to Company | 16 |

**ARTICLE IX MEETINGS AND VOTING OF MEMBERS** ... 17
| 9.1. | Meetings | 17 |
| 9.2. | Voting | 17 |

**ARTICLE X TRANSFER OF MEMBERSHIP INTERESTS** ... 17
| 10.1. | Limitation on Transfers | 17 |
| 10.2. | Permitted Transfer of Membership Interest | 18 |
| 10.3. | Conditions to Permitted Transfers of Membership Interests | 19 |
| 10.4. | Effective Date; Distributions | 19 |
| 10.5. | Transferor's Obligations | 20 |
| 10.6. | Assignee's Rights and Obligations | 20 |
| 10.7. | Effect and Consequences of Prohibited Transfer | 20 |
| 10.8. | Agreements of Spouse; Sole Management Community Property | 21 |

**ARTICLE XI ADMISSION OF NEW MEMBERS** ... 21
| 11.1. | Substituted Members | 21 |
| 11.2. | Additional Members | 22 |

**ARTICLE XII WITHDRAWAL OR REMOVAL OF MEMBERS** ... 22
| 12.1. | Withdrawal of Members | 22 |
| 12.2. | Removal of Members | 23 |

1150848v2 2/12/2014

CALMR.0440

12.3.     Optional Redemption of Membership Interest ........................................ 24
12.4.     Status of Former Member ..................................................................... 24

**ARTICLE XIII  WINDING UP AND TERMINATION ....................................... 24**
13.1.     Events Requiring Winding Up ............................................................... 24
13.2.     Winding Up Procedures ......................................................................... 24
13.3.     Continuation Without Winding Up ....................................................... 25
13.4.     Liquidation of Assets and Application and Distribution of Proceeds ...... 25
13.5.     Certificate of Termination ..................................................................... 26
13.6.     Reinstatement ....................................................................................... 26

**ARTICLE XIV  VALUATION .......................................................................... 26**
14.1.     Fair Value of Company Property ........................................................... 26
14.2.     Fair Value of Membership Interest ........................................................ 27

**ARTICLE XV  GENERAL PROVISIONS ......................................................... 28**
15.1.     Amendments .......................................................................................... 28
15.2.     Notice .................................................................................................... 28
15.3.     Governing Law; Consent to Jurisdiction ............................................... 29
15.4.     Waiver ................................................................................................... 29
15.5.     Entire Agreement .................................................................................. 29
15.6.     Successors and Assigns ......................................................................... 29
15.7.     Third-Parties ......................................................................................... 29
15.8.     Severability ........................................................................................... 29
15.9.     Construction .......................................................................................... 29
15.10.    Execution of Agreement ........................................................................ 30
15.11.    Further Assurances ................................................................................ 30
15.12.    Power of Attorney ................................................................................. 30

**EXHIBIT A  MEMBERS' CONTRIBUTIONS AND PERCENTAGE INTERESTS ........ 32**

**EXHIBIT B  SPOUSAL JOINDER AND CONSENT ............................................. 1**

**APPENDIX A  PRINCIPLES OF ALLOCATION ............................................. A-1**
A.1      Introduction ......................................................................................... A-1
A.2      Definitions ........................................................................................... A-1
A.3      Capital Accounts ................................................................................. A-4
A.4      Allocations of Net Profit and Net Loss ................................................ A-5
A.5      Tax Allocations .................................................................................... A-8

1150848v2 2/12/2014

CALVFR.0481

# COMPANY AGREEMENT
## OF
## CENTURION LOGISTICS LLC

This agreement ("Agreement") is entered into effective as of September 18, 2013 (the "Effective Date"), by the persons identified on the signature page(s) hereof.

## RECITALS

A.     The Company was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Texas effective as of September 16, 2013.

B.     The parties desire to provide for the regulation and management of the affairs of the Company according to this Agreement and the Code.

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.     Defined Terms.

The following definitions and the definitions set forth in Appendix A to this Agreement, apply to the terms used in this Agreement for all purposes.

"Additional Capital Contribution" means the sum of cash and the Fair Value of any property contributed to the Company with respect to a Membership Interest as permitted under this Agreement, but does not include an Initial Capital Contribution.

"Additional Member" means a person who acquires a Membership Interest from the Company in exchange for a Capital Contribution and is admitted to the Company as a Member pursuant to Section 11.2 after the Effective Date.

"Affiliate" means a person who directly or indirectly controls, is controlled by, or is under common control with the person in question.

"Agreement" means this Agreement, as it may be amended, supplemented or restated from time to time.

"Assignee" means a person to whom a Membership Interest has been transferred by a Member or Assignee in a Permitted Transfer, or in a Prohibited Transfer that the Company is required by law to recognize, but who has not become a Member.

"Capital Contribution" means the sum of the Initial Capital Contribution and Additional Capital Contributions, if any, with respect to a Membership Interest.

CALVER.0142

"Certificate of Formation" means the certificate of formation filed with respect to the Company as provided in Section 2.1, as such certificate may be corrected, amended, or restated.

"Certificate of Membership Interest" means a certificate representing each Member's Membership Interest in a form approved by the Managers.

"Code" means the Texas Business Organizations Code, as amended from time to time, and any successor law.

"Company" means the limited liability company formed pursuant to the Certificate of Formation.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

"Damages" means any expense or loss (including any court costs, judgment, or settlement payment, penalty, fine, tax, and reasonable attorney's fees or other dispute resolution costs) paid or incurred in connection with or as a consequence of any Proceeding, net of any insurance or other recoveries received by the Indemnified Party with respect to the foregoing.

"Distributable Cash" means the cash and cash equivalents held by the Company (determined in accordance with its accounting policies for reporting cash flows), less any amount of such cash that the Managers determine should be retained for the reasonable current and future needs of the Company business.

"Effective Date" means the effective date of this Agreement as set forth in the introduction to this Agreement.

"Fair Value" means, with respect to an asset, its Fair Value determined according to Article XIV.

"Formation Date" means the effective date of the original Certificate of Formation of the Company.

"Indemnified Person" means (a) a Member or Assignee; (b) a Manager, (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1.

"Index Rate" means the rate specified in section 302.002 of the Texas Finance Code.

CALVFR.0143

"Initial Capital Contribution" means the sum of any cash and the Fair Value of any property contributed to the Company by a Member with respect to a Membership Interest in connection with the original issuance of the Membership Interest by the Company as set forth on Exhibit A or determined pursuant to Section 11.2.

"Initial Members" is defined in Section 2.8.

"I.R.C." means the Internal Revenue Code of 1986, as amended, or any successor thereto.

"Liquidator" is defined in Section 13.2(b).

"Manager" means the person designated as manager of the Company in the Certificate of Formation, any person who becomes a Manager hereunder, including a replacement Manager, and the Members when they are acting pursuant to Section 5.7(e), in each case in such person's capacity as Manager and for the period that such person has such capacity. "Managers" means all persons that are designated as a Manager, collectively.

"Mandatory Distribution" means any distribution that a Member is entitled to receive and as to which the Member has attained the status of a creditor under Section 101.207 of the Code.

"Member" means any person identified as a member on Exhibit A, and any other person who becomes a member of the Company pursuant to this Agreement, who has not ceased to be a Member. "Members" means all persons that are Members, collectively.

"Member Notes" is defined in Section 3.6.

"Membership Interest" means a Member's or Assignee's economic interest in the Company. The term includes the Member's or Assignee's right to receive allocations of profits and losses and distributions as described in Article IV, and other rights and obligations under this Agreement or the Code of an Assignee who has not been admitted as a Member, but does not include any right to participate in management or any other right reserved under this Agreement or the Code exclusively to a Member.

"Percentage Interest" means, as to any Member or Assignee, the Membership Interest of the Member or Assignee expressed as a percentage, which percentage shall be determined from time to time by dividing the number of Units held by such Member or Assignee by the Units held by all Members and Assignees.

"Permitted Transfer" means any transfer of a Membership Interest that is described in Section 10.2.

"Proceeding" means (a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding; and (c) an inquiry or investigation that could lead to any such proceeding.

CALVFR.0144

"Prohibited Transfer" means any transfer of a Membership Interest that is not a Permitted Transfer.

"Requisite Percentage" means one or more Members owning more than seventy five percent (75.0%) of the Percentage Interests owned by all Members entitled to vote on the particular issue.

"Substituted Member" means a person who is admitted as a Member to the Company pursuant to Section 11.1 with respect to the transfer of an existing Membership Interest.

"Units" means units of Membership Interest in the Company.

1.2.  Usage.

In this Agreement, unless a clear contrary intention appears:

(a)    the singular number includes the plural number and vice versa;

(b)    reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually;

(c)    reference to any gender includes the other gender and the neuter;

(d)    reference to any agreement or other document means such agreement or other document as amended or modified and in effect from time to time;

(e)    reference to any statute, regulation, or other legal requirement means such legal requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)    "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)    "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)    "or" is used in the inclusive sense of "and/or";

(i)    with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

CALVFR.0445

(j)     references to agreements or other documents refer as well to all addenda, exhibits, schedules, or amendments thereto.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1.     Formation. The Company was formed pursuant to the Certificate of Formation of the Company filed with the Texas Secretary of State effective as of the Formation Date.

2.2.     Name. The Company's name is as set forth in the Certification of Formation. The Managers may change the Company name at any time without the approval of any Member by filing a Certificate of Amendment. The Managers shall provide notice of the change to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Managers. The Managers shall cause to be executed and filed of record all assumed or fictitious name certificates required by law.

2.3.     Registered Office and Agent; Principal Office.

(a)     The street address of the initial registered office of the Company in Texas and the name of the initial registered agent of the Company are as set forth in the Certificate of Formation. The Managers may change the Company's registered office or registered agent at any time by filing a Change of Registered Agent and/or Registered Office as provided in the Code. The Managers shall provide notice of the change to all Members.

(b)     The address of the principal office of the Company in the United States where records are to be kept or made available under Section 101.501 of the Code shall be as determined by the Managers. The Managers may change the Company's principal office in the United States at any time upon notice to the Members. The Company shall keep at its registered office and make available to a Member on reasonable request the street address of the Company's principal office in the United States.

2.4.     Term. The Company will exist perpetually and will continue until terminated in accordance with Article XIII.

2.5.     Purposes. The purposes of the Company are to engage in any activities that are permitted under applicable laws.

2.6.     Powers. Subject to any limitations in this Agreement, the Company may exercise the power to do any and all acts reasonably related to its purposes.

2.7.     Company Property.

(a)     All Company property shall be owned in the name of the Company and not in the name of any Member. No Member or Assignee will have any interest in such Company property solely by reason of the Member's status as a Member.

CALDER.0146

(b)    The Managers shall deposit or invest all funds of the Company in an account or accounts in the name of the Company. No funds other than the funds of the Company may be deposited therein. The funds in such accounts shall be used exclusively for the business of the Company (including distributions to the Members) and may be withdrawn only by persons approved by the Managers.

2.8.    Initial Members. In connection with the formation of the Company, the persons executing this Agreement as of the Effective Date ("Initial Members") are admitted to the Company as Members. The number of Units held by each of the Initial Members as of the Effective Date are set forth next to the Initial Members' names on Exhibit "A."

2.9.    Consent of Members. Each person executing this Agreement consents to the admission as members in the Company all of the Initial Members and all other persons who are Members as of the date such person executes this Agreement and further consents to the issuance of additional Units as provided in Section 2.9.

2.10.    Status of Managers and Members. Except as otherwise provided by this Agreement, the Managers have the status, rights, and obligations of a manager in a limited liability company as set forth in the Code, and each Member has the status, rights, and obligations of a member in a limited liability company as set forth in the Code.

2.11.    Unit Certificates. Each Member's Units may be represented by a Unit Certificate. If Unit Certificates are issued, each Unit Certificate shall be numbered and registered in the records of the Company as they are issued, and signed by any of the Managers. The holder of any Unit Certificate shall promptly notify the Company of any loss or destruction of the certificate, and the Managers shall cause a replacement certificate to be issued to the holder upon receipt of satisfactory evidence of the loss, destruction, or mutilation or the certificate and satisfaction of other reasonable conditions.

2.12.    No State Law Partnership. The Members intend that the Company is not a partnership or joint venture, and that no Manager or Member is a partner or a joint venturer of any other Manager or Member for any purposes other than income tax purposes. No provision of this Agreement may be construed to suggest otherwise.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1.    Initial Capital Contributions. Each Member's Initial Capital Contribution is set forth on Exhibit A.

3.2.    Additional Capital Contributions. A Member is not required to make Additional Capital Contributions to the Company. No Member has the right or is permitted to make Additional Capital Contributions unless (a) all of the Managers and a Requisite Percentage approves such Additional Capital Contribution after notice to all Members of (i) the amount of the Additional Capital Contribution to be made and (ii) other material information relevant to the

CALMR.0487

proposed Additional Capital Contribution, and (b) all Members are afforded an opportunity to participate in the Additional Capital Contribution in accordance with their relative Percentage Interests.

3.3.  Capital Accounts.  The Company shall establish a separate Capital Account for each Member and Assignee.  The Capital Accounts shall be maintained according to the provisions of Appendix A.

3.4.  No Right to Return of or Interest on Capital Account.  No Member may demand or receive the return of its Capital Contribution or any portion of its Capital Account, except as provided in this Agreement and the Code.  The Managers do not have any personal liability for the repayment of any Capital Contributions of any Member.  No interest will accrue or be paid with respect to the Capital Contributions or Capital Account of any Member.

3.5.  Member Loans.  Subject to the approval of all of the Managers, the Company may borrow money from one or more Members to the extent the Managers deem appropriate to the conduct of the Company business on terms that comply with the requirements of Section 5.6(c) (relating to related party transactions).  The amount of any loan made to the Company by a Member will not constitute a Capital Contribution or otherwise affect such Member's Capital Account or Membership Interest.

3.6.  Member Notes.  In connection with the execution of this Agreement, the Company expects to issue promissory notes to certain Members in connection with assets that the Members have transferred to the Company or expenses that the Members have incurred on behalf of the Company ("Member Notes").  For federal income tax purposes, the Members intend that each Member Note be characterized as a preferred membership interest (equity) in the Company, that a holder's right to any interest or original issue discount on the Member Note be characterized as a right to a distributive share of Company income and not as a guaranteed payment under I.R.C. Section 707(c), and that all payments with respect to the Member Note be characterized as a distribution with respect to a membership interest. Allocations of profit or loss and tax items as provided in Section 4.1 and Section A.5 of Appendix A shall be adjusted as necessary, as determined by the Managers, to reflect the preferred membership interest deemed to be held by the holders of the Member Notes. For this purpose, the Members intend that only net profit or net loss, and only net taxable income or loss (rather than items thereof), for any allocation period will be allocated with respect to the Member Notes.  For example, if there is net taxable income for the period from the issue date of the Member Notes through the end of 2009, it is intended that such net taxable income will be allocated to the Member Notes holders to the extent of any accrued interest or original issue discount on the Member Notes, and if there is a net taxable loss for such period, it is intended that such net taxable loss will be allocated first to the Members to the extent of their Capital Contributions and then to the holders of the Member Notes.

CALVER.0148

# ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.1. Allocation of Profit or Loss. Subject to Section 3.6, Company profits and losses shall be allocated among the Members and Assignees in accordance with the provisions of Appendix A or as is determined by the Managers. The Members are aware of the income tax consequences of the allocations.

4.2. Distributions of Distributable Cash.

(a) Except as otherwise provided in Section 4.3 (relating to withholding), Section 4.4 (relating to limitations on distributions), or Section 13.4 (relating to liquidating distributions), any Distributable Cash shall be distributed not later than the 30th day after the end of each fiscal quarter to the Members and Assignees according to their Percentage Interests unless otherwise determined by the Managers. The Managers may provide for a record date with respect to distributions.

(b) To the extent it may lawfully do so, the Company shall make distributions to Members and Assignees in accordance with Section 4.2(a) and Section 13.4(a)(iii) at such times and in such amounts as the Managers determine is sufficient to enable Members and Assignees to make payments of tax due (including any applicable interest and penalties) with respect to their allocable shares of the Company's taxable income. Unless the Managers determine otherwise, the taxes due for each Member and Assignee shall be calculated by assuming that the Member or Assignee is an individual taxed at the highest tax rate applicable to the type of income involved.

4.3. Withholding. The Company shall withhold from distributions, or pay on behalf of a Member or Assignee, all amounts that the Managers determine the Company is required to withhold or pay on behalf of such person (including federal and state income tax withholding). All amounts so withheld from distributions are deemed to have been distributed to the person otherwise entitled to receive the amount so withheld. To the extent an amount is paid by the Company on behalf of a Member or Assignee but not withheld from a distribution, the amount paid constitutes a loan to such Member or Assignee. Such loan bears interest at the Index Rate and is repayable on demand or, at the election of the Managers, is repayable out of distributions to which such Member or Assignee would otherwise be entitled.

4.4. Limitation on Distributions.

(a) The Company may not make a distribution to a Member or Assignee if it would render the Company insolvent, determined in accordance with Section 101.206 of the Code. A Member or Assignee who receives a distribution in violation of Section 101.206 of the Code is not required to return the distribution except as required in Section 101.206 of the Code.

(b) The Members shall look solely to the assets of the Company for any distributions, including liquidating distributions. If the assets of the Company remaining after the payment or

discharge, or the provision for payment or discharge, of the Company liabilities are insufficient to make any distributions, no Member has any recourse against the separate assets of any other Member.

4.5.     No Right to Partition or Distributions in Kind. No Member has any right, and waives any right that it might otherwise have, to cause any Company property to be partitioned and/or distributed in kind. Except as provided in Section 13.4(d) (relating to liquidating distributions), the Company may not make any distributions in kind.

# ARTICLE V
# MANAGEMENT

5.1.     Management and Control of Company Business.

(a)     Subject to the limitations set forth in this Agreement, the Managers have exclusive authority to manage and conduct the Company's business. The Managers shall do all things appropriate to carry out the Company's purpose. Except as otherwise provided in this Agreement, all actions that the Managers may take and all determinations that the Managers may make pursuant to this Agreement may be taken and made in the absolute discretion of the Managers.

(b)     The initial Managers of the Company are: John Calce, Antonio Albanese, and Marc Marrocco. Each Manager will serve as a Manager until his successor is appointed pursuant to Section 5.7(f).

(c)     The Members may not take part in the management or control of the Company business or bind the Company in their capacity as Members. A Member may have the status of a Manager or governing person of a Manager or the Company and may possess and exercise the powers and authority associated with such status.

(d)     Meetings of the Managers shall be held from time to time as determined by the Managers. Managers may participate in any meeting by means of video or audio conferencing or similar communications equipment whereby all Managers can hear each other. No notice of any meeting of the Managers is required to be given. At all meetings of Managers, the presence of a majority of the Managers shall be necessary and sufficient to constitute a quorum for the transaction of business unless a greater number is required by this Agreement, law or the Certificate of Formation. Each Manager will have one vote. Except as otherwise provided in this Agreement, the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. If a quorum shall not be present at any meeting of Managers, the Managers present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(e)     Any action required by the Code to be taken at any annual or special meeting of Managers, or any action which may be taken at any annual or special meeting of Managers, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in

CALMR.0450

writing, setting forth the action so taken, shall be signed by Managers having not fewer than the minimum number of votes required to approve such action under the Code, the Certificate or this Agreement. A facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Managers for purposes of this Section 5.1(e).

5.2. Delegation of Authority.

(a) The Managers may cause the Company to hire employees and agents, and may delegate to such persons any of its authority hereunder, as the Managers deems appropriate for the conduct of the Company's business.

(b) The Managers may appoint officers of the Company as the Managers deem appropriate. The officers may be appointed for such terms and may exercise such powers and authority and perform such duties as determined by the Managers. An officer need not be a Member of the Company. Any two or more offices may be held by the same person. Any officer elected or appointed by the Managers may be removed, with or without cause, at any time by the Managers. Each officer will hold office until his successor is chosen and is qualified in his stead, or until his death, resignation, or removal from office. Any vacancy in an office because of death, resignation, removal, or otherwise may be filled by a person appointed by the Managers. An officer has the same fiduciary duties as a Manager as described in Section 5.6.

5.3. Reliance. Persons dealing with the Company may rely conclusively on the authority of the Managers as set forth in this Agreement. Every document executed by a Manager with respect to any business or property of the Company is conclusive evidence in favor of any person relying on the document that (a) at the time of the execution and delivery of the document this Agreement was effective, (b) the document was executed in accordance with this Agreement and is binding upon the Company, and (c) the Manager was authorized to execute and deliver the document on behalf of the Company.

5.4. Compensation and Expenses of Members and Managers. Members and Managers are not entitled to any salary, fee, or other remuneration (other than distributions with respect to the Member's Membership Interest) for providing property or services or other consideration to or for the benefit of the Company in their capacity as a Member or Manager, except that the Managers are entitled to reimbursement from the Company for reasonable out-of-pocket expenses paid or incurred on behalf of the Company. The Company shall pay all out-of-pocket costs incurred in organizing the Company. This Section 5.5 does not limit or enlarge the Manager's or a Member's rights to liability protection or indemnification under Article VI, and does not limit the Company's ability to enter into transactions with Members in their capacities other than as Members in accordance with Section 5.6(c).

5.5. Standards of Manager and Member Conduct.

(a) In General. Each Manager shall manage and conduct the Company's business in good faith and in a manner the Manager reasonably believes to be in the Company's best

CALVFR.0491

interest. A Manager does not violate its obligations under this Section 5.6(a) or the Code unless the Manager engages in conduct described in Section 6.3(a) (relating to improper conduct).

(b) <u>Outside Activities of Managers and Members</u>. Each Manager shall devote to the Company's affairs only such time and resources as the Managers deem necessary for the conduct and winding up of the Company business. The Managers and Members or their Assignees may engage in or have an interest in other business ventures of every nature and description, independently or with others, including the ownership and operation of businesses similar to or in competition with, directly or indirectly, the Company. Neither the Company nor any Member or Assignee has, solely as a result of such person's interest in the Company, any right to acquire any rights in or to any such other business venture or to the income or profits derived from any such other business venture.

(c) <u>Related Party Transactions</u>. Except as otherwise provided in this Agreement, the Managers, when acting on behalf of the Company, may purchase property from, sell property to, or otherwise deal with any Manager, Member, or Assignee, acting on its own behalf, or any Affiliate of any Manager, Member, or Assignee, but any such transaction shall be on terms that are no less favorable to the Company than if the transaction had been entered into with an independent third party. No provision of this Agreement requires disclosure of any transaction to, and approval of the transaction by, any disinterested governing persons of the Company or the Members as provided in Section 101.255 of the Code.

5.6. <u>Resignation, Removal, and Replacement of Manager</u>.

(a) <u>Resignation</u>. A Manager may resign as manager of the Company only upon notice to all Members. If there is no resignation date specified in the notice, or if the specified date is earlier than 90 days following the date the notice is given to Members ("notice date"), the Manager's resignation is effective on the 90th day following the notice date. If the specified resignation date is later than 180 days after the notice date, the Manager's resignation is effective on the 180th day following the notice date. A Manager is deemed to have resigned as manager of the Company upon the following events:

(i) any event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Manager were a general partner;

(ii) if the Manager is an individual, the Manager's death, the appointment of a guardian or general conservator for the Manager, or a judicial determination that the Manager is incapable of performing the Manager's duties under the Agreement; or

(iii) if the Manager is an entity, the termination of the Manager's existence or suspension of the Manager's right to do business.

(b)     Removal for Cause.  A Manager may be removed as manager of the Company only upon the affirmative vote of a Requisite Percentage if there is cause for removal as specified in Section 5.7(c) and the Company has received a written opinion of counsel that:

(i)     cause for removal as specified in Section 5.7(c) exists; and

(ii)     the removal of the Manager is not prohibited under any loan agreements, contracts, or other applicable legal requirements.

(c)     Definition of Cause.  Cause for removal exists only if one or more of the following conditions has occurred:

(i)     there has been a change in Control of the Manager;

(ii)     a final judgment of a court of competent jurisdiction has been entered that the Manager's removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal or state agency or judicial authority or contained in any federal or state statute.

(d)     Status of Former Manager.  A Manager who has resigned in violation of this Agreement or who has been removed has the status of an Assignee with respect to any Membership Interest held by the former Manager.

(e)     Interim Management.  During the period that the Members may elect a replacement Manager as provided in Section 5.7(f) and prior to such election (or an election to wind up the Company), the Members may by vote of a Requisite Percentage appoint an interim manager having authority to manage and conduct the Company's business as the Manager as provided herein.  If an interim Manager is not appointed, the authority to manage and conduct the Company's business is vested in the Members who may act by vote of a Requisite Percentage, and who may by vote of a Requisite Percentage appoint a committee of one or more persons to exercise the authority of the Manager until such time as a replacement Manager is elected or the Company commences winding up.  The Members shall file any required amendments to this Agreement or the Certificate of Formation to reflect the resignation or removal of the former Manager and the appointment of the interim Manager or the conversion of the Company to a member-managed limited liability company, and all Members approve any such amendments.

(f)     Election of Replacement Manager.  If a Manager dies, is disabled, resigns, or is removed as the manager of the Company, within 90 days following such death, disablement, resignation or removal a Requisite Percentage may elect a replacement Manager of the Company effective as of the date of the former Manager's death, disablement, resignation, or removal. The Managers shall file any required amendments to this Agreement to reflect the death, disablement, resignation, or removal of the former Manager and the election of the replacement Manager.

CALVFR.0453

## ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1. <u>Limitation of Liability</u>. No Member or Manager is liable for any debts, obligations, or liabilities of the Company. Subject to Section 6.3, an Indemnified Person is not liable to the Company or any other Indemnified Person for any Damages arising from any Proceeding relating to the conduct of the Company's business or relating to any act or omission by the Indemnified Person within the scope of the Indemnified Person's authority in the course of the Company's business, including any breach of any fiduciary duties, or for any misconduct or negligence on the part of any other person who is an employee or agent of the Company.

6.2. <u>Indemnification by Company</u>. To the fullest extent permitted by applicable law, and subject to Section 6.3, the Company indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of the Company's business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of the Company's business or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company. An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred. The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

6.3. <u>Conduct Not Protected</u>.

(a) This Article VI does not operate to limit liability or to indemnify a person to the extent the person is found liable pursuant to a final judgment of a court of competent jurisdiction for:

(i) an act or omission that involves gross negligence, intentional misconduct, or a knowing violation of law;

(ii) a transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, a Manager's resignation in violation of Section 5.7(a), or a Member ceasing to be a Member in violation of Section 12.1(a);

(iii) a willful or reckless material breach of this Agreement or any other agreement relating to the Company's business; or

(iv) an act or omission for which indemnification is prohibited by law.

(b) No provision of this Agreement requires the Company to pay or incur any amount for which indemnification is not permitted under this Article VI.

(c) Any payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to the Company. The Company may

CALVFR.0104

require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section 6.3; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

6.4. Insurance. The Company may maintain insurance to protect any person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such person against such expense, liability, or loss under the Code.

6.5. Survival. The indemnities provided for in this Agreement survive the transfer of an Indemnified Person's Membership Interest, the termination of the person's status as a Member or other status giving rise to classification as an Indemnified Person, and the termination of this Agreement and the Company.

## ARTICLE VII
## BOOKS AND RECORDS; REPORTS

7.1. Maintenance of and Access to Books and Records. The Company shall maintain such books and records regarding the Company's business and properties as is reasonable, including all books and records required under the Code. Each Member shall have access thereto during ordinary business hours to the extent and under the conditions provided in the Code.

7.2. Fiscal Year. The Company shall adopt the calendar year as its fiscal year for financial and tax accounting purposes.

7.3. Financial and Operating Reports. As soon as practicable after the end of each fiscal year, but in any event not later than 90 days after the end of the fiscal year, the Managers shall deliver to each Member an annual report containing the following:

(a) a Company balance sheet as of the end of such fiscal year, and Company statements of income, cash flows, and changes in Members' equity for such fiscal year, each in reasonable detail and prepared according to United States generally accepted accounting principles;

(b) a general description of the Company's activities during such fiscal year and business plans for the succeeding year; and

(c) a statement of changes in the Member's Capital Account (showing the balance in the Member's Capital Account as of the beginning of the fiscal year, contributions or distributions during the year, allocations of profits and losses during the year, any other adjustments to the Capital Account balances during the year, and the balance in the Capital Account as of the end of the year).

CALDER.0455

7.4.  Tax Reports.

(a)  Not later than the date (including extensions) for filing the Company's tax return with the Internal Revenue Service (Form 1065), the Managers shall deliver to each person who was a Member or Assignee at any time during the period covered by the return all information necessary for the preparation of such person's United States federal income tax returns, including a Form 1065 Schedule K-1 (if applicable).

(b)  Upon the written request of any Member or Assignee, the Managers shall deliver to such person information necessary for the preparation of any tax returns that must be filed by such person, including information necessary for estimating and paying estimated taxes.

7.5.  Transmission of Communications. Each person who holds a Membership Interest on behalf of, or for the benefit of, another person or persons shall be responsible for conveying any report, notice, or other communication received concerning the Company's affairs to such other person or persons.

## ARTICLE VIII
## TAX MATTERS

8.1.  Tax Classification. The Members intend that the Company be classified as a partnership for federal income tax purposes. The Managers shall take all actions as are or may be reasonably necessary or appropriate to ensure the Company is so classified (including the filing of elections or tax returns). No Manager, officer, or Member shall take any action inconsistent with the classification of the Company as a partnership for federal income tax purposes.

8.2.  Company Returns. The Managers shall cause the Company to file such tax returns as may be required by law.

8.3.  Tax Elections.

(a)  General. Except as otherwise provided in this Agreement, the Managers shall cause the Company to timely make or revoke all elections, and take all tax reporting positions, necessary or desirable for the Company and to maximize the tax benefits to the Members. No election shall be made to have the Company excluded from the application of any provision of Subchapter K of the I.R.C. or any equivalent tax provision in any other tax jurisdiction.

(b)  Section 754 Election. The Company shall make the election referred to in I.R.C. Section 754 upon the request of any Member in connection with a transfer of the Member's Membership Interest.

(c)  Safe Harbor Election for Compensatory Membership Interests. If Proposed Treasury Regulation 1.83-3(l) is adopted as a temporary or final regulation, the Company shall make the safe harbor election described in such regulations, and the Company and each Member

CALDER.0456

(including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the safe harbor with respect to all Membership Interests transferred in connection with the performance of services while the election remains effective. The Managers shall prepare, execute, and file any required documentation to cause the election to be effective. The Managers may terminate the safe harbor election at any time if it determines in good faith that it is in the best interests of the Company and the Members to do so.

8.4. Consistent Reporting. Each Member shall, on the Member's tax returns, treat each partnership item (as defined in I.R.C. Section 6231(a)(3)) in a manner consistent with the treatment of the item on the Company's return in all respects, including the amount, timing, and character of the item. No Member shall file a request for an administrative adjustment of partnership items under I.R.C. Section 6227(a) if such request would cause the Member's treatment of the item to be inconsistent with the treatment of the item on the Company's return.

8.5. Tax Proceedings.

(a) The Managers shall be the Company's tax matters partner as defined in I.R.C. Section 6231, and shall take such actions as are required to be designated the tax matters partner under applicable Treasury Regulations. The tax matters partner shall represent the Company in connection with all examinations of the Company's tax returns by tax authorities, including administrative and judicial proceedings to contest any proposed adjustments. Subject to Section 8.5(c), the tax matters partner has the exclusive right to conduct Proceedings relating to Company taxes and to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. The tax matters partner shall keep the Members informed on a timely basis of all material developments with respect to any such Proceeding. Each Member shall cooperate with the tax matters partner and do or refrain from doing all things reasonably requested by the tax matters partner with respect to the conduct of any Company tax Proceeding.

(b) The tax matters partner may not bind any other Member to a settlement agreement relating to taxes without obtaining the written concurrence of such Member.

(c) Any deficiency for taxes imposed on a Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member and, if paid or required to be paid by the Company, is recoverable from such Member pursuant to Section 4.3 or by other legal means.

(d) This Section 8.5 and Section 8.6 survive the termination of the Company and the termination of any Member's interest in the Company and remain binding for a period of time necessary to resolve all tax matters with applicable taxing authorities.

8.6. Information and Documents to Company. Each Member shall timely provide to the Company all information and documents that such Member is required to provide by applicable tax requirements, and shall also provide to the Company upon request such additional

information and documents as the Managers may reasonably request in connection with the Company's compliance with applicable tax requirements or filing of any permitted tax elections.

## ARTICLE IX
### MEETINGS AND VOTING OF MEMBERS

9.1.    Meetings.

(a)    Meetings of the Members may be called at any time by the Managers or by one or more Members holding at least 75.0% of the Percentage Interest held by Members. Meetings shall be held at the Company's principal place of business or at such other reasonable place set forth in the notice of the meeting.

(b)    Any action that may be taken at a Members' meeting may be taken without holding a meeting if Members having at least the Requisite Percentage interest that would be necessary to take the action at a meeting, in which each Member entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

(c)    Except as otherwise provided in this Agreement, meeting notices and procedures, including procedures for obtaining written consents in lieu of a meeting, shall be in conformity with Chapters 6 and 101(H) of the Code. Sections 101.353 through 101.356 of the Code (relating to quorum and minimum voting requirements) shall not apply to the extent such provisions are inconsistent with this Agreement. The Managers are solely responsible for convening and conducting meetings of the Members, conducting the solicitation of consents, determining the validity and effect of responses to any solicitation of consents, and determining other matters regarding meetings, voting, and consents.

(d)    Notice of the results of any vote taken at a meeting, or the results of any solicitation of consents in lieu of a meeting, shall be given to the Members not later than with the delivery of the next following report of financial information given pursuant to Section 7.3.

9.2.    Voting. A Member may vote at a meeting in person, or by a proxy executed in writing by the Member and received by the Managers prior to the time when the votes of Members are to be counted. The provisions of the Code pertaining to the validity and use of proxies by shareholders of a corporation govern the validity and use of proxies given by Members. Only Members of record on the date of the meeting (or if the vote is conducted without a meeting then on the date of the notice soliciting the Member consents) may vote.

## ARTICLE X
### TRANSFER OF MEMBERSHIP INTERESTS

10.1.    Limitation on Transfers.

(a)    The term "transfer," when used in reference to a transfer of a Membership Interest, means an assignment (whether voluntarily, involuntarily, or by operation of law and

whether or not effective under this Agreement) of all or any portion of a Member's or Assignee's Membership Interest, or any interest therein, to another person, and includes a sale, assignment, conveyance, gift, exchange, or other disposition, a transfer by merger or other business combination, a transfer pursuant to bankruptcy, insolvency, incapacity, or death, and any pledge, hypothecation, or other encumbrance. A redemption of a Member's or Assignee's Membership Interest pursuant to Section 12.3 is not a transfer of the Membership Interest. A transfer does not include a transfer of a community property or other interest in a Membership Interest from a former spouse of a Member to the Member pursuant to the death of the former spouse or in connection with the termination of the marital relationship.

(b) No Member may transfer all or any portion of its Membership Interest unless the transfer is a Permitted Transfer. A transfer of a Membership Interest that is not a Permitted Transfer is a Prohibited Transfer.

(c) A change of Control of any Member constitutes a transfer of the Membership Interest held by such Member.

10.2. Permitted Transfer of Membership Interest.

(a) A transfer of a Membership Interest is a Permitted Transfer only if the transfer satisfies the conditions set forth in Section 10.3 and is described in one or more of the following paragraphs of this Section:

(i) the transfer is approved by all of the Managers;

(ii) if the Member is a corporation, the transfer is to a member of the Member's affiliated group (as defined in I.R.C. Section 1504(a));

(iii) if the Member is a trustee of one or more employee benefit plans, the transfer is to a co-trustee or a successor trustee to such plans; or

(iv) if the Member is an individual, the transfer is to the Member's estate, testamentary trust, or legal representative as a result of the Member's death or adjudication of incapacity in managing its person or affairs, or the transfer is to a member of the Member's family, directly or in trust.

(b) Upon a Permitted Transfer by a Member of all of its Membership Interest, the Member ceases to be a Member as of the effective date of the transfer determined according to Section 10.4.

(c) For purposes of Section 10.2(a)(iv), a Member's family means the Member's spouse (excluding a former spouse), children, grandchildren, parents, and grandparents. A person's legally adopted child is treated as his child.

CALDER 1099
MR. 1099

10.3.    Conditions to Permitted Transfers of Membership Interests. Without limiting the Managers' authority to withhold approval for the transfer of a Membership Interest, a transfer shall not be a Permitted Transfer unless the Managers determine that all of the following conditions are satisfied:

(a)    The transfer complies with all applicable laws, including any applicable securities laws.

(b)    The transfer will not cause the Company to be treated as other than a partnership for United States federal income tax purposes.

(c)    The transfer will not cause the Company to be subject to regulation under the Investment Company Act of 1940, as amended.

(d)    The transfer will not cause any assets of the Company to be deemed "plan assets" under the Employee Retirement Income Security Act of 1974.

(e)    The transfer will not result in a termination of the Company under I.R.C. Section 708, unless the Managers determine that such termination will not have an adverse impact on the Members.

(f)    The transfer will not cause the application of the tax-exempt use property rules of I.R.C. Sections 168(g)(1)(B) and 168(h) to the Company or its Members, unless the Managers determine that such rules will not have an adverse impact on the Members.

(g)    The transferor and transferee have delivered to the Company any documents that the Managers request to confirm that the transfer satisfies the requirements of this Agreement, to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as an Assignee.

(h)    If requested by the Managers, the Company has received a transfer fee in an amount determined by the Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with such transfer.

10.4.    Effective Date; Distributions.

(a)    A Permitted Transfer of a Membership Interest is effective as of the first day of the calendar month following the calendar month during which the Managers receive notice of such transfer (in such form and manner as the Managers may require) unless the Managers determine that the transfer should be effective as of an earlier or later date (for example, on any date the transfer is effective as a matter of state law, or where the notice of transfer specifies that the transfer is to be effective on a future date).

CAL_MFR.0560

(b)     Distributions with respect to a transferred Membership Interest that are made before the effective date of the transfer shall be paid to the transferor, and distributions made after such date shall be paid to the Assignee.

(c)     Effective as of the effective date of a transfer of a Membership Interest, the Managers shall amend Exhibit A to reflect the reduction in the transferor's Percentage Interest and to reflect the Assignee's Percentage Interest.

(d)     Neither the Company nor the Managers have any liability for making allocations and distributions to the Members determined in accordance with this Section 10.4, whether or not the Company or the Managers have knowledge of any transfer of any Membership Interest.

10.5.   Transferor's Obligations.  The transferor of a Membership Interest who ceases to be a Member continues to be obligated with respect to its Membership Interest or its status as a former Member as provided in the Code and applicable law.

10.6.   Assignee's Rights and Obligations.

Unless an Assignee becomes a Member pursuant to Article XI, such Assignee shall not be entitled to any of the rights granted to a Member, other than the rights to receive allocations of profits and losses and distributions as if such Assignee were a Member, to transfer the Assignee's Membership Interest (subject to the conditions of this Article X), and to receive reports and information as specified in Article VII. An Assignee of a Membership Interest shall succeed to the Capital Contribution of the transferor to the extent of the Membership Interest transferred. An Assignee is bound by this Agreement irrespective of whether the Assignee has signed or otherwise adopted this Agreement. An Assignee's Membership Interest may be redeemed at the option of the Managers as provided in Section 12.3.

10.7.   Effect and Consequences of Prohibited Transfer.

(a)     Except as otherwise required by law, the Company and the Managers shall treat a Prohibited Transfer as void and shall recognize the transferor as continuing to be the owner of the Membership Interest purported to be transferred. If the Company is required by law to recognize a Prohibited Transfer, the transferee shall be treated as an Assignee with respect to the Membership Interest transferred and may not be treated as a Member with respect to the Membership Interest transferred unless admitted as a Member in accordance with Article XI.

(b)     The Company may remove the transferor and Assignee with respect to a Prohibited Transfer as provided in Article XII.

(c)     The transferor and transferee with respect to a Prohibited Transfer shall be jointly and severally liable to the Company for, and shall indemnify and hold the Company harmless against, any expense, liability, or loss incurred by the Company (including reasonable legal fees and expenses) as a result of such transfer, their removal and liquidation of their Membership Interests (if applicable), and the efforts to enforce the indemnity granted in this Section 10.7(c).

10.8. Agreements of Spouse: Sole Management Community Property.

(a) Execution of Spousal Joinder and Consent. The spouse of each Member shall execute and deliver to the Company a Spousal Joinder and Consent in the form of Exhibit B.

(b) Agreements of Spouse. The spouse of each Member agrees that:

(i) this Agreement is entirely fair, just and equitable and in his or her best interest;

(ii) the covenants made in this Agreement are binding on such spouse individually and that such spouse is bound by this Agreement, including insofar as any interest such spouse may have now or hereafter in any Membership Interest by reason of the community property laws of the State of Texas or any other state, or otherwise;

(iii) whenever, pursuant to the terms of this Agreement, such Member does, or is required to, in any manner transfer, pledge, or encumber his or her Membership Interest, or any interest in such Membership Interest, to the Company or any other person, such transfer, pledge, or encumbrance shall include the community property interest, if any, of such spouse in such Membership Interest so transferred, pledged, or encumbered; and

(iv) in the event of the death of such spouse, any interest such spouse may have now or hereafter in any Membership Interest which constitutes community property should pass to such Member and, accordingly, such spouse shall will and bequeath such spouse's entire community property interest, if any, in such Membership Interest to such Member.

(c) Sole Management Community Property. Each Member who is a natural person and his or her spouse agree that such Member's Membership Interest, whether presently owned or hereafter acquired, is, if such Membership Interest is community property, community property subject to the sole management, control, and disposition of such Member.

## ARTICLE XI
## ADMISSION OF NEW MEMBERS

11.1. Substituted Members. An Assignee of a Membership Interest shall be admitted as a Substituted Member with respect to such Membership Interest on the date on which all of the following conditions are satisfied:

(a) The Managers have approved in writing the admission of the Substituted Member.

(b) The Assignee has delivered to the Company any agreements and other documents that the Managers request to confirm such Assignee as a Member in the Company and such Assignee's agreement to be bound by this Agreement as a Member.

CALVFR.0562

(c)     If requested by the Managers, the Company has received an admission fee in an amount determined by the Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with the admission of the Assignee as a Substituted Member.

11.2.   Additional Members.

(a)     In General.  The Managers may cause the Company to admit a person as an Additional Member and issue Additional Units to such Additional Member upon satisfaction of all of the following conditions.

(i)     A Requisite Percentage has approved the admission of the Additional Member after notice to all Members of (i) the Initial Capital Contribution to be made by the proposed Additional Member, (ii) the effect of the admission on each Partner's Percentage Interest, and (iii) other material information relevant to the proposed admission.

(ii)    The admission of the proposed Additional Member satisfies the applicable conditions of Section 10.3.

(iii)   The proposed Additional Member has delivered to the Company any agreements and other documents that the Managers request to confirm the person as a Member in the Company and the person's agreement to be bound by this Agreement as a Member.

**ARTICLE XII**
**WITHDRAWAL OR REMOVAL OF MEMBERS**

12.1.   Withdrawal of Members.

(a)     No Member may withdraw from the Company or otherwise cease to be a Member except upon the following events:

(i)     receipt by the Company of a notice of such Member's withdrawal from the Company;

(ii)    a transfer of all of the Member's Membership Interest in a Permitted Transfer; or

(iii)   removal of the Member as a Member as provided in this Agreement.

(b)     A Member shall be deemed to withdraw from the Company upon the following events:

(i)     an event specified in Section 12.1(a);

CALVFR.0763

(ii)     an event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Member were a general partner;

(iii)    if a Member is an individual, the Member's death, the appointment of a guardian or general conservator for the Member, or a judicial determination that the Member is incapable of performing the Member's duties under this Agreement; or

(iv)    if the Member is an entity, an event requiring the Member's winding up or causing the termination of the Member's existence or suspension of the Member's right to do business.

(c)     If a Member ceases to be a Member in violation of Section 12.1(a), the Company may recover damages from the former Member for breach of this Agreement.

12.2.   Removal of Members.

(a)     A Member may be removed as a Member by the unanimous written consent of the Managers under the following circumstances:

(i)     the Member has transferred or attempted to transfer all or any portion of its Membership Interest in a Prohibited Transfer;

(ii)    in the case of any Member who is also a Manager or an Affiliate of a Manager, the Member or its Affiliate has ceased to be a Manager in violation of Section 5.7(a) or has been removed as a Manager in accordance with Section 5.7(b);

(iii)    the Managers determine, in their sole discretion, that it is in the best interest of the Company to remove a Member;

(iv)    the Member has materially breached the terms of this Agreement or any other material agreement with the Company; or

(v)     the Managers determine that removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any United States federal or state agency or judicial authority or contained in any United States federal or state statute.

(b)     If the Managers propose to remove a Member pursuant to this Section 12.2, the Managers shall notify the Member in writing of the proposed removal, and if applicable shall provide such Member a reasonable opportunity to cure the event giving rise to removal. The removal of the Member is effective at such time as determined by the Managers in accordance with applicable law and taking into account the Member's opportunity to cure the event giving rise to removal.

CALMR.0564

12.3. Optional Redemption of Membership Interest. Subject to Section 4.4 (relating to limitations on distributions), the Managers, or, if there is no Manager, a Requisite Percentage, may cause the Company to redeem the Membership Interest of an Assignee by paying the Assignee the Fair Value of its Membership Interest as of the redemption date or the actual value of the Members Capital Account. Interest will accrue at the Index Rate on the amount owed under this Section 12.3 from the 30th day after the redemption date to the date the payment is made. The redemption date shall be fixed by the Managers in accordance with the principles of Section 10.4. Except as otherwise required by the I.R.C., amounts paid in redemption of an Assignee's Membership Interest shall be treated as made in exchange for the interest of the Assignee in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Assignee in Company goodwill.

12.4. Status of Former Member. A Member who withdraws or has been removed from the Company or otherwise ceases to be a Member has the status of an Assignee with respect to any Membership Interest held by such former Member. Except as provided in Section 12.3 (relating to optional redemption of a Member's Membership Interest) or Article XIII (relating to winding up and termination), such former Member is not entitled to receive any payments under Section 101.205 of the Code.

## ARTICLE XIII
## WINDING UP AND TERMINATION

13.1. Events Requiring Winding Up. The Company shall commence winding up procedures in accordance with this Agreement and the Code upon the first to occur of any of the following events:

(a)     a Requisite Percentage vote to wind up and terminate the Company;

(b)     a decree by a court requiring the winding up of the Company;

(c)     the termination of membership of the last remaining Member; or

(d)     the resignation or removal of all Managers if the Members fail to elect a replacement Manager as provided in Section 5.7(f).

13.2. Winding Up Procedures.

(a)     On the occurrence of an event requiring winding up of the Company, unless there is an action to continue the Company without winding up in accordance with Section 13.3, the Managers (or other Liquidator as provided below) shall, as soon as reasonably practicable, wind up the Company's business and affairs (including disposing of the Company's assets and applying the proceeds as provided in Section 13.4) and terminate the Company in accordance with this Agreement and the Code. The Company shall cease to carry on its business (except to the extent necessary to wind up its business), collect and sell its property to the extent the

CALMR.0565

property is not to be transferred or distributed in kind, and perform any other act required to wind up its business and affairs.

(b)    If the Managers have wrongfully caused the winding up of the Company or if there is no Manager, (i) a Requisite Percentage may vote to elect a person or persons to accomplish the winding up of the Company, or (ii) if the Members fail to elect a person to accomplish winding up the Company, then any Member or Assignee may petition a court to wind up the Company as provided in Section 11.054 of the Code. The person or persons winding up the Company, whether the Managers or an elected or court appointed person or persons, is referred to in this Agreement as the "Liquidator."

(c)    The Liquidator may determine the time, manner, and terms of any sale or sales of Company property pursuant to such winding up. The Liquidator (if not the Managers) is entitled to receive reasonable compensation for its services; may exercise all of the powers conferred upon the Managers under this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties; and with respect to acts taken or omitted while acting in such capacity on behalf of the Company, is entitled to the limitation of liability and indemnification rights set forth in Article VI.

(d)    The Liquidator shall provide quarterly reports to the Members and Assignees during the winding up procedure showing the assets and liabilities of the Company, providing information and documents required by the Members and Assignees to comply with their tax reporting obligations, and such other information as the Liquidator deems appropriate. Within a reasonable time after completing the winding up, the Liquidator shall give each Member and Assignee a final statement setting forth the assets, liabilities, and reserves of the Company as of the date of completion of winding up.

13.3.    Continuation Without Winding Up.

(a)    If there is a decision to wind up and terminate the Company as described in Section 13.1(a), the Company may be continued as provided in Section 101.552 of the Code.

(b)    If there is a termination of the continued membership of the last remaining Member as described in Section 13.1(c), then prior to completion of the winding up process but not later than 90 days after the event of termination, the Managers may continue the Company by admitting one or more Members effective as of the occurrence of the event of termination. Any Assignee whose Percentage Interest would be diminished by reason of the admission of an Additional Member under the circumstances described in this Section 13.3(b) must approve the admission of the Additional Member.

13.4.    Liquidation of Assets and Application and Distribution of Proceeds.

(a)    In General. On winding up the Company, the Liquidator shall dispose of the Company's properties and apply and distribute the proceeds, or transfer the Company properties, in the following order of priority:

CAL.VFR.0566

(i) to creditors (including Members who are creditors) in accordance with their relative rights and priorities to satisfy the liabilities of the Company, including expenses associated with the winding up and termination of the Company, but excluding any Company liability for any unpaid Mandatory Distributions;

(ii) to Members, Assignees, and former Members to satisfy the Company's liability for any unpaid Mandatory Distributions; and

(iii) to Members and Assignees as provided in Section 4.2.

(b) No Member Deficit Restoration Obligation. No Member is liable to the Company, to another Member, or to a third party, for the repayment of any deficit in the Member's Capital Account, except as provided in Section 101.206 of the Code.

(c) Reserves. In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made pursuant to Section 13.4(a)(ii) and (iii) may be withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and future expenses, including a reasonable reserve for any claims for indemnification under Article VI and for any future expenses associated with any tax audit or other Proceeding that is pending or may arise.

(d) Payments and Distributions to Members in Kind. The Liquidator may not make any payments or distributions to Members or Assignees pursuant to Section 13.4(a)(ii) or (iii) other than in cash unless all Members and Assignees receiving the property approve the transfer in kind. The Liquidator shall determine the Fair Market Value of any property transferred to Members or Assignees in kind according to the valuation procedures set forth in Article XIV.

(e) Character of Liquidating Distributions. Except as otherwise required by the I.R.C., amounts paid to Members pursuant to this Section 13.4 shall be treated as made in exchange for the interest of the Member in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Member in Company goodwill.

13.5. Certificate of Termination. The Liquidator shall file a Certificate of Termination of a Domestic Entity on the completion of the winding up of the Company.

13.6. Reinstatement. If the Company is terminated, it may be reinstated in the manner provided in the Code.

## ARTICLE XIV
## VALUATION

14.1. Fair Value of Company Property. The Fair Value of property contributed to the Company by a Member as part of such Member's Initial Capital Contribution is the amount of such Member's Initial Capital Contribution, as set forth on Exhibit A, minus the amount of any cash contributed to the Company as part of such Member's Initial Capital Contribution. In all

other cases, the Fair Value of an asset as of any date is its fair market value as determined by the Managers in good faith using any reasonable valuation method. If any affected Member does not agree with the valuation set by the Managers, the Fair Value shall be determined using procedures similar to those set forth in Section 14.2, and the cost of any such determination shall be borne entirely by the affected Member unless the Managers or a majority in interest of all Members other than the affected Member approves an alternative allocation of such costs.

14.2. Fair Value of Membership Interest.

(a)    For purposes of any redemption of a Membership Interest pursuant to Section 12.3, the Fair Value of the Membership Interest is its fair market value as determined by the Managers (or, if there are no Managers, by the Liquidator) in good faith based on the net proceeds that would be received with respect to the Membership Interest in a winding up of the Company, taking into account all expenses associated with such winding up and any damages or other amounts recoverable by the Company from the Assignee or with respect to the Assignee's Membership Interest. In connection with the payment in redemption of the Membership Interest, the Managers or Liquidator shall provide a notice to the Assignee setting forth the Fair Value of the Membership Interest, including information relevant to the determination of such Fair Value.

(b)    If the Assignee does not agree with the Fair Value of the Membership Interest as determined by the Managers or Liquidator, the Member may submit to the Company a notice of objection within 30 days of the Member's receipt of the valuation notice. Within 15 days following receipt of the Assignee's notice of objection, the Company shall appoint a qualified appraiser, and inform the Assignee of the name and business address of the appraiser. The appraiser shall determine the Fair Value of the Membership Interest in accordance with the principles of Section 14.2(a). The appraiser shall give the Assignee and the Managers an opportunity to meet with him prior to completing his appraisal. Except as provided in Section 14.2(c), the appraiser's determination of the Fair Value of the asset(s) in dispute shall be made within 30 days of his appointment (or such longer period as is reasonably required to complete the appraisal), and is final and binding on all concerned, absent manifest error.

(c)    If the Assignee does not approve the appraiser selected by the Company, within 15 days following notification of such selection pursuant to Section 14.2(b) the Assignee may appoint a qualified appraiser of the Assignee's choice, and inform the Company in writing of the name and business address of the appraiser. In such event, the appraisers appointed by the Company and the Assignee shall appoint a third qualified appraiser. Each of the three appraisers shall determine the Fair Value of the Membership Interest in accordance with the principles of Section 14.2(a). The average of the two valuations that are closest to each other shall be determined to be the Fair Value of the Membership Interest and such determination shall be final and binding on all concerned, absent manifest error.

(d)    The cost of each appraisal shall be shared equally by the Company and the Assignee.

(e)     The Company shall pay the Assignee any excess of (i) the recomputed Fair Value of the Membership Interest over (ii) the sum of any amount previously paid to the Assignee in redemption of his Membership Interest plus any costs charged to the Assignee as provided in paragraph (d). The Assignee shall pay the Company any excess of (i) the sum of any amount previously paid to the Assignee in redemption of his Membership Interest plus any costs charged to the Assignee as provided in paragraph (d), over (ii) the recomputed Fair Value of the Membership Interest.

(f)     Interest shall be paid at the Index Rate on any amount determined under Section 14.2(e) for the period from the 30th day after the redemption date to the date the amount is paid.

## ARTICLE XV
## GENERAL PROVISIONS

15.1.   Amendments.

(a)     In General. Subject to the following exceptions and limitations set forth in Section 15.1(b), this Agreement may be amended only with the approval of a Requisited Percentage.

(b)     Exceptions and Limitations. The Managers may amend Exhibit A from time to time to reflect the admission and withdrawal of Members, and changes to any Member's Percentage Interest, in accordance with this Agreement. The Managers may use the power of attorney granted in Section 15.12 to make non-substantive amendments that do not adversely impact the rights or obligations of any Manager or Member. No amendment of the Agreement may adversely affect any Member's rights or obligations under this Agreement (determined without taking into account the right of other Members to amend the Agreement) without the adversely affected Member's approval. No amendment of Article VI (relating to liability and indemnification) may adversely affect the rights or obligations of any Indemnified Person without the Indemnified Person's approval. No amendment of this Agreement may change the requirements under this Agreement for approving any action without the approval of the Members holding an aggregate Percentage Interest required to approve the action.

15.2.   Notice. Any notice, report, or other communication required or permitted to be made to any person by this Agreement shall be in writing and is deemed given when (a) delivered to the person by hand, (b) the third business day after delivery to the United States Postal Service (or other designated delivery service as defined in I.R.C. Section 7502(f)), postage prepaid, in an envelope properly addressed to the person at the person's address set forth in the Company's records as of the date of delivery, or (c) successfully transmitted by facsimile or electronic message to the facsimile phone number or e-mail address (as applicable) set forth in the Company's records as of the date of transmission. Any communication to the Managers or the Company may be delivered to the Company's registered office designated pursuant to Section 2.3.

CALMR.0569

15.3. <u>Governing Law; Consent to Jurisdiction</u>. This Agreement is governed by and shall be construed under the laws of the State of Texas without regard to legal requirements that would require the application of the law of any other jurisdiction. Any Proceeding arising out of or relating to this Agreement or the Company's activities or properties may be brought in the state courts of the County where the Company's principal office is located, or, if it has or can acquire jurisdiction, in the United States District Court for the District in which the Company's principal office is located. Each Member and Assignee irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court and agrees not to bring any such Proceeding in any other court. The Company or any Member or Assignee may file a copy of this Agreement with any court as written evidence of the agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the second sentence of this section may be served on any party anywhere in the world.

15.4. <u>Waiver</u>. Any failure by a party to insist upon the strict performance of any covenant or condition of this Agreement, or to exercise any right or remedy upon a breach of any such covenant or condition, does not constitute waiver of any such covenant or condition or any breach thereof.

15.5. <u>Entire Agreement</u>. This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the agreement between the parties with respect to its subject matter.

15.6. <u>Successors and Assigns</u>. No Member or Assignee may assign any of its rights or delegate any of its obligations under this Agreement except as expressly permitted in this Agreement.

15.7. <u>Third-Parties</u>. Other than as provided in <u>Section 5.4</u> (relating to reliance on authority of the Managers), <u>Section 3.6</u> (relating to Member Notes), <u>Section 11.2(b)</u> (relating to the Cotham/Merritt Note Equity Kicker), and <u>Article VI</u> (relating to rights of Indemnified Persons), none of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company or other persons not a party to this Agreement, except such benefits as inure to a successor or permitted assign in accordance with <u>Section 15.6</u>.

15.8. <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

15.9. <u>Construction</u>. The language in this Agreement is to be construed according to its fair meaning and is not to be strictly construed for or against any party. Nothing in this Agreement is to be construed as authorizing or requiring any action that is prohibited by the

CALVER.0570

Code or other applicable law, or as prohibiting any action that is required by the Code or other applicable law.

15.10. Execution of Agreement. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which together constitute one agreement. Any signature to this Agreement evidenced by a facsimile transmission of such signature shall be binding on the parties to the same extent as if such signature were an original.

15.11. Further Assurances. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

15.12. Power of Attorney.

(a) Each Member appoints the Managers and the Liquidator severally with full power of substitution, as the true and lawful attorney-in-fact for such Member, and in the name, place, and stead of such Member, to execute, certify, acknowledge, swear to, file, publish, and record:

(i) any certificate or other document that may be required to be filed by the Company or the Members in order to qualify the Company to do business in any jurisdiction, except that no such filing shall include a consent by any Member to service of process in any jurisdiction without the Member's approval;

(ii) any amendment to the Certificate of Formation, to this Agreement, or to any other agreement or document as required or permitted by this Agreement;

(iii) any certificate of termination and other documents that may be required to effectuate the termination of the Company pursuant to the provisions of this Agreement; and

(iv) any document required of the Company to carry out the actions that the Managers are authorized to take under this Agreement.

(b) The foregoing appointment of the Managers and Liquidator as a Member's attorney-in-fact does not grant such attorney-in-fact any power or authority to approve, consent, or agree to the substantive terms of any agreement or other document on behalf of such Member.

(c) The power of attorney granted pursuant to this Section 15.12 (i) is a special power of attorney coupled with an interest and is irrevocable, and (ii) survives the withdrawal or removal of a Member or the assignment of its Membership Interest.

[This Page Intentionally Left Blank. Signature Page Follows.]

CALMR.0571

Executed as of the Effective Date set forth above, by and among the persons signing below.

MEMBERS:

TXC ENERGY LLC

BY: _____
John V. Calce, Its President

Marc Marrocco, an individual

_____

Antonio Albanese, an individual

_____

## EXHIBIT A

### Effective as of September 18, 2013

| MEMBER NAME AND ADDRESS | Number of Units | Initial Capital Contribution |
|---|---|---|
| **TXC Energy LLC**<br>5601 Preakness Ln<br>Plano, Texas 75093 | 300 | $300.00 |
| **Marc Marrocco**<br>3602 Binkley Ave<br>Dallas, Texas 75205 | 300 | $300.00 |
| **Antonio Albanese**<br>6605 Gentle Wind Ln<br>Dallas, Texas 75248 | 300 | $300.00 |

CALMR.0573

# COMPANY AGREEMENT
## OF
## CENTURION LOGISTICS LLC

## EXHIBIT B

## SPOUSAL JOINDER AND CONSENT

I ACKNOWLEDGE (i) THAT I HAVE READ THE FOREGOING COMPANY AGREEMENT OF CENTURION LOGISTICS LLC (THE "AGREEMENT"), (ii) FULLY UNDERSTAND ITS CONTENTS, AND (iii) I HAVE BEEN GIVEN THE OPPORTUNITY TO ASK QUESTIONS AND TO SEEK AND OBTAIN THE ADVICE OF LEGAL COUNSEL CONCERNING MY RIGHTS, AND THE LIMITATIONS ON THOSE RIGHTS, THAT ARE CONTAINED IN THE AGREEMENT. I agree to be bound by all of the terms of the Agreement, including, without limitation, the provisions of Section 10.8. I am aware that, by the provisions of the Agreement, my spouse agrees to hold his or her Membership Interest (as such term is defined in the Agreement) including any portion of such Membership Interest comprising my community property, subject to the specific restrictions on the transfer of such Membership Interests set forth in the Agreement. I agree that I will not make any transfer of, or otherwise deal with, such Membership Interest or my community property interest therein, if any, during my lifetime except as expressly permitted by the Agreement. As provided in Section 10.8 of the Agreement, I agree that, in the event of my death, any Membership Interest that constitutes my community property should pass to my spouse, and I agree to will and bequeath my entire community property interest, if any, in such Membership Interest to my spouse.

Signature: _____

Printed Name: _____

Date: _____

CALVR.0574

## COMPANY AGREEMENT
## OF
## CENTURION LOGISTICS LLC

## APPENDIX A

## PRINCIPLES OF ALLOCATION

A.1     Introduction. This Appendix sets forth principles under which items of income, gain, loss, deduction and credit shall be allocated among the Members. This Appendix also provides for the determination and maintenance of Capital Accounts, generally in accordance with Treasury Regulations promulgated under I.R.C. Section 704(b), for purposes of determining such allocations. For purposes of this Appendix, an Assignee shall be treated in the same manner as a Member.

A.2     Definitions. Capitalized terms used in this Appendix have the meanings set forth below or in the Agreement.

"Adjusted Capital Account Deficit" means any deficit balance in a Member's Capital Account as of the end of a taxable year, after giving effect to the following adjustments:

(i)     Credit to the Capital Account any amounts the Member is obligated to restore pursuant to the Agreement or is deemed to be obligated to restore pursuant to (a) Treasury Regulations Section 1.704-1(b)(2)(ii)(c) (relating to obligations to pay partner promissory notes and other obligations to make contributions to the Company), or (b) the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) (relating to partnership minimum gain) and 1.704-2(i)(5) (relating to partner nonrecourse debt minimum gain); and

(ii)     Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Capital Account" has the meaning set forth in Section A.3.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation is an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis. If the adjusted basis for federal income tax purposes of an asset at the

1150848v2 2/12/2014

CALMER.0375

beginning of such taxable year is zero. Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

"Gross Asset Value" means an asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of an asset contributed by a Member to the Company is the gross Fair Value of such asset, as determined by the contributing Member and the Managers and as set forth on Exhibit A.

(ii)    The Gross Asset Values of Company assets shall be adjusted to equal their respective gross Fair Values (taking I.R.C. § 7701(g) into account), as determined by the Managers, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by a Member acting in a member capacity or in anticipation of being a Member. Adjustments pursuant to clauses (A), (B) and (C) above are required only if the Managers determine that such adjustments are necessary to accurately reflect the relative economic interests of the Members in the Company.

(iii)   The Gross Asset Value of a Company asset distributed to a Member shall be adjusted to equal the gross Fair Value (taking I.R.C. § 7701(g) into account) of such asset on the date of distribution as determined by the distributee and the Managers.

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*). Gross Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment is required pursuant to paragraph (ii).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii) or (iv) of this definition, the asset's Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

"Net Profit" and "Net Loss" mean, for each taxable year or other relevant period, an amount equal to the Company's taxable income or loss for such taxable year or other relevant period, determined in accordance with I.R.C. Section 703(a) (for this purpose, all items of

CALMR.1576

income, gain, loss, or deduction required to be stated separately pursuant to I.R.C. Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

    (i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss.

    (ii)    Any expenditures of the Company described in I.R.C. Section 705(a)(2)(B) or treated as I.R.C. Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss.

    (iii)    If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the Section A.2 definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit and Net Loss.

    (iv)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of (unreduced by any liabilities attributable thereto), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

    (v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation computed in accordance with the definition of Depreciation in Section A.2.

    (vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1) and shall be determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

1150848v2 2/12/2014

CALMR.0577

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(1) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

A.3    Capital Accounts. The Company shall determine and maintain Capital Accounts. "Capital Account" means an account of each Member determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the foregoing, the following rules apply:

(a)    The Capital Account of each Member shall be credited with (i) an amount equal to such Member's Capital Contributions and the Fair Value of property contributed (if permitted hereunder) to the Company by such Member, (ii) such Member's share of the Company's Net Profit, and (iii) the amount of any Company liabilities assumed by such Member or that are secured by property distributed to such Member.

(b)    The Capital Account of each Member shall be debited by (i) the amount of cash and the Fair Value of property distributed to such Member, (ii) such Member's share of the Company's Net Loss, and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)    Upon the transfer by a Member of all or part of an interest in the Company after the Effective Date, the Capital Account of the transferor that is attributable to the transferred interest carries over to the transferee and the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)    In determining the amount of any liability for purposes of Sections A.3.1(a) and A.3.1(b), I.R.C. Section 752(c) and any other applicable provisions of the I.R.C. and the Treasury Regulations shall be taken into account.

(e)    Except as otherwise required by Treasury Regulations Section 1.704-1(b)(2)(iv), adjustment to Capital Accounts in respect of Company income, gain, loss, deduction, and I.R.C. Section 705(a)(2)(B) expenditures (or items thereof) shall be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to the federal tax

1150848\2 2/12/2014

CALMR.0578

treatment of the corresponding tax items) at the Company level, without regard to any mandatory or elective tax treatment of such items at the Member level.

(f)  The provisions of this Appendix and of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Managers determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Managers may make such modification if it is not likely to have a material effect on the amounts distributed or to be distributed to any Member pursuant to the Agreement. The Managers shall make any adjustments that are necessary or appropriate (i) to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) if unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(g)  The provisions of the proposed Treasury Regulations published on January 22, 2003 (68 Fed. Reg. 2930), as they may subsequently be modified or adopted as temporary or final Treasury Regulations, shall apply with respect to any noncompensatory options issued by the Company.

A.4  Allocations of Net Profit and Net Loss

A.4.1  In General. Subject to Section 3.6, Company Net Profit and Net Loss shall be allocated to the Members as follows:

(a)  Net Profit. Net Profit for any period (excluding tax items allocated pursuant to Sections A.4.2 and A.4.3) shall be allocated as follows:

(i)  First, Net Profit shall be allocated to the Members to the extent of and in proportion to the excess, if any, of (i) the cumulative Net Loss allocated pursuant to Section A.4.1(b) for all prior periods, over (ii) the cumulative Net Profit allocated pursuant to this Section A4.1(a) for all prior periods.

(ii)  Second, any remaining Net Profit shall be allocated to the Members pro rata in accordance with their respective Percentage Interests.

(b)  Net Loss. Net Loss for any period (excluding tax items allocated pursuant to Sections A.4.2 and A.4.3) shall be allocated as follows:

(i)  Net Loss shall be allocated to the Members pro rata in accordance with their respective Percentage Interests, subject to the limitation in Section A.4.1(b)(ii).

1150848v2 2/12/2014

(ii)    No Member may receive an allocation of Net Loss that would cause the Member to have an Adjusted Capital Account Deficit at the end of the taxable year. Net Loss not allocated to a Member pursuant to this subparagraph (ii) shall be allocated to other Members according to their relative positive Capital Account balances (calculated taking into account the adjustments described in the definition of Adjusted Capital Account Deficit).

A.4.2    Regulatory Allocations.    The following special allocations shall be applied in the order in which they are listed. Such ordering is intended to comply with the ordering rules in Treasury Regulations Section 1.704-2(j) and shall be applied consistently therewith.

(a)    Minimum Gain Chargeback.    Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding anything to the contrary in this Section A.4, if there is a net decrease in Partnership Minimum Gain during any taxable year, each Member shall be allocated items of income and gain for that taxable year (and, if necessary, subsequent taxable years) equal to that Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section A.4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for requesting a waiver described in Treasury Regulations Section 1.704-2(f)(4) are met or the requirements for any other exception prescribed by or pursuant to Treasury Regulations Section 1.704-2(f) are met.

(b)    Partner Nonrecourse Debt Minimum Gain Chargeback.    Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding anything to the contrary in this Section, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year, then, in addition to the amounts, if any, allocated pursuant to paragraph 4.2(a), any Member with a share of that Partner Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the taxable year shall be allocated items of Company income and gain for that taxable year (and, if necessary, for subsequent taxable years) equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section A.4.2(b) is intended to comply with the chargeback of partner nonrecourse debt minimum gain required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for any exceptions provided in Treasury Regulation Section 1.704-2(i)(4) are met.

(c)    Qualified Income Offset.    If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible. An allocation pursuant to the foregoing sentence shall be made only to the extent that such Member would

CALVFR.0580

have an Adjusted Capital Account Deficit after all other allocations provided for in Section A.4 have been tentatively made as if this Section A.4.2(c) were not in this Appendix. This allocation is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed in accordance with the requirements thereof.

(d)    Gross Income Allocation. In the event a Member has an Adjusted Capital Account Deficit at the end of any taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this clause shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section A.4 have been made as if this Section A.4.2(d) were not in this Appendix.

(e)    Nonrecourse Deductions. Nonrecourse Deductions for any taxable year shall be allocated among the Members in accordance with their Percentage Interests.

(f)    Partner Nonrecourse Deductions. Partner Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)    Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b) is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

A.4.3   Curative Allocations. The allocations set forth in Section A.4.2 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section A.4.3. Therefore, notwithstanding any other provisions of this Section A.4 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Managers determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.4.1. In exercising their discretion under this Section A.4.3, the Managers shall take into account future Regulatory Allocations under Sections A.4.2(a) and A.4.2(b) that, although not yet made, are

1150848v2 2/12/2014

CALVFR.0581

likely to offset other Regulatory Allocations previously made under Sections A.4.2(e) and A.4.2(f).

### A.4.4 Other Allocation Rules

(a)     Net Profit, Net Loss, and other items shall be allocated to the Members pursuant to this Appendix A as of the last day of each taxable year, and at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b)     If during any taxable year any Member's Percentage Interest changes, each Member's share of Net Profit, Net Loss, and other items for such taxable year shall be determined according to their varying interests and I.R.C. Section 706(d), using any conventions permitted by law and selected by the Managers.

(c)     All allocations pursuant to this Appendix shall, except as otherwise provided in this Agreement, be divided among the Members in proportion to the Percentage Interests held by each.

(d)     For purposes of determining a Member's share of Company "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' shares of Company profits shall be deemed to be in proportion to their respective Percentage Interests.

(e)     To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Managers may treat any distribution of the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (that would otherwise be allocable to an increase in Partnership Minimum Gain) as a distribution that is not allocable to an increase in Partnership Minimum Gain to the extent the distribution does not cause or increase an Adjusted Capital Account Deficit for any Member.

### A.5     Tax Allocations

(a)     In General.  Except as otherwise provided in this Section A.5, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under the Agreement and this Appendix.

(b)     Contributed or Revalued Property.  In accordance with I.R.C. Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value.  If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value in Section A.2 hereof, subsequent allocations of income, gain, loss, and deductions

1150848v2 2/12/2014

CALMR.082

with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under I.R.C. Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations pursuant to this Section A.5 shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Appendix and the Agreement.

(c)     Credits. Except as otherwise required by Treasury Regulations Section 1.704-1(b)(4)(ii), items of tax credit and tax credit recapture shall be allocated among the Members in accordance with their Percentage Interests.

(d)     Effect of Tax Allocations. Allocations pursuant to this Section are solely for purposes of U.S. federal, state, and local taxes and shall not affect any Member's Capital Account or share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Appendix and the Agreement.

1150848v2 2/12/2011

CALVFR.0383

# EXHIBIT B

MR.084

COMPANY AGREEMENT

OF

CENTURION PECOS TERMINAL LLC

a Texas Limited Liability Company

September 12, 2014

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS, AND MAY NOT BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED ABSENT SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE TRANSFER OF MEMBERSHIP INTERESTS IS FURTHER RESTRICTED BY ARTICLE X OF THIS AGREEMENT.

MR-085
CALCE01433

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................................1
   1.1.   Defined Terms ...............................................................................................1
   1.2.   Construction ..................................................................................................5

ARTICLE II ORGANIZATIONAL MATTERS ........................................................................6
   2.1.   Formation ......................................................................................................6
   2.2.   Name .............................................................................................................6
   2.3.   Registered Office and Agent; Principal Office .............................................6
   2.4.   Term ..............................................................................................................6
   2.5.   Purposes .......................................................................................................6
   2.6.   Powers ..........................................................................................................6
   2.7.   Company Property .........................................................................................6
   2.8.   Consent to Admission of Members ...............................................................7
   2.9.   Status of Managers and Members .................................................................7
   2.10.  Certificates of Membership Interests ...........................................................7
   2.11.  No State Law Partnership .............................................................................7

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ..................................7
   3.1.   Initial Capital Contributions ........................................................................7
   3.2.   Additional Capital Contributions .................................................................7
   3.3.   Capital Accounts ..........................................................................................7
   3.4.   No Right to Return of or Interest on Capital Account ..................................7
   3.5.   Member Loans ..............................................................................................8

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS ........................................................8
   4.1.   Allocation of Profit or Loss .........................................................................8
   4.2.   Distributions of Distributable Cash ..............................................................8
   4.3.   Withholding ..................................................................................................9
   4.4.   Limitation on Distributions ..........................................................................9
   4.5.   No Right to Partition or Distributions in Kind .............................................9
   4.6.   Recovery of Erroneous Distributions ...........................................................9

ARTICLE V MANAGEMENT; ACTIVITIES OF MANAGERS AND MEMBERS .................9
   5.1.   Management and Control of Company Business ...........................................9
   5.2.   Resignation, Removal, and Replacement of Managers ...............................10
   5.3.   Actions of the Board of Managers ..............................................................11
   5.4.   Limitations on Board of Managers' Authority ...........................................11
   5.5.   Delegation of Authority; Officers ..............................................................12
   5.6.   Reliance ......................................................................................................13
   5.7.   Compensation and Expenses of Members and Managers ...........................13
   5.8.   Standards of Manager and Member Conduct .............................................13

ARTICLE VI LIABILITY AND INDEMNIFICATION ........................................................14

MR_086
CALCE01434

6.1.   Limitation of Liability .......................................................................... 14
6.2.   Indemnification by Company .............................................................. 14
6.3.   Conduct Not Protected ........................................................................ 14
6.4.   Insurance ............................................................................................ 15
6.5.   Survival .............................................................................................. 15

ARTICLE VII  BOOKS AND RECORDS: REPORTS ............................................ 15
7.1.   Maintenance of and Access to Books and Records ............................ 15
7.2.   Fiscal Year ......................................................................................... 15
7.3.   Financial and Operating Reports ....................................................... 15
7.4.   Tax Reports ........................................................................................ 16
7.5.   Transmission of Communications ...................................................... 16

ARTICLE VIII  TAX MATTERS .......................................................................... 16
8.1.   Tax Classification .............................................................................. 16
8.2.   Company Returns ............................................................................... 16
8.3.   Tax Elections ...................................................................................... 16
8.4.   Consistent Reporting .......................................................................... 17
8.5.   Tax Proceedings ................................................................................ 17
8.6.   Information and Documents to Company ........................................... 17
8.7.   Survival .............................................................................................. 17

ARTICLE IX  MEETINGS AND VOTING OF MEMBERS ................................. 17
9.1.   Meetings ............................................................................................ 17
9.2.   Voting ................................................................................................ 18

ARTICLE X  TRANSFER OF MEMBERSHIP INTERESTS .................................. 18
10.1.   Limitation on Transfers ..................................................................... 18
10.2.   Permitted Transfer of Membership Interest ....................................... 18
10.3.   Right of First Refusal; Tag-Along Rights; Triggering Events ............. 19
10.4.   Conditions to Permitted Transfers of Membership Interests ............... 20
10.5.   Effective Date; Distributions ............................................................. 21
10.6.   Transferor's Obligations .................................................................... 21
10.7.   Assignee's Rights and Obligations ..................................................... 21
10.8.   Effect and Consequences of Prohibited Transfer ............................... 21

ARTICLE XI  ADMISSION OF NEW MEMBERS ......................................... 22
11.1.   Substituted Members ......................................................................... 22
11.2.   Additional Members ........................................................................... 22
11.3.   No Required Capital Contributions .................................................... 22

ARTICLE XII  WITHDRAWAL OR REMOVAL OF MEMBERS ........................... 23
12.1.   Withdrawal of Members ..................................................................... 23
12.2.   Removal of Members ......................................................................... 23
12.3.   Status of Former Member ................................................................... 23

ARTICLE XIII  WINDING UP AND TERMINATION ..................................... 24

MR_087

CALCE01435

13.1. Events Requiring Winding Up..............................................................24
13.2. Winding Up Procedures....................................................................24
13.3. Continuation Without Winding Up.........................................................25
13.4. Liquidation of Assets and Application and Distribution of Proceeds..................25
13.5. Certificate of Termination..............................................................26
13.6. Reinstatement...........................................................................26

ARTICLE XIV VALUATION.............................................................................26
14.1. Fair Value of Company Property..........................................................26
14.2. Purchase Price of Membership Interest...................................................26
14.3. Valuation of Membership Interests.......................................................26

ARTICLE XV GENERAL PROVISIONS.....................................................................26
15.1. Amendments..............................................................................26
15.2. Notice..................................................................................27
15.3. Governing Law; Consent to Jurisdiction..................................................27
15.4. Waiver..................................................................................27
15.5. Entire Agreement........................................................................27
15.6. Successors and Assigns..................................................................27
15.7. Third-Parties...........................................................................27
15.8. Severability............................................................................27
15.9. Construction............................................................................28
15.10. Execution of Agreement.................................................................28
15.11. Further Assurances.....................................................................28

MR-088
CALCE01436

# COMPANY AGREEMENT
## OF
## CENTURION PECOS TERMINAL LLC

This Company Agreement of Centurion Pecos Terminal LLC (this "Agreement") is entered into effective as of September 12, 2014 (the "Effective Date"), by the persons identified on the signature page(s) hereof.

WHEREAS, the Company was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Texas (the "Certificate of Formation") effective on September 12, 2014 (the "Formation Date"); and

WHEREAS, the parties desire to provide for the regulation and management of the affairs of the Company according to this Agreement and the Code (as herein defined);

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1. Defined Terms. The following definitions, and the definitions set forth in Appendix A to this Agreement, apply to the terms used in this Agreement for all purposes.

"Additional Capital Contribution" means the sum of cash and the Fair Value of any property contributed to the Company with respect to a Membership Interest as permitted under this Agreement, but does not include an Initial Capital Contribution.

"Additional Member" means a person who acquires a Membership Interest from the Company in exchange for a Capital Contribution and is admitted to the Company as a Member pursuant to Section 11.2 after the Effective Date.

"Affiliate" means a person who directly or indirectly Controls, is Controlled by, or is under common Control with the person in question.

"Agreement" means this Company Agreement, as it may be amended, supplemented, or restated from time to time.

"Assignee" means (a) a person to whom a Membership Interest has been transferred by a Member or Assignee in a Permitted Transfer, or in a Prohibited Transfer that the Company is required by law to recognize, but who has not become a Member, and (b) a former Member as described in Section 12.3.

"Board of Managers" means all of the Managers acting together.

"CAM" means CAM Oil and Natural Gas, LLC, a Louisiana limited liability company.

"Capital Contribution" means the sum of the Initial Capital Contribution and Additional Capital Contributions, if any, with respect to a Membership Interest.

MR_089
CALCE01437

"Centurion" means Centurion Logistics LLC, a Texas limited liability company, and a Member of the Company as of the Effective Date.

"Certificate of Formation" means the Certificate of Formation identified in the recitals to this Agreement, as such certificate may be corrected, amended, or restated.

"Certificate of Membership Interest" means a certificate representing a Member's Membership Interest in a form approved by the Board of Managers.

"Code" means the Texas Business Organizations Code.

"Company" means the limited liability company formed pursuant to the Certificate of Formation.

"Change of Control" means with respect to a Member, that the owners of such Member (as existing as of the date hereof) shall (i) cease to own, directly or indirectly, 51.0% of the outstanding ownership interests of such Member, or (ii) cease to own or exercise voting control over 51.0% of the outstanding voting interests of such Member.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

"Damages" means any expense or loss (including any court costs, judgment or settlement payment, penalty, fine, tax, and reasonable attorney's fees or other dispute resolution costs) paid or incurred in connection with or as a consequence of any Proceeding, net of any insurance or other recoveries received by the Indemnified Person with respect to the foregoing.

"Distributable Cash" means the cash and cash equivalents held by the Company from operations reasonably determined by the Board of Managers to be available for distribution to the Members after payment of the Company's debts, expenses, and other obligations, and after establishment and maintenance of such cash reserves as the Board of Managers determines should be retained for the reasonable current and future needs of the Company's business.

"Effective Date" is defined in the introduction to this Agreement.

"CAM Capital Contribution Balance" means, with respect to CAM, the total Capital Contribution of CAM less the cumulative distributions of cash by the Company to CAM in return of CAM's Capital Contribution pursuant to Section 4.2(a)(i). For purposes of calculating the CAM Capital Contribution Balance, no deduction shall be made for any tax distributions made to CAM, whether pursuant to Section 4.2(b) of this Agreement or otherwise.

"CAM Preferred Return Balance" means, with respect to CAM, the cumulative accrued CAM Preferred Return less the cumulative distributions of cash by the Company to CAM in payment of the CAM Preferred Return pursuant to Section 4.2(a)(i). For purposes of calculating the CAM Preferred Return Balance, no deduction shall be made for any tax distributions made to CAM, whether pursuant to Section 4.2(b) of this Agreement or otherwise.

"Entity" means any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization, or other business entity.

MR-090
CALCE01438

"Fair Value" means, with respect to an asset, its Fair Value determined according to Section 14.1.

"Fiscal Year" is defined in Section 7.2.

"Formation Date" is defined in the recitals to this Agreement.

"Indemnified Person" means (a) a Member or Assignee; (b) a Manager, (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1, provided such person had the status required to be an Indemnified Person at the time of the relevant actions referenced in the Proceeding.

"Index Rate" means the rate specified in Section 302.002 of the Texas Finance Code.

"Initial Capital Contribution" means the sum of any cash and the Fair Value of any property contributed to the Company by a Member with respect to a Membership Interest in connection with the original issuance of the Membership Interest by the Company as set forth on Exhibit A.

"CAM Preferred Return" means, with respect to CAM an amount equal to an 8% cumulative compounded annual return on the amount of CAM's unreturned total Capital Contribution accrued as of any date of determination. The CAM Preferred Return will be calculated by treating all distributions of the CAM Preferred Return pursuant to Section 4.2(a) as first being a payment of any undistributed accumulated annual return as of the distribution date and then being a repayment of any and all of CAM's Capital Contributions as of the distribution date.

"I.R.C." means the Internal Revenue Code of 1986.

"Liquidator" is defined in Section 13.2(b).

"Majority-in-Interest" means one or more Members owning collectively more than 50% of the Percentage Interests owned by all Members entitled to vote on the particular issue.

"Manager" means the person or persons designated as manager of the Company in the Certificate of Formation and any person who becomes a replacement Manager pursuant to Section 5.2. The name of the person designated as manager of the Company in the Certificate of Formation is John V. Calce.

"Mandatory Distribution" means any distribution that a Member is entitled to receive and as to which the Member has attained the status of a creditor under Section 101.207 of the Code.

"Member" means any person identified as a member on Exhibit A, and any other person who becomes a member of the Company pursuant to this Agreement, who has not ceased to be a Member. "Members" means all persons that are Members, collectively.

"Membership Interest" means a Member's or Assignee's economic interest in the Company. The term includes the Member's or Assignee's right to receive allocations of profits and losses and distributions as described in Article IV, and other rights and obligations under this Agreement or the

MR_091
CALCE01439

Code of an Assignee who has not been admitted as a Member, but does not include any right to participate in management or any other right reserved under this Agreement or the Code exclusively to a Member.

"Offering Member" is defined in Section 10.3(c)(i).

"Percentage Interest" means, as to any Member or Assignee, the percentage interest set forth on Exhibit A.

"Permitted Transfer" means any transfer of a Membership Interest that is described in Section 10.2.

"Person" or "person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person," as and where the context so permits or requires.

"Proceeding" means (a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding; and (c) an inquiry or investigation that could lead to any such proceeding.

"Prohibited Transfer" means any transfer of a Membership Interest that is not a Permitted Transfer.

"Redemption Notice" is defined in Section 10.3(c)(i).

"Redemption Option" is defined in Section 10.3(c)(i).

"Substituted Member" means a person who is admitted as a Member pursuant to Section 11.1 with respect to the transfer of an existing Membership Interest.

"Treasury Regulations" means the Treasury regulations promulgated under the I.R.C.

"Triggering Event" means the first to occur of (a) the date of a Prohibited Transfer, including any transfer to (i) a Member's trustee in bankruptcy, (ii) a purchaser at any creditor's or court sale, (iii) a Member's spouse pursuant to a decree of a divorce court, or (iv) the guardian of an incompetent Member, (b) the date of death of an individual Member, (c) the date of a Change of Control or termination of a Member that is not an individual; (d) the removal of a Member pursuant to Section 12.2; or (e) the voluntary election of a Member that is not an individual to liquidate all or substantially all of its assets and/or dissolve.

"Triggering Event Closing" is defined in Section 10.3(c)(ii).

"Triggering Event Purchase Price" means, in the case of a Membership Interest to be purchased pursuant to Section 10.3(c), the "fair market value" (as defined in this paragraph) of the Membership Interest as of the date of the Triggering Event, determined assuming an arms length sale of all of the Company's assets to a third party (as a going concern and not as a liquidation) for fair market value and the application of the proceeds of the sale according to Section 13.4. The Triggering Event Purchase Price will be determined (a) if there is in effect as of the date of the Triggering Event a valid Certificate of Fair Market Value in substantially the form attached as Schedule A executed by all Members, by reference to the fair market value for such Membership Interest as set forth in such Certificate of Fair

MR_092

CALCE01440

Market Value, and (b) if there is no such Certificate of Fair Market Value effective with respect to the Triggering Event, (i) by agreement of the Company and the Offering Member or the Offering Member's successor in interest, as applicable, or (ii) if no such agreement is reached within 30 days after the issuance of the Redemption Notice, by an independent appraiser chosen mutually by the Company and the Offering Member or the Offering Member's successor in interest, as applicable; provided, however, that in determining the fair market value of a Member's Membership Interest, such appraiser shall take into account the CAM's Capital Contribution Balance and the CAM Preferred Return Balance and shall increase or decrease Triggering Event Purchase Price of each Member's Membership Interest accordingly. Any fair market value agreed by the Members in a Certificate of Fair Market Value shall be effective until the earlier of (A) 90 days from the date set forth in any such Certificate of Fair Market Value, or (A) the date that a new Certificate of Fair Market Value has been executed by all of the Members.

1.2.    Construction. In this Agreement, unless a clear contrary intention appears:

(a)    the singular number includes the plural number and vice versa;

(b)    reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually;

(c)    reference to any gender includes the other gender and the neuter;

(d)    reference to any agreement or other document means such agreement or other document as amended or modified and in effect from time to time;

(e)    reference to any statute, regulation, or other legal requirement means such legal requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)    "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)    "including" (and with its correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)    "or" is used in the inclusive sense of "and/or";

(i)    with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

(j)    references to agreements or other documents refer as well to all addenda, exhibits, schedules, or amendments thereto.

MR_093
CALCE01441

# ARTICLE II
## ORGANIZATIONAL MATTERS

2.1.    Formation. The Company was formed pursuant to the Certificate of Formation effective as of the Formation Date.

2.2.    Name. The Company's name is as set forth in the Certificate of Formation. The Board of Managers may change the Company name at any time without the approval of any Member by filing a certificate of amendment to the Certificate of Formation. The Board of Managers shall provide notice of any such change to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board of Managers. The Board of Managers shall cause to be executed and filed of record all assumed or fictitious name certificates for the Company as are required by law.

2.3.    Registered Office and Agent; Principal Office.

(a)    The street address of the initial registered office of the Company in Texas and the name of the initial registered agent of the Company are as set forth in the Certificate of Formation. The Board of Managers may change the Company's registered office or registered agent at any time by filing a Change of Registered Agent and/or Registered Office as provided in the Code. The Board of Managers shall provide notice of the change to all Members.

(b)    The address of the principal office of the Company in the United States where records are to be kept or made available under Section 101.501 of the Code shall be as determined by the Board of Managers. The Board of Managers may change the Company's principal office in the United States at any time upon notice to the Members. The Company shall keep at its registered office and make available to a Member on reasonable request the street address of the Company's principal office in the United States.

2.4.    Term. The Company will continue until terminated in accordance with Article XIII.

2.5.    Purposes. The purpose for which the Company is organized is for the development and operation of the Project and the transaction of any and all lawful business for which limited liability companies may be organized under the Code.

2.6.    Powers. Subject to any limitations in this Agreement, the Company may exercise the power to do any and all acts reasonably related to its purposes.

2.7.    Company Property.

(a)    All Company property shall be owned in the name of the Company and not in the name of any Member. No Member or Assignee will have any interest in such Company property solely by reason of the Member's status as a Member.

(b)    The Board of Managers shall cause all funds of the Company to be deposited or invested in an account or accounts in the name of the Company. No funds other than the funds of the Company may be deposited therein. The funds in such accounts shall be used exclusively for the business of the Company (including distributions to the Members) and may be withdrawn only by persons approved by the Board of Managers.

MR-094
CALCE01442

2.8. Consent to Admission of Members. Each person executing this Agreement consents to the admission as members in the Company all of the other persons who are Members as of the date such person executes this Agreement.

2.9. Status of Managers and Members. Except as otherwise provided by this Agreement, each Manager has the status, rights, and obligations of a manager in a limited liability company as set forth in the Code, and each Member has the status, rights, and obligations of a member in a limited liability company as set forth in the Code.

2.10. Certificates of Membership Interests. If provided by the Board of Managers, each Member's Membership Interest may be represented by a Certificate of Membership Interest. Each such Certificate of Membership Interest, if any, shall be numbered and registered in the records of the Company as they are issued, and shall be signed by two officers of the Company. The holder of any Certificate of Membership Interest shall promptly notify the Company of any loss or destruction of the certificate, and the Company shall cause a replacement certificate to be issued to the holder upon receipt of satisfactory evidence of the loss, destruction, or mutilation or the certificate and satisfaction of other reasonable conditions established by the Board of Managers.

2.11. No State Law Partnership. The Members intend that the Company is not a partnership or joint venture, and that no Manager or Member is a partner or a joint venturer of any other Manager or Member, for any purposes other than income tax purposes. No provision of this Agreement may be construed to suggest otherwise.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1. Initial Capital Contributions. Each Member's Initial Capital Contribution is set forth on Exhibit A.

3.2. Additional Capital Contributions. No Member shall be required to make Additional Capital Contributions. No Member has the right or is permitted to make any other Additional Capital Contributions unless (a) the Board of Managers approves such Additional Capital Contribution after notice to all Members of (i) the amount of the Additional Capital Contribution to be made, (ii) the effect of the Additional Capital Contribution on each Member's Percentage Interest, and (iii) other material information relevant to the proposed Additional Capital Contribution, and (b) all Members are afforded an opportunity to participate in the Additional Capital Contribution according to their relative Percentage Interests.

3.3. Capital Accounts. The Company shall establish a separate Capital Account for each Member and Assignee. The Capital Accounts shall be maintained according to the provisions of Appendix A.

3.4. No Right to Return of or Interest on Capital Account. No Member may demand or receive the return of its Capital Contribution or any portion of its Capital Account, except as provided in this Agreement and the Code. Neither any Manager nor any Member has any personal liability for the repayment of any Capital Contributions of any Member. No interest will accrue or be paid with respect to the Capital Contributions or Capital Account of any Member.

MR_095
CALCE01443

3.5.    Member Loans. The Company may borrow money from one or more Members to the extent the Board of Managers deems appropriate to the conduct of the Company business on terms that comply with the requirements of Section 5.8(b)(iii) (relating to related party transactions). The amount of any loan made to the Company by a Member will not constitute a Capital Contribution or otherwise affect such Member's Capital Account or Membership Interest.

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.1.    Allocation of Profit or Loss. Company profits and losses shall be allocated among the Members and Assignees in accordance with the provisions of Appendix A. The Members are aware of the income tax consequences of the allocations made by Appendix A and agree to be bound by the provisions of Appendix A in reporting their shares of Company income and loss for income tax purposes.

4.2.    Distributions of Distributable Cash.

(a)    Except as otherwise provided in Section 4.2(b) (relating to distributions to pay taxes), Section 4.3 (relating to withholding), Section 4.4 (relating to limitations on distributions), or Section 13.4 (relating to liquidating distributions), Distributable Cash shall be distributed to the Members as follows:

(i)    first, to CAM in payment of the CAM Preferred Return until the CAM Preferred Return Balance has been reduced to zero;

(ii)    next, to CAM in payment of CAM's Capital Contribution until the CAM Capital Contribution Balance has been reduced to zero; and

(iii)    finally, to the Members according to their Percentage Interests. The Board of Managers may provide for a record date with respect to distributions.

(b)    To the extent the Board of Managers determines that any Member or Assignee has an unfunded tax liability as a result of allocations of Company tax items for any tax year, then, to the extent the Company has funds legally available for the payment of distributions to Members, the Board of Managers shall make a special tax distribution to all such Members and Assignees pro rata according to their relative unfunded tax liabilities in the minimum amount necessary to pay any such unfunded tax liabilities. For this purpose, a Member or Assignee is deemed to have an unfunded tax liability for a tax year to the extent (i) the cumulative amount distributed to the Member or Assignee under Section 4.2(a) and advanced to the Member or Assignee under this Section 4.2(b) (and not previously recovered) from the inception of the Company through the end of the such tax year exceeds (ii) the Member's or Assignee's tax liability with respect to such Member's or Assignee's cumulative allocable share of Company tax items for all periods from the inception of the Company through the end of such tax year. Unless the Board of Managers determines otherwise, the taxes due for each Member and Assignee shall be calculated by assuming that the Member or Assignee is an individual taxed at the highest tax rate applicable to the type of income involved. Any such tax distribution shall, to the extent it exceeds the amount the Member or Assignee would otherwise be entitled to receive under Section 4.3(a), be treated as an advance against, and shall be recovered from, amounts subsequently distributable under Section 4.2(a). No interest shall be charged on any such tax distributions, and no Member or Assignee shall be personally liable for the repayment to the Company or the Members of any such tax distribution. The

MR_096
CALCE01444

Board of Managers may make special tax distributions during the tax year in accordance with the principles of this Section 4.2(b) to the extent necessary to fund payments by Members and Assignees of estimated tax payments.

4.3.    Withholding.    The Company shall withhold from distributions, or pay on behalf of a Member or Assignee, all amounts that the Board of Managers determines the Company is required to withhold or pay on behalf of such person (including federal and state income tax withholding). All amounts so withheld from distributions are deemed to have been distributed to the person otherwise entitled to receive the amount so withheld. To the extent an amount is paid by the Company on behalf of a Member or Assignee but not withheld from a distribution, the amount paid constitutes a loan to such Member or Assignee. Such loan bears interest at the Index Rate and is repayable on demand or, at the election of the Board of Managers, is repayable out of distributions to which such Member or Assignee would otherwise be entitled.

4.4.    Limitation on Distributions.

(a)    The Company may not make a distribution to a Member or Assignee if it would render the Company insolvent, determined in accordance with Section 101.206 of the Code. A Member or Assignee who receives a distribution in violation of Section 101.206 of the Code is not required to return the distribution except as required in Section 101.206 of the Code.

(b)    The Members shall look solely to the assets of the Company for any distributions, including liquidating distributions. If the assets of the Company remaining after the payment or discharge, or the provision for payment or discharge, of the Company liabilities are insufficient to make any distributions, no Member has any recourse against the separate assets of any other Member.

4.5.    No Right to Partition or Distributions in Kind. No Member has any right, and waives any right that it might otherwise have, to cause any Company property to be partitioned and/or distributed in kind. Except as provided in Section 13.4(d) (relating to liquidating distributions), the Company may not make any distributions in kind.

4.6.    Recovery of Erroneous Distributions. If the Company has, pursuant to any clear and manifest accounting or similar error, distributed to any Member an amount in excess of the amount to which the Member is entitled pursuant to this Agreement, the Member shall reimburse the Company to the extent of such excess, without interest, within 30 days after demand by the Company.

## ARTICLE V
## MANAGEMENT; ACTIVITIES OF MANAGERS AND MEMBERS

5.1.    Management and Control of Company Business.

(a)    Subject to the limitations set forth in this Agreement, the Board of Managers has exclusive authority to manage and conduct the Company's business. The Board of Managers shall do all things appropriate to carry out the Company's purpose and the transactions contemplated by this Agreement. Except as otherwise provided in this Agreement, all actions that the Board of Managers may take and all determinations that the Board of Managers may make pursuant to this Agreement may be taken and made in the absolute discretion of the Board of Managers.

MR_097
CALCE01445

(b)   Except as provided in Sections 8.5(a) (relating to tax matters), the Members may not take part in the management or control of the Company business or bind the Company in their capacity as Members. The Members shall not have the right to vote or otherwise consent or withhold consent to any actions taken by the Board of Managers except with respect to such matters as are expressly stated in this Agreement.

5.2.   Resignation, Removal, and Replacement of Managers.

(a)   Resignation. Any Manager may resign as a manager of the Company upon notice to all Members, which resignation shall be effective immediately upon delivery of such notice. A Manager is deemed to have resigned as a manager of the Company effectively immediately upon the following events:

(i)   any event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Manager were a general partner;

(ii)   if the Manager is an individual, the Manager's death, the appointment of a guardian or general conservator for the Manager, or a judicial determination that the Manager is incapable of performing the Manager's duties under the Agreement; or

(iii)   if the Manager is an entity, the termination of the Manager's existence or suspension of the Manager's right to do business.

A resignation pursuant to paragraph (ii) is not a violation of this Section 5.2(a), provided the estate or personal representative or other authorized person provides notice of the deemed resignation within 90 days after the event giving rise to the deemed resignation.

(b)   Removal.

(i)   Removal for Cause. Any Manager may be removed as manager of the Company upon the affirmative vote of one or more Members owning collectively at least 75% of the Percentage Interests if there is cause for removal as specified in Section 5.2(b)(ii) and the Company has received a written opinion of counsel that:

(A)   cause for removal as specified in Section 5.2(b)(ii) exists; and

(B)   the removal of the Manager is not prohibited under any loan agreements, contracts, or other applicable legal requirements.

(ii)   Definition of Cause. Cause for removal exists only if one or more of the following conditions has occurred:

(A)   there has been a change in Control of the Manager;

(B)   the Manager has engaged in wrongful conduct described in Section 6.3(a) that adversely and materially affected the Company business or the Members;

MR_098
CALCE01446

(C) except as permitted by this Agreement, the Manager has engaged in conduct relating to the Company business that has made it not reasonably practicable to carry on the Company business with the Manager;

(D) the Manager or an Affiliate of the Manager has been convicted of a felony; or

(E) a final judgment of a court of competent jurisdiction has been entered that the Manager's removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal or state agency or judicial authority or contained in any federal or state statute; or

(F) the Manager commits a material breach of any provision of this Agreement, which breach is not cured within 30 days of notice thereof.

5.3 Election of Replacement Manager. If the Manager resigns or is removed as the manager of the Company, within 90 days following such resignation or removal a Majority-in-Interest may elect a replacement Manager of the Company effective as of the date of the former Manager's resignation or removal. The replacement Manager shall file any required amendments to this Agreement to reflect the resignation or removal of the former Manager and the election of the replacement Manager. If the Members fail to elect a replacement Manager within 90 days following the resignation or removal of the former Manager, the Company shall be wound-up according to Article XIII.

5.4. Actions of the Board of Managers.

(a) Except as set forth herein, meetings of the Board of Managers shall be held in any manner allowed by the Act, including by means of conference telephone or similar communication equipment if each Manager participating in the meeting can hear and be heard by all other Managers participating in the meeting.

(b) For purposes of establishing a quorum at any such meeting of the Board of Managers, it is necessary that all Managers appointed by the Members be present.

(c) Approval by the unanimous vote or written consent of the Managers shall be required to approve any action by the Board of Managers. In the event an action is approved by the Board of Managers, the Managers, individually or collectively, shall be authorized to carry out such action on behalf of the Company.

(d) Any action of the Board of Managers to be taken by written consent must be signed by all of the Managers to be effective.

5.5. Limitations on Board of Managers' Authority. The Board of Managers may not do any of the following acts without the approval of all Members:

(a) knowingly do any act in contravention of this Agreement or, when acting on behalf of the Company, engage in, or cause or permit the Company to engage in, any activity that is not consistent with the purposes of the Company;

MR_099

CALCE01447

(b)     except as otherwise provided in this Agreement, knowingly do any act that would make it impossible to carry on the Company business; or

(c)     cause the Company to (i) not be taxable as a partnership for federal income tax purposes, or (ii) take a position inconsistent with such treatment.

(d)     cause the Company to (i) make a general assignment for the benefit of creditors, (ii) file a voluntary bankruptcy petition, or (iii) seek an order for relief or declaration of insolvency in a federal or state bankruptcy or insolvency proceeding;

(e)     file a pleading seeking for the Company, or admitting or failing to contest the material allegations of a petition filed by any other person seeking for the Company, a proceeding of the type described by subparagraph (d) immediately above;

(f)     except as provided in Article XIII, seek, consent to, or acquiesce in the appointment of a trustee, receiver, or liquidator of the Company or of all or a substantial part of the Company's properties;

(g)     cause the Company to issue any Membership Interest or admit any Member other than pursuant to Section 2.8 or Article XI;

(h)     cause the Company to acquire any equity or debt securities of any Member or any Affiliate of a Member, or otherwise make loans to any Member or any Affiliate of a Member;

(i)     cause the Company to acquire from any person any equity or debt securities or assets of any corporation, limited liability company, partnership, association, business, or business division, whether by stock purchase, asset purchase, contribution, or other business combination (excluding investments and asset acquisitions in the ordinary course of the Company's business and transactions contemplated by this Agreement);

(j)     cause the Company to participate in any merger, consolidation, transfer, continuance, or conversion of the Company with or into any other person;

(k)     cause the Company to participate in any reorganization in which Membership Interests are exchanged for or converted into cash, securities of any other person, or other property; or

(l)     sell or otherwise dispose of all or substantially all of the Company property, except in connection with winding up the Company as permitted in this Agreement.

5.6.    Delegation of Authority; Officers.

(a)     The Board of Managers may cause the Company to hire such employees and agents as the Board of Managers deems appropriate for the conduct of the Company's business.

(b)     The Board of Managers may establish offices and appoint officers of the Company, and may delegate to such officers any of its authority hereunder, as the Board of Managers deems appropriate. The officers may be appointed for such terms and may exercise such powers and authority and perform such duties as determined by the Board of Manager. An officer need not be a Member of the Company. Any two or more offices may be held by the same person. An officer may be removed, with or without cause, at any time by the Board of Managers. Each officer will hold office

MR-100
CALCE01448

until his successor is chosen and is qualified in his stead, or until his death, resignation, or removal from office. Any vacancy in an office because of death, resignation, removal, or otherwise may be filled by a person appointed by the Board of Managers. An officer is subject to the same standards of conduct as apply to a Manager as described in Section 5.9.

5.7.    Reliance. Persons dealing with the Company may rely conclusively on the authority of the Board of Managers as set forth in this Agreement. Every document executed by any Manager with respect to any business or property of the Company is conclusive evidence in favor of any person relying on the document that (a) at the time of the execution and delivery of the document this Agreement was effective, (b) the document was executed in accordance with this Agreement and is binding on the Company, and (c) the Manager was authorized to execute and deliver the document on behalf of the Company.

5.8.    Compensation and Expenses of Members and Managers. Members and Managers are not entitled to any salary, fee, or other remuneration (other than distributions with respect to the Member's Membership Interest) for providing property or services or other consideration to or for the benefit of the Company in their capacity as a Member or Manager, except that each Manager is entitled to reimbursement from the Company for reasonable out-of-pocket expenses paid or incurred on behalf of the Company, including reasonable charges for services provided by employees of the Manager and overhead expenses. The Company shall pay all out-of-pocket costs incurred in organizing the Company. This Section 5.8 does not limit or enlarge a Manager's or a Member's rights to liability protection or indemnification under Article VI, and does not limit the Company's ability to enter into transactions with Members in their capacities other than as Members in accordance with Section 5.9(iii).

5.9.    Standards of Manager and Member Conduct.

(a)    In General. The Board of Managers shall manage and conduct the Company's business in good faith and in a manner the Managers reasonably believe to be in the Company's best interest. A Manager does not violate this Section 5.8(a) unless the Manager engages in conduct described in Section 6.3(a) (relating to improper conduct).

(b)    Outside Activities of Manager and Members; Noncompetition Covenants.

(i)    Each Manager shall devote to the Company's affairs only such time and resources as the Manager deems necessary for the conduct and winding up of the Company business.

(ii)    Except as provided herein, the Managers and Members or their Assignees may engage in or have an interest in other business ventures of every nature and description, independently or with others, including the ownership and operation of businesses similar to or in competition with, directly or indirectly, the Company, and neither the Company nor any Member or Assignee has, solely as a result of such person's interest in the Company, any right to acquire any rights in or to any such other business venture or to the income or profits derived from any such other business venture. A Manager or Member or Assignee has no duty to disclose any such similar or competing business venture to the Company or any Member or Assignee, or to offer to the Company or any Member or Assignee any prior opportunity to acquire an interest in such other business venture.

MR-101
CALCE01449

(iii)    Related Party Transactions.    Except as otherwise provided in this Agreement, the Board of Managers, when acting on behalf of the Company, may purchase property from, sell property to, or otherwise deal with any Manager, Member, or Assignee, acting on its own behalf, or any Affiliate of any Manager, Member, or Assignee, but any such transaction shall be on terms that are no less favorable to the Company than if the transaction had been entered into with an independent third party. No provision of this Agreement requires disclosure of any transaction to, and approval of the transaction by, any disinterested governing persons of the Company or the Members as provided in Section 101.255 of the Code.

## ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1.    Limitation of Liability.    No Member or Manager is liable for any debts, obligations, or liabilities of the Company. Subject to Section 6.3, an Indemnified Person is not liable to the Company or any other Indemnified Person for any Damages arising from any Proceeding relating to the conduct of the Company's business or relating to any act or omission by the Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of the Company's business, or for any misconduct or negligence on the part of any other person who is an employee or agent of the Company.

6.2.    Indemnification by Company.    To the fullest extent permitted by applicable law and subject to Section 6.3, the Company indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of the Company's business or to any act or omission by such Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of the Company's business or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company. An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred. The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

6.3.    Conduct Not Protected.

(a)    This Article VI does not operate to limit liability or to indemnify a person to the extent the person is found liable pursuant to a final judgment of a court of competent jurisdiction for:

(i)    an act or omission that involves gross negligence, intentional misconduct, or a knowing violation of law;

(ii)    a transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, a Manager's resignation in violation of Section 5.2(a), or a Member ceasing to be a Member in violation of Section 12.1(a);

(iii)    a willful or reckless material breach of this Agreement or any other agreement relating to the Company's business; or

(iv)    an act or omission for which indemnification is prohibited by law.

MR_102
CALCE01450

(b)    No provision of this Agreement requires the Company to pay or incur any amount for which indemnification is not permitted under this Article VI.

(c)    Any payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to the Company. The Company may require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

6.4.    Insurance. The Company may maintain insurance to protect any person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such person against such expense, liability, or loss under the Code.

6.5.    Survival. The indemnities provided for in this Agreement survive the transfer of an Indemnified Person's Membership Interest, the termination of the person's status as a Member or other status giving rise to classification as an Indemnified Person, and the termination of this Agreement and the Company.

## ARTICLE VII
## BOOKS AND RECORDS; REPORTS

7.1.    Maintenance of and Access to Books and Records. The Company shall maintain such books and records regarding the Company's business and properties as is reasonable, including all books and records required under the Code. Each Member shall have access thereto during ordinary business hours to the extent and under the conditions provided in the Code.

7.2.    Fiscal Year. The Company shall adopt the calendar year as its fiscal year for financial and tax accounting purposes (such fiscal year of the Company being referred to as the "Fiscal Year").

7.3.    Financial and Operating Reports. As soon as practicable after the end of each Fiscal Year, but in any event not later than 99 days after the end of the Fiscal Year, the Board of Managers shall deliver to each Member an annual report containing the following:

(a)    a Company balance sheet as of the end of such Fiscal Year, and Company statements of income, cash flows, and changes in Members' equity for such Fiscal Year, each in reasonable detail and prepared according to United States generally accepted accounting principles;

(b)    a general description of the Company's activities during such Fiscal Year, including a description of the amount and circumstances of any indemnification payments paid or requested pursuant to Section 6.2, a description of any material insurance claims or recoveries during the fiscal quarter, and a description of any Proceedings involving the Company; and

(c)    a statement of changes in the Member's Capital Account (showing the balance in the Member's Capital Account as of the beginning of the Fiscal Year, contributions or distributions during the year, allocations of profits and losses during the year, any other adjustments to the Capital Account balances during the year, and the balance in the Capital Account as of the end of the year).

MR-103
CALCE01451

7.4.    Tax Reports.

(a)    Not later than the date (including extensions) for filing the Company's tax return with the Internal Revenue Service (Form 1065), the Board of Managers shall deliver to each person who was a Member or Assignee at any time during the period covered by the return all information necessary for the preparation of such person's United States federal income tax returns, including a Form 1065 Schedule K-1 (if applicable).

(b)    Upon the written request of any Member or Assignee, the Board of Managers shall deliver to such person information necessary for the preparation of any tax returns that must be filed by such person, including information necessary for estimating and paying estimated taxes.

7.5.    Transmission of Communications.    Each person who holds a Membership Interest on behalf of, or for the benefit of, another person or persons shall be responsible for conveying any report, notice, or other communication received concerning the Company's affairs to such other person or persons.

## ARTICLE VIII
## TAX MATTERS

8.1.    Tax Classification.    The Members intend that the Company be classified as a partnership for federal income tax purposes. The Board of Managers shall take all actions reasonably necessary or appropriate to ensure the Company is so classified (including the filing of elections or tax returns). No Manager, officer, or Member shall take any action inconsistent with the classification of the Company as a partnership for federal income tax purposes.

8.2.    Company Returns.    The Board of Managers shall cause the Company to file such tax returns as may be required by law.

8.3.    Tax Elections.

(a)    General.    Except as otherwise provided in this Agreement, the Board of Managers shall cause the Company to timely make or revoke all elections, and take all tax reporting positions, necessary or desirable for the Company as determined by the Board of Managers. No election shall be made to have the Company excluded from the application of any provision of Subchapter K of the I.R.C. or any equivalent tax provision in any other tax jurisdiction. The Company shall make the election referred to in I.R.C. Section 754 upon the request of any Member in connection with a transfer of the Member's Membership Interest in accordance with this Agreement.

(b)    Safe Harbor Election for Compensatory Membership Interests.    If Proposed Treasury Regulation 1.83-3(l) is adopted as a temporary or final regulation, the Company shall make the safe harbor election described in such regulations, and the Company and each Member (including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the safe harbor with respect to all Membership Interests transferred in connection with the performance of services while the election remains effective. The Board of Managers shall prepare, execute, and file any required documentation to cause the election to be effective. The Board of Managers may terminate the safe harbor election at any time if it determines in good faith that it is in the best interests of the Company and the Members to do so.

MR-104
CALCE01452

8.4. Consistent Reporting. Each Member shall, on the Member's tax returns, treat each partnership item (as defined in I.R.C. Section 6231(a)(3)) in a manner consistent with the treatment of the item on the Company's return in all respects, including the amount, timing, and character of the item. No Member shall file a request for an administrative adjustment of partnership items under I.R.C. Section 6227(a) if such request would cause the Member's treatment of the item to be inconsistent with the treatment of the item on the Company's return.

8.5. Tax Proceedings.

(a) John V. Calce shall be the Company's tax matters partner as defined in I.R.C. Section 6231, and shall take such actions as are required to be designated the tax matters partner under applicable Treasury Regulations. The tax matters partner shall represent the Company in connection with all proceedings with any tax authority related to the Company's tax returns and taxes payable, including administrative examinations and appeals and judicial proceedings. Subject to Section 8.5(c), the tax matters partner has the exclusive right to conduct such proceedings and to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest adjustments proposed or imposed by any tax authority. The tax matters partner shall keep the Members informed on a timely basis of all material developments with respect to any such Proceeding. Each Member shall cooperate with the tax matters partner and do or refrain from doing all things reasonably requested by the tax matters partner with respect to the conduct of any Company tax Proceeding.

(b) The tax matters partner may not bind any other Member to a settlement agreement relating to taxes without obtaining the written concurrence of such Member.

(c) Any deficiency for taxes imposed on a Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member and, if paid or required to be paid by the Company, is recoverable from such Member pursuant to Section 4.3 or by other legal means.

8.6. Information and Documents to Company. Each Member shall timely provide to the Company all information and documents that such Member is required to provide by applicable tax requirements, and shall also provide to the Company upon request such additional information and documents as the Board of Managers may reasonably request in connection with the Company's compliance with applicable tax requirements or filing of any permitted tax elections.

8.7. Survival. This Article VIII shall survive the termination of the Company and the termination of any Member's interest in the Company and remain binding for such period of time as is necessary to resolve all tax matters with applicable taxing authorities.

ARTICLE IX
MEETINGS AND VOTING OF MEMBERS

9.1. Meetings.

(a) Meetings of the Members may be called at any time by the Board of Managers, or by one or more Members holding at least 25% of the Percentage Interest held by the Members. Meetings shall be held at the Company's principal place of business or at such other reasonable place set forth in the notice of the meeting.

MR-105
CALCE01453

(b)     Any action that may be taken at a Members' meeting may be taken without holding a meeting if Members having at least the minimum Percentage Interest that would be necessary to take the action at a meeting, in which each Member entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

(c)     Except as otherwise provided in this Agreement, meeting notices and procedures, including procedures for obtaining written consents in lieu of a meeting, shall be in conformity with Chapters 6 and 101(H) of the Code. Sections 101.353 through 101.356 of the Code (relating to quorum and minimum voting requirements) shall not apply to the extent such provisions are inconsistent with this Agreement. The Board of Managers is solely responsible for convening and conducting meetings of the Members, conducting the solicitation of consents, determining the validity and effect of responses to any solicitation of consents, and determining other matters regarding meetings, voting, and consents.

(d)     Notice of the results of any vote taken at a meeting, or the results of any solicitation of consents in lieu of a meeting, shall be given to the Members not later than with the delivery of the next following report of financial information given pursuant to Section 7.3.

9.2.    Voting. A Member may vote at a meeting in person, or by a proxy executed in writing by the Member and received by the Board of Managers prior to the time when the votes of Members are to be counted. The provisions of the Code pertaining to the validity and use of proxies by shareholders of a corporation govern the validity and use of proxies given by Members. Only Members of record on the date of the meeting (or if the vote is conducted without a meeting then on the date of the notice soliciting the Member consents) may vote.

## ARTICLE X
## TRANSFER OF MEMBERSHIP INTERESTS

10.1.   Limitation on Transfers.

(a)     The term "transfer," when used in this Agreement in reference to a transfer of a Membership Interest, means an assignment (whether voluntarily, involuntarily, or by operation of law and whether or not effective under this Agreement) of all or any portion of a Member's or Assignee's Membership Interest, or any interest therein, to another person, and includes a sale, assignment, conveyance, gift, exchange, abandonment, or other disposition, a transfer by merger or other business combination, a transfer pursuant to bankruptcy, insolvency, incapacity, divorce, or death, and any pledge, hypothecation, or other encumbrance.

(b)     No Member may transfer all or any portion of its Membership Interest unless the transfer is a Permitted Transfer. A transfer of a Membership Interest that is not a Permitted Transfer is a Prohibited Transfer.

10.2.   Permitted Transfer of Membership Interest.

(a)     A transfer of a Membership Interest is a Permitted Transfer only if the transfer satisfies the conditions set forth in Section 10.4 and is described in one of more of the following paragraphs of this Section:

(i)     the transfer is approved by the other Members;

MR-106
CALCE01454

(ii)    the transfer occurs in accordance with the procedures set forth in Section 10.3;

(iii)   if the Member is a corporation, the transfer is to a member of the Member's affiliated group (as defined in I.R.C. Section 1504(a));

(iv)    if the Member is a trustee of one or more employee benefit plans, the transfer is to a co-trustee or a successor trustee to such plans; or

(v)     if the Member is an individual, the transfer is of a community property or other interest from the Member's spouse or former spouse to the Member pursuant to the death of the Member's spouse or termination of the marital relationship of the Member and the spouse.

(b)     Upon a Permitted Transfer by a Member of all of its Membership Interest, the Member ceases to be a Member as of the effective date of the transfer determined according to Section 10.5.

10.3.   Right of First Refusal; Tag-Along Rights; Triggering Events.

(a)     In the event a Member desires to sell all or any portion of its Membership Interest to another Person, the selling Member shall first offer to sell such interest to the other Members on the terms on which it is prepared to sell such interest to such Person by sending written notice to each other Member describing the offer and its terms. Additionally, upon receipt of an offer from a third party to purchase all or any portion of a Member's interest in the Company, which such Member desires to accept, such Member shall promptly deliver a copy of the third party offer to each other Member. Each other Member will have 15 business days from the date of receipt of notice of the proposed sale of a Member's Membership Interest or the third party offer, as the case may be, to notify the selling Member in writing that such other Member elects to (i) purchase the selling Member's Membership Interest upon the terms and conditions of the proposed sale or third party offer, or (ii) sell in the contemplated transfer, at the same price in the same form of consideration and on the same terms (including if the transfer is made to another Member making an election under clause (i), Membership Interests representing a Percentage Interest in the Company equal to the product of (A) the quotient determined by dividing the Percentage Interest owned by such party by the aggregate Percentage Interests owned by all parties participating in such transfer, and (B) the aggregate Percentage Interests to be sold in the contemplated transfer, as the case may be. If the other Members fail to give notification within 15 business days of an election to purchase the selling Member's Membership Interest or participate in the contemplated transfer, then the selling Member shall be permitted, for a period of 90 days, to sell all of its Membership Interest to the third party upon the terms and conditions of the proposed sale or third party offer, as the case may be.

(b)     If more than one Member makes an election to purchase the selling Member's Membership Interest under Section 10.3(a)(i), each of the purchasing Members shall purchase a portion of the selling Member's Membership Interest that is proportional to that Member's Percentage Interest.

(c)     (i) Upon the occurrence of a Triggering Event with respect to any Member (the "Offering Member"), Company shall have the right but not the obligation to purchase all of the Offering Member's Membership Interest in the Company at the time of the Triggering Event (the "Redemption Option"). Within 60 days after the Company receives written notice of the occurrence of (and date of) the Triggering Event, the Company shall provide written notice of its election of the Redemption Option

MR 107
CALCE01455

to the Offering Member or the Offering Member's successor in interest, as applicable (the "Redemption Notice"). In the event the Company elects to exercise the Redemption Option, the Company shall purchase, and the Offering Member or the Offering Member's successor interest, as applicable, shall sell, all of the Membership Interest owned by the Offering Member at the time of the Triggering Event at a price equal to the Triggering Event Purchase Price.

(ii)     A closing (a "Triggering Event Closing") shall be held 60 days after the later of the date of the Redemption Notice or the date that the Triggering Event Purchase Price has been established.

(iii)     At the Triggering Event Closing, the Offering Member or Offering Member's successor in interest, as applicable, shall deliver to the Company an assignment of Membership Interest owned by the Offering Member, duly endorsed for transfer to the Company.

(iv)     At the Triggering Event Closing, the Company shall pay the Triggering Event Purchase Price to the Offering Member or the Offering Member's successor in interest, as applicable, in immediately available funds (by wire, certified or bank cashier's check or other means acceptable) and the parties shall execute such documentation as may be necessary or desirable, as determined by the Company, in the Company's sole discretion, to effectuate the transfer of such Offering Member's or Offering Member successor in interest's Membership Interest.

10.4.     Conditions to Permitted Transfers of Membership Interests.    A transfer shall not be a Permitted Transfer unless the Board of Managers determines that all of the following conditions are satisfied:

(a)     The transfer complies with all applicable laws, including any applicable securities laws.

(b)     The transfer will not cause the Company to be treated as other than a partnership for United States federal income tax purposes.

(c)     The transfer will not cause the Company to be subject to regulation under the Investment Company Act of 1940.

(d)     The transfer will not cause any assets of the Company to be deemed "plan assets" under the Employee Retirement Income Security Act of 1974.

(e)     The transfer will not result in a termination of the Company under I.R.C. Section 708, unless the Board of Managers determines that such termination will not have an adverse impact on the Members.

(f)     The transfer will not cause the application of the tax-exempt use property rules of I.R.C. Sections 168(g)(1)(B) and 168(h) to the Company or its Members, unless the Board of Managers determines that such rules will not have an adverse impact on the Members.

(g)     The transferor and transferee have delivered to the Company any documents that the Board of Managers requests to confirm that the transfer satisfies the requirements of this Agreement.

MR 108
CALCE01456

to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as an Assignee.

(h)     If requested by the Board of Managers, the Company has received a transfer fee in an amount determined by the Board of Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with such transfer.

10.5.   Effective Date: Distributions.

(a)     A Permitted Transfer of a Membership Interest is effective as of the first day of the calendar month following the calendar month during which the Board of Managers receives notice of such transfer (in such form and manner as the Board of Managers may require) unless the Board of Managers determines that the transfer should be effective as of an earlier or later date (for example, on any date the transfer is effective as a matter of state law, or where the notice of transfer specifies that the transfer is to be effective on a future date).

(b)     Distributions with respect to a transferred Membership Interest that are made before the effective date of the transfer shall be paid to the transferor, and distributions made after such date shall be paid to the Assignee.

(c)     Effective as of the effective date of a transfer of a Membership Interest, the Board of Managers shall amend Exhibit A to reflect the reduction in the transferor's Percentage Interest and to reflect the Assignee's Percentage Interest.

(d)     Neither the Company nor the Board of Managers has any liability for making allocations and distributions to the Members determined in accordance with this Section 10.5, whether or not the Board of Managers or the Company has knowledge of any transfer of any Membership Interest.

10.6.   Transferor's Obligations.  The transferor of a Membership Interest who ceases to be a Member continues to be obligated with respect to its Membership Interest or its status as a former Member as provided in the Code and applicable law.

10.7.   Assignee's Rights and Obligations.  Unless an Assignee becomes a Member pursuant to Article XI, such Assignee shall not be entitled to any of the rights granted to a Member (other than as required by the Code), and shall have no right to participate in the management of the business of the Company or to become a Member, unless the Members specifically approve the admission of such Assignee as a Member or such assignment or transfer is accomplished in accordance with the permissive provisions of this Agreement.  An Assignee not admitted as a Member hereunder shall have no membership rights and shall not be a Member with regard to the Membership Interests transferred to such Assignee (other than as required by the Code).

10.8.   Effect and Consequences of Prohibited Transfer.

(a)     Except as otherwise required by law, the Company and the Board of Managers shall treat a Prohibited Transfer as void and shall recognize the transferor as continuing to be the owner of the Membership Interest purported to be transferred. If the Company is required by law to recognize a Prohibited Transfer, the transferee shall be treated as an Assignee with respect to the Membership

MR 109
CALCE01457

Interest transferred and may not be treated as a Member with respect to the Membership Interest transferred unless admitted as a Member in accordance with Article XI.

(b)     The Company may remove the transferor and Assignee with respect to a Prohibited Transfer as provided in Article XII.

(c)     The transferor and transferee with respect to a Prohibited Transfer shall be jointly and severally liable to the Company for, and shall indemnify and hold the Company harmless against, any expense, liability, or loss incurred by the Company (including reasonable legal fees and expenses) as a result of such transfer, their removal and liquidation of their Membership Interests (if applicable), and the efforts to enforce the indemnity granted in this Section 10.8(c).

## ARTICLE XI
## ADMISSION OF NEW MEMBERS

11.1.     Substituted Members.   An Assignee of a Membership Interest shall be admitted as a Substituted Member with respect to such Membership Interest on the date on which all of the following conditions are satisfied:

(a)     The Board of Managers has approved in writing the admission of the Substituted Member.

(b)     The Assignee has delivered to the Company any agreements and other documents that the Board of Managers requests to confirm such Assignee as a Member in the Company and such Assignee's agreement to be bound by this Agreement as a Member.

(c)     If requested by the Board of Managers, the Company has received an admission fee in an amount determined by the Board of Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with the admission of the Assignee as a Substituted Member.

11.2.     Additional Members.   The Board of Managers shall admit a person as an Additional Member upon satisfaction of all of the following conditions:

(a)     A Majority-in-Interest has approved the admission of the Additional Member after notice to all Members of (i) the Initial Capital Contribution to be made by the proposed Additional Member, (ii) the effect of the admission on each Member's Percentage Interest, and (iii) other material information relevant to the proposed admission.

(b)     The admission of the proposed Additional Member satisfies the applicable conditions of Section 10.4.

(c)     The proposed Additional Member has delivered to the Company any agreements and other documents that the Board of Managers requests to confirm the person as a Member in the Company and the person's agreement to be bound by this Agreement as a Member.

11.3.     No Required Capital Contributions.   A person may be admitted as a Member, including as the sole Member, and may acquire a Membership Interest without making a contribution to the Company or assuming an obligation to make a contribution to the Company.

MR-110
CALCE01458

## ARTICLE XII
## WITHDRAWAL OR REMOVAL OF MEMBERS

12.1. <u>Withdrawal of Members</u>.

(a) No Member may withdraw from the Company or otherwise cease to be a Member except upon the following events:

(i) a transfer of all of the Member's Membership Interest in a Permitted Transfer; or

(ii) removal of the Member as a Member as provided in <u>Section 12.2</u> of this Agreement.

(b) A Member shall be deemed to withdraw from the Company upon the occurrence of an event specified in <u>Section 12.1(a)</u>.

12.2 <u>Removal of Members</u>.

(a) A Member may be removed as a Member by the Board of Managers under the following circumstances:

(i) the Member has transferred or attempted to transfer all or any portion of its Membership Interest in a Prohibited Transfer;

(ii) the Member has materially breached the terms of this Agreement; ; or

(iii) the Board of Managers determines that removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any United States federal or state agency or judicial authority or contained in any United States federal or state statute.

(b) If the Board of Managers proposes to remove a Member pursuant to this Section, the Board of Managers shall notify the Member in writing of the proposed removal, and if applicable shall provide such Member a reasonable opportunity to cure the event giving rise to removal. The removal of the Member is effective at such time as determined by the Board of Managers in accordance with applicable law and taking into account the Member's opportunity to cure the event giving rise to removal.

12.3. <u>Status of Former Member</u>. A Member who withdraws or has been removed from the Company or otherwise ceases to be a Member has the status of an Assignee with respect to any Membership Interest held by such former Member. Except as provided in <u>Section 10.3(c)</u> (relating to optional redemption of a Member's Membership Interest upon the occurrence of a Triggering Event) or <u>Article XIII</u> (relating to winding up and termination), such former Member is not entitled to receive any payments under Section 101.205 of the Code.

MR 111
CALCE01459

## ARTICLE XIII
## WINDING UP AND TERMINATION

13.1. Events Requiring Winding Up. The Company shall commence winding up procedures in accordance with this Agreement and the Code upon the first to occur of the following events:

(a)  the Members unanimously vote to wind up and terminate the Company;

(b)  a decree by a court requiring the winding up of the Company;

(c)  the termination of membership of the last remaining Member; or

(d)  the resignation or removal of all Managers if the Members fail to appoint any replacement Manager as provided in Section 5.3.

13.2. Winding Up Procedures.

(a)  On the occurrence of an event requiring winding up of the Company, unless there is an action to continue the Company without winding up in accordance with Section 13.3, the Board of Managers (or other Liquidator as provided below) shall, as soon as reasonably practicable, wind up the Company's business and affairs (including disposing of the Company's assets and applying the proceeds as provided in Section 13.4) and terminate the Company in accordance with this Agreement and the Code. The Company shall cease to carry on its business (except to the extent necessary to wind up its business), collect and sell its property to the extent the property is not to be transferred or distributed in kind, and perform any other act required to wind up its business and affairs.

(b)  If the Board of Managers has wrongfully caused the winding up of the Company or if there is no Manager, (i) a Majority-in-Interest may vote to elect a person or persons to accomplish the winding up of the Company, or (ii) if the Members fail to elect a person to accomplish winding up the Company, then any Member or Assignee may petition a court to wind up the Company as provided in Section 11.054 of the Code. The person or persons winding up the Company, whether the Board of Managers or an elected or court appointed person or persons, is referred to in this Agreement as the "Liquidator."

(c)  The Liquidator may determine the time, manner, and terms of any sale or sales of Company property pursuant to such winding up. The Liquidator (if not the Board of Managers) is entitled to receive reasonable compensation for its services; may exercise all of the powers conferred upon the Board of Managers under this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties; and with respect to acts taken or omitted while acting in such capacity on behalf of the Company, is entitled to the limitation of liability and indemnification rights set forth in Article VI.

(d)  The Liquidator shall provide quarterly reports to the Members and Assignees during the winding up procedure showing the assets and liabilities of the Company, providing information and documents required by the Members and Assignees to comply with their tax reporting obligations, and such other information as the Liquidator deems appropriate. Within a reasonable time after completing the winding up, the Liquidator shall give each Member and Assignee a final statement setting forth the assets, liabilities, and reserves of the Company as of the date of completion of winding up.

MR-112
CALCE01460

13.3. Continuation Without Winding Up.

(a)     If there is a decision to wind up and terminate the Company as described in Section 13.1(a), the Company may be continued as provided in Section 101.552 of the Code.

(b)     If there is a termination of the continued membership of the last remaining Member as described in Section 13.1(c), then prior to completion of the winding up process but not later than 90 days after the event of termination, the Board of Managers may continue the Company by admitting one or more Members effective as of the occurrence of the event of termination. Any Assignee whose Percentage Interest would be diminished by reason of the admission of an Additional Member under the circumstances described in this Section must approve the admission of the Additional Member.

13.4.  Liquidation of Assets and Application and Distribution of Proceeds.

(a)     In General.  On winding up the Company, the Liquidator shall dispose of the Company's properties and apply and distribute the proceeds, or transfer the Company properties, in the following order of priority:

(i)     to creditors (including Members who are creditors) in accordance with their relative rights and priorities to satisfy the liabilities of the Company, including expenses associated with the winding up and termination of the Company, but excluding any Company liability for any unpaid Mandatory Distributions;

(ii)    to Members, Assignees, and former Members to satisfy the Company's liability for any unpaid Mandatory Distributions; and

(iii)   to Members and Assignees as provided in Section 4.2(a).

(b)     No Member Deficit Restoration Obligation.  No Member is liable to the Company or any other person for the repayment of any deficit in the Member's Capital Account, except as provided in Section 101.206 of the Code.

(c)     Reserves.  In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made pursuant to Section 13.4(a)(ii) and (iii) may be withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and future expenses, including a reasonable reserve for any claims for indemnification under Article VI and for any future expenses associated with any tax audit or other Proceeding that is pending or may arise.

(d)     Payments and Distributions to Members in Kind.  The Liquidator may not make any payments or distributions to Members or Assignees pursuant to Section 13.4(a)(ii) or (iii) other than in cash unless all Members and Assignees receiving the property approve the transfer in kind. The Liquidator shall determine the Fair Market Value of any property transferred to Members or Assignees in kind according to the valuation procedures set forth in Article XIV.

(e)     Character of Liquidating Distributions.  Except as otherwise required by the I.R.C., amounts paid to Members pursuant to this Section 13.4 shall be treated as made in exchange for the interest of the Member in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Member in Company goodwill.

MR-113
CALCE01461

13.5. Certificate of Termination. The Liquidator shall file a Certificate of Termination of a Domestic Entity on the completion of the winding up of the Company.

13.6. Reinstatement. If the Company is terminated, it may be reinstated in the manner provided in the Code.

## ARTICLE XIV
## VALUATION

14.1. Fair Value of Company Property. The Fair Value of property contributed to the Company by a Member as part of such Member's Initial Capital Contribution is the amount of such Member's Initial Capital Contribution, as set forth on Exhibit A, minus the amount of any cash contributed to the Company as part of such Member's Initial Capital Contribution. In all other cases, the Fair Value of an asset as of any date is its fair market value as determined by the Board of Managers in good faith using any reasonable valuation method. If any affected Member does not agree with the valuation set by the Board of Managers, the Fair Value shall be determined using procedures similar to those set forth in Section 14.2, and the cost of any such determination shall be borne entirely by the affected Member unless the Board of Managers or a Majority-in-Interest of all Members other than the affected Member approves an alternative allocation of such costs.

14.2. Purchase Price of Membership Interest.

(a) For purposes of any redemption of a Membership Interest pursuant to Section 10.3(c), the purchase price shall be the Triggering Event Purchase Price.

(b) If the Offering Member and the Company cannot cooperatively designate an appraiser within 15 days following the date of the Redemption Notice, then the Offering Member and the Company shall each select an appraiser, and such two (2) appraisers shall select a third appraiser who shall select the appraiser to perform such appraisal. The cost of each appraisal shall be shared equally by the Company and the Offering Member.

14.3. Valuation of Membership Interests. For all purposes of this Agreement other than the valuation of Membership Interests in connection with a Triggering Event, the fair market value of the Membership Interests shall be determined by the Managers pursuant to an independent third party appraisal of the assets of the Company. The Board of Managers shall no less than annually cause the assets of the Company to be appraised by an independent third party.

## ARTICLE XV
## GENERAL PROVISIONS

15.1. Amendments.

(a) In General. Subject to the following exceptions and limitations, this Agreement may be amended only with the written approval of all Members.

(b) Exceptions and Limitations. The Board of Managers may amend Exhibit A from time to time to reflect the admission and withdrawal of Members, and changes to any Member's Percentage Interest, in accordance with this Agreement. No amendment of Article VI (relating to liability and indemnification) may adversely affect the rights or obligations of any Indemnified Person without the Indemnified Person's prior written approval.

MR-114
CALCE01462

15.2. Notice. Any notice, report, or other communication required or permitted to be made to any person by this Agreement shall be in writing and is deemed given when (a) delivered to the person by hand, (b) the third business day after delivery to the United States Postal Service (or other designated delivery service as defined in I.R.C. Section 7502(f)), postage prepaid, in an envelope properly addressed to the person at the person's address set forth in the Company's records as of the date of delivery, or (c) successfully transmitted by facsimile or electronic message to the person's facsimile phone number or e-mail address (as applicable) set forth in the Company's records as of the date of transmission. Any communication to the Board of Managers or the Company may be delivered to the Company's registered office designated pursuant to Section 2.3.

15.3. Governing Law; Consent to Jurisdiction. This Agreement is governed by and shall be construed under the laws of the State of Texas without regard to legal requirements that would require the application of the law of any other jurisdiction. Any Proceeding arising out of or relating to this Agreement or the Company's activities or properties may be brought in the state courts of Dallas County, Texas or, if it has or can acquire jurisdiction, in the United States District Court located in Dallas County, Texas. Each Member and Assignee irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court and agrees not to bring any such Proceeding in any other court. The Company or any Member or Assignee may file a copy of this Agreement with any court as written evidence of the agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the second sentence of this Section may be served on any party anywhere in the world.

15.4. Waiver. Any failure by a party to insist upon the strict performance of any covenant or condition of this Agreement, or to exercise any right or remedy upon a breach of any such covenant or condition, does not constitute waiver of any such covenant or condition or any breach thereof. A party will not be deemed to have waived any right or remedy under this Agreement unless that party has signed a written document to that effect, and any such waiver is applicable only with respect to the specific provision and instance for which it is given.

15.5. Entire Agreement. This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the agreement between the parties with respect to its subject matter.

15.6. Successors and Assigns. No Member or Assignee may assign any of its rights or delegate any of its obligations under this Agreement except as expressly permitted in this Agreement.

15.7. Third-Parties. Other than as provided in Section 5.7 (relating to reliance on authority of the Board of Managers) and Article VI (relating to rights of Indemnified Persons), none of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company or other persons not a party to this Agreement, except such benefits as inure to a successor or permitted assign in accordance with Section 15.6.

15.8. Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

MR-115
CALCE01463

15.9. <u>Construction</u>. The language in this Agreement is to be construed according to its fair meaning and is not to be strictly construed for or against any party. Nothing in this Agreement is to be construed as authorizing or requiring any action that is prohibited by the Code or other applicable law, or as prohibiting any action that is required by the Code or other applicable law.

15.10. <u>Execution of Agreement</u>. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which together constitute one agreement. Any signature to this Agreement evidenced by a facsimile or other electronic transmission of such signature shall be binding on the parties to the same extent as if such signature were an original.

15.11. <u>Further Assurances</u>. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

[This Space Left Blank Intentionally. Signature Page Follows.]

MR 116
CALCE01464

Executed as of the Effective Date set forth above, by and among the persons signing below.

MEMBERS:

CENTURION LOGISTICS LLC

By: _____
      Marc Marrocco
Title:   Manager

CAM OIL AND NATURAL GAS, LLC

By: _____

Name: Karen W. Hardtner

Title: Chief Operating Officer

_____
      John V. Calce

MANAGER:

CALCE01465

COMPANY AGREEMENT
OF
CENTURION PECOS TERMINAL LLC

EXHIBIT A
MEMBERS' CONTRIBUTIONS AND PERCENTAGE INTERESTS

Effective as of the Effective Date

| MEMBER NAME AND ADDRESS | Initial Capital Contribution | Initial Percentage Interest |
|---|---|---|
| Centurion Logistics LLC<br>17950 Preston Road<br>Suite 1080<br>Dallas, Texas 75252 | $400.00 | 40.00% |
| CAM Oil and Natural Gas, LLC<br>800 Spring Street<br>Suite 205<br>Shreveport, Louisiana 71101 | $600.00 | 60.00% |

MR-118
CALCE01466

# COMPANY AGREEMENT
## OF
## CENTURION PECOS TERMINAL LLC

### APPENDIX A
### PRINCIPLES OF ALLOCATION

A.1    Introduction. This Appendix sets forth principles under which items of income, gain, loss, deduction and credit shall be allocated among the Members. This Appendix also provides for the determination and maintenance of Capital Accounts, generally in accordance with Treasury Regulations promulgated under I.R.C. Section 704(b), for purposes of determining such allocations. For purposes of this Appendix, an Assignee shall be treated in the same manner as a Member.

A.2    Definitions. Capitalized terms used in this Appendix have the meanings set forth below or in the Agreement.

"Adjusted Capital Account Deficit" means any deficit balance in a Member's Capital Account as of the end of a taxable year, after giving effect to the following adjustments:

(i)    Credit to the Capital Account any amounts the Member is obligated to restore pursuant to the Agreement or is deemed to be obligated to restore pursuant to (a) Treasury Regulations Section 1.704-1(b)(2)(ii)(c) (relating to obligations to pay partner promissory notes and other obligations to make contributions to the Company), or (b) the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) (relating to partnership minimum gain) and 1.704-2(i)(5) (relating to partner nonrecourse debt minimum gain); and

(ii)    Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Capital Account" has the meaning set forth in Section A.3.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation is an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis. If the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"Gross Asset Value" means an asset's adjusted basis for federal income tax purposes, except as follows:

MR 119
CALCE01467

(i)    The initial Gross Asset Value of an asset contributed by a Member to the Company is the gross Fair Value of such asset, as determined by the contributing Member and the Board of Managers and as set forth on Exhibit A.

(ii)    The Gross Asset Values of Company assets shall be adjusted to equal their respective gross Fair Values (taking I.R.C. § 7701(g) into account), as determined by the Board of Managers, as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by a Member acting in a member capacity or in anticipation of being a Member.  Adjustments pursuant to clauses (A), (B), and (D) above are required only if the Board of Managers determines that such adjustments are necessary to accurately reflect the relative economic interests of the Members in the Company.

(iii)    The Gross Asset Value of a Company asset distributed to a Member shall be adjusted to equal the gross Fair Value (taking I.R.C. § 7701(g) into account) of such asset on the date of distribution as determined by the distributee and the Board of Managers.

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m). Gross Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment is required pursuant to paragraph (ii).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv) of this definition, the asset's Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

"Net Profit" and "Net Loss" mean, for each taxable year or other relevant period, an amount equal to the Company's taxable income or loss for such taxable year or other relevant period, determined in accordance with I.R.C. Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to I.R.C. Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss.

(ii)    Any expenditures of the Company described in I.R.C. Section 705(a)(2)(B) or treated as I.R.C. Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss.

MR-120
CALCE01468

(iii)    If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the Section A.2 definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit and Net Loss.

(iv)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of (unreduced by any liabilities attributable thereto), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation computed in accordance with the definition of Depreciation in Section A.2.

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1) and shall be determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(1) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

A.3    Capital Accounts.    The Company shall determine and maintain Capital Accounts. "Capital Account" means an account of each Member determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Treasury Regulations Section 1.704-1(b)(2)(iv)  Without limiting the generality of the foregoing, the following rules apply:

(a)    The Capital Account of each Member shall be credited with (i) an amount equal to such Member's Capital Contributions and the Fair Value of property contributed (if permitted hereunder) to the Company by such Member; (ii) such Member's share of the Company's Net Profit.

MR 121
CALCE01469

and (iii) the amount of any Company liabilities assumed by such Member or that are secured by property distributed to such Member.

(b)     The Capital Account of each Member shall be debited by (i) the amount of cash and the Fair Value of property distributed to such Member, (ii) such Member's share of the Company's Net Loss, and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)     Upon the transfer by a Member of all or part of an interest in the Company after the Effective Date, the Capital Account of the transferor that is attributable to the transferred interest carries over to the transferee and the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)     In determining the amount of any liability for purposes of Sections A.3(a) and A.3(b), I.R.C. Section 752(c) and any other applicable provisions of the I.R.C. and the Treasury Regulations shall be taken into account.

(e)     Except as otherwise required by Treasury Regulations Section 1.704-1(b)(2)(iv), adjustment to Capital Accounts in respect of Company income, gain, loss, deduction, and I.R.C. Section 705(a)(2)(B) expenditures (or items thereof) shall be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to the federal tax treatment of the corresponding tax items) at the Company level, without regard to any mandatory or elective tax treatment of such items at the Member level.

(f)     The provisions of this Appendix and of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Board of Managers may make such modification if it is not likely to have a material effect on the amounts distributed or to be distributed to any Member pursuant to the Agreement. The Board of Managers shall make any adjustments that are necessary or appropriate (i) to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) if unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(g)     The provisions of the proposed Treasury Regulations published on January 22, 2003 (68 Fed. Reg. 2930), as they may subsequently be modified or adopted as temporary or final Treasury Regulations, shall apply with respect to any noncompensatory options issued by the Company.

A.4     Allocations of Net Profit and Net Loss

A.4.1     In General

After giving effect to the special allocations set forth in Sections A.4.2 and A.4.3 hereof, Net Profit and Net Loss (and to the extent necessary, individual items of income, gain, loss, or deduction) for

MR 122
CALCE01470

any period shall be allocated to the Members in such amounts as may be necessary to cause each Member's Capital Account (as adjusted through the end of such period) to equal, as nearly as possible, the sum (which may be either a positive or negative amount) of (i) the amount such Member would receive if all Company assets on hand at the end of such period were sold for cash at their Gross Asset Values, all Company liabilities were satisfied in cash according to their terms (limited in the case of any Nonrecourse Liability and Partner Nonrecourse Debt to the Gross Asset Value of the property securing such liabilities), all obligations (if any) of Members to contribute additional capital to the Company were satisfied, and any remaining cash was distributed to the Members under Section 4.2 as of the last day of such period, minus (ii) the Member's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain computed immediately prior to such deemed sale of assets.

A.4.2. Regulatory Allocations. The following special allocations shall be applied in the order in which they are listed. Such ordering is intended to comply with the ordering rules in Treasury Regulations Section 1.704-2(j) and shall be applied consistently therewith.

(a) Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), anything to the contrary in this Section A.4 notwithstanding, if there is a net decrease in Partnership Minimum Gain during any taxable year, each Member shall be allocated items of income and gain for that taxable year (and, if necessary, subsequent taxable years) equal to that Member's share of the net decrease in Partnership Minimum Gain determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section A.4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for requesting a waiver described in Treasury Regulations Section 1.704-2(f)(4) are met or the requirements for any other exception prescribed by or pursuant to Treasury Regulations Section 1.704-2(f) are met.

(b) Partner Nonrecourse Debt Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), anything to the contrary in this Section notwithstanding, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year, then, in addition to the amounts, if any, allocated pursuant to paragraph 4.2(a), any Member with a share of that Partner Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the taxable year shall be allocated items of Company income and gain for that taxable year (and, if necessary, for subsequent taxable years) equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section A.4.2(b) is intended to comply with the chargeback of partner nonrecourse debt minimum gain required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for any exceptions provided in Treasury Regulation Section 1.704-2(i)(4) are met.

(c) Qualified Income Offset. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible. An allocation pursuant to the foregoing sentence shall be made only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in Section A.4 have been tentatively made as if this Section A.4.2(c) were not in this Appendix. This allocation is intended to constitute a "qualified income

MR_123
CALCE01471

offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed in accordance with the requirements thereof.

(d)     Gross Income Allocation. If a Member has an Adjusted Capital Account Deficit at the end of any taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this clause shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section A.4 have been made as if this Section A.4.2(d) were not in this Appendix.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any taxable year shall be allocated among the Members in accordance with their Percentage Interests.

(f)     Partner Nonrecourse Deductions. Partner Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b) is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

A.4.3   Curative Allocations. The allocations set forth in Section A.4.2 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section A.4.3. Therefore, any other provisions of this Section A.4 (other than the Regulatory Allocations) notwithstanding, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Board of Managers determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.4.1. In exercising its discretion under this Section A.4.3, the Board of Managers shall take into account future Regulatory Allocations under Sections A.4.2(a) and A.4.2(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections A.4.2(e) and A.4.2(f).

A.4.4   Other Allocation Rules

(a)     Net Profit, Net Loss, and other items shall be allocated to the Members pursuant to this Appendix A as of the last day of each taxable year, and at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b)     If during any taxable year any Member's Percentage Interest changes, each Member's share of Net Profit, Net Loss, and other items for such taxable year shall be determined

MR_124
CALCE01472

according to their varying interests and I.R.C. Section 706(d), using any conventions permitted by law and selected by the Board of Managers.

(c) For purposes of determining a Member's share of Company "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3). the Members' shares of Company profits shall be deemed to be in proportion to their respective Percentage Interests.

(d) To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Board of Managers may treat any distribution of the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (that would otherwise be allocable to an increase in Partnership Minimum Gain) as a distribution that is not allocable to an increase in Partnership Minimum Gain to the extent the distribution does not cause or increase an Adjusted Capital Account Deficit for any Member.

A.5 Tax Allocations

(a) In General. Except as otherwise provided in this Section A.5, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under the Agreement and this Appendix.

(b) Contributed or Revalued Property. In accordance with I.R.C. Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value. If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value in Section A.2 hereof, subsequent allocations of income, gain, loss, and deductions with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under I.R.C. Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations pursuant to this Section A.5 shall be made by the Board of Managers in any manner that reasonably reflects the purpose and intention of this Appendix and the Agreement.

(c) Credits. Except as otherwise required by Treasury Regulations Section 1.704-1(b)(4)(ii), items of tax credit and tax credit recapture shall be allocated among the Members in accordance with their Percentage Interests.

(d) Effect of Tax Allocations. Allocations pursuant to this Section A.5 are solely for purposes of U.S. federal, state, and local taxes and shall not affect any Member's Capital Account or share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Appendix and the Agreement.

MR 125
CALCE01473

## SCHEDULE A
## CERTIFICATE OF FAIR MARKET VALUE

In accordance with the provisions of the definition of "Triggering Event Purchase Price" of the Company Agreement of Centurion Pecos Terminal LLC (the "Company"), effective as of September 12, 2014, the liquidating value of the Membership Interests is as follows:

| | | |
|---|---|---|
| 1 | Estimated fair market value of Company assets | $ |
| 2 | Less: estimated selling expenses | $ |
| 3 | Less: liabilities | $ |
| 4 | Less: reserves | $ |
| 5 | Equals: total distributable proceeds (Sum of lines 1 -4) | $ |
| 6 | Less: CAM Preferred Return Balance | $ |
| 7 | Less: CAM Capital Contribution Balance | $ |
| 8 | Equals: residual distribution amount (Sum of lines 5 – 7) | $ |
| 9 | Residual distribution amount per percentage point of Percentage Interest (line 8 ÷ 100) | $ |
| 10 | Liquidating Value of CAM Membership Interest | |
| 11 | CAM Preferred Return Balance (line 6) | $ |
| 12 | CAM Capital Contribution Balance (line 7) | $ |
| 13 | CAM Percentage Interest (line 9 x 60.00) | $ |
| 14 | Total (Sum of lines 11 – 13) | $ |
| 15 | Liquidating Value of Centurion Membership Interest | |
| 16 | Centurion Percentage Interest (line 9 x 40.00) | |

[This Space Left Blank Intentionally. Signature Page Follows.]

MR 126
CALCE01474

IN WITNESS WHEREOF, the Members have executed this Certificate of Fair Market Value as of the date first written above.

MEMBERS:

CENTURION LOGISTICS LLC

By:_____

Name:_____

Title:_____

CAM OIL AND NATURAL GAS, LLC

By:_____

Name:_____

Title:_____

MR 127
CALCE01475

# EXHIBIT C

FIRST AMENDED AND RESTATED

COMPANY AGREEMENT

OF

CENTURION PECOS TERMINAL LLC

a Texas Limited Liability Company

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS, AND MAY NOT BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED ABSENT SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE TRANSFER OF MEMBERSHIP INTERESTS IS FURTHER RESTRICTED BY ARTICLE X OF THIS AGREEMENT.

MR.129

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................................1
    1.1.    Defined Terms .......................................................................................1
    1.2.    Construction.........................................................................................5

ARTICLE II ORGANIZATIONAL MATTERS .....................................................................6
    2.1.    Formation .............................................................................................6
    2.2.    Name ....................................................................................................6
    2.3.    Registered Office and Agent; Principal Office....................................6
    2.4.    Term ....................................................................................................7
    2.5.    Purposes ..............................................................................................7
    2.6.    Powers.................................................................................................7
    2.7.    Company Property ...............................................................................7
    2.8.    Consent to Admission of Members .....................................................7
    2.9.    Status of Managers and Members.......................................................7
    2.10.    Certificates of Membership Interests...................................................7
    2.11.    No State Law Partnership ....................................................................8

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS .............................8
    3.1.    Initial Capital Contributions ...............................................................8
    3.2.    Additional Capital Contributions........................................................8
    3.3.    Capital Accounts.................................................................................8
    3.4.    No Right to Return of or Interest on Capital Account ........................8
    3.5.    Member Loans .....................................................................................8

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS.....................................................8
    4.1.    Allocation of Profit or Loss ................................................................8
    4.2.    Distributions of Distributable Cash ....................................................8
    4.3.    Withholding ........................................................................................9
    4.4.    Limitation on Distributions.................................................................9
    4.5.    No Right to Partition or Distributions in Kind ................................10
    4.6.    Recovery of Erroneous Distributions ...............................................10

ARTICLE V MANAGEMENT; ACTIVITIES OF MANAGERS AND MEMBERS .............10
    5.1.    Management and Control of Company Business ...............................10
    5.2.    Resignation, Removal, and Replacement of Managers .....................10
    5.3.    Actions of the Board of Managers ....................................................12
    5.4.    Limitations on Board of Managers' Authority .................................12
    5.5.    Delegation of Authority; Officers.....................................................13
    5.6.    Reliance .............................................................................................13
    5.7.    Compensation and Expenses of Members and Managers .................13
    5.8.    Standards of Manager and Member Conduct ...................................14

ARTICLE VI LIABILITY AND INDEMNIFICATION......................................................14

MR.130

| | | |
|---|---|---|
| 6.1. | Limitation of Liability | 14 |
| 6.2. | Indemnification by Company | 15 |
| 6.3. | Conduct Not Protected | 15 |
| 6.4. | Insurance | 15 |
| 6.5. | Survival | 15 |

**ARTICLE VII BOOKS AND RECORDS; REPORTS** .......... 16

| | | |
|---|---|---|
| 7.1. | Maintenance of and Access to Books and Records | 16 |
| 7.2. | Fiscal Year | 16 |
| 7.3. | Financial and Operating Reports | 16 |
| 7.4. | Tax Reports | 16 |
| 7.5. | Transmission of Communications | 16 |

**ARTICLE VIII TAX MATTERS** .......... 17

| | | |
|---|---|---|
| 8.1. | Tax Classification | 17 |
| 8.2. | Company Returns | 17 |
| 8.3. | Tax Elections | 17 |
| 8.4. | Consistent Reporting | 17 |
| 8.5. | Tax Proceedings | 17 |
| 8.6. | Information and Documents to Company | 18 |
| 8.7. | Survival | 18 |

**ARTICLE IX MEETINGS AND VOTING OF MEMBERS** .......... 18

| | | |
|---|---|---|
| 9.1. | Meetings | 18 |
| 9.2. | Voting | 19 |

**ARTICLE X TRANSFER OF MEMBERSHIP INTERESTS** .......... 19

| | | |
|---|---|---|
| 10.1. | Limitation on Transfers | 19 |
| 10.2. | Permitted Transfer of Membership Interest | 19 |
| 10.3. | Right of First Refusal; Tag-Along Rights; Triggering Events | 20 |
| 10.4. | Conditions to Permitted Transfers of Membership Interests | 21 |
| 10.5. | Effective Date; Distributions | 21 |
| 10.6. | Transferor's Obligations | 22 |
| 10.7. | Assignee's Rights and Obligations | 22 |
| 10.8. | Effect and Consequences of Prohibited Transfer | 22 |

**ARTICLE XI ADMISSION OF NEW MEMBERS** .......... 23

| | | |
|---|---|---|
| 11.1. | Substituted Members | 23 |
| 11.2. | Additional Members | 23 |
| 11.3. | No Required Capital Contributions | 23 |

**ARTICLE XII WITHDRAWAL OR REMOVAL OF MEMBERS** .......... 23

| | | |
|---|---|---|
| 12.1. | Withdrawal of Members | 23 |
| 12.2. | Removal of Members | 24 |
| 12.3. | Status of Former Member | 24 |

**ARTICLE XIII WINDING UP AND TERMINATION** .......... 24

MR.131

13.1. Events Requiring Winding Up..............................................................................24
13.2. Winding Up Procedures......................................................................................25
13.3. Continuation Without Winding Up.....................................................................25
13.4. Liquidation of Assets and Application and Distribution of Proceeds...................26
13.5. Certificate of Termination .................................................................................26
13.6. Reinstatement...................................................................................................26

ARTICLE XIV VALUATION...................................................................................................26
14.1. Fair Value of Company Property ........................................................................26
14.2. Purchase Price of Membership Interest ............................................................27
14.3. Valuation of Membership Interests....................................................................27

ARTICLE XV GENERAL PROVISIONS..................................................................................27
15.1. Amendments .....................................................................................................27
15.2. Notice...............................................................................................................27
15.3. Governing Law; Consent to Jurisdiction ...........................................................28
15.4. Waiver...............................................................................................................28
15.5. Entire Agreement..............................................................................................28
15.6. Successors and Assigns ....................................................................................28
15.7. Third-Parties ....................................................................................................28
15.8. Severability .......................................................................................................28
15.9. Construction......................................................................................................28
15.10. Execution of Agreement ..................................................................................28
15.11. Further Assurances .........................................................................................29

MR.132

# FIRST AMENDED AND RESTATED
# COMPANY AGREEMENT
# OF
# CENTURION PECOS TERMINAL LLC

This First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC (this "Agreement") is made and entered into effective as of November ___, 2014 (the "Effective Date"), by the persons identified on the signature page(s) hereof.

## RECITALS

WHEREAS, the Company was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Texas (the "Certificate of Formation") effective on September 12, 2014 (the "Formation Date"); and

WHEREAS, the members of the Company as of the Formation Date entered into the Company Agreement (as herein defined); and

WHEREAS, in each case on and as of the Effective Date, in accordance with the Company Agreement and prior to the execution of this Agreement, sequentially,

(a)     contemporaneously (i) CAM Oil and Natural Gas, LLC, a Louisiana limited liability company, without any reservation of any right, title, or interest therein, assigned all of its Membership Interest to Stampede (as herein defined) (the "Membership Interest Assignment"), (ii) in connection with the Membership Interest Assignment, Centurion (as herein defined), acting in its capacity as a Member, (1) pursuant to Section 10.2(a)(i) of the Company Agreement approved such transfer, and (2) waived all of its rights set forth in Section 10.3 of the Company Agreement in connection with such transferred Membership Interests, (iii) the Manager (as herein defined) so named in the Certificate of Formation determined that the Membership Interest Assignment satisfied the conditions set forth in Section 10.4 of the Company Agreement, and (iv) such Manager, pursuant to and in accordance with Section 11.1 of the Company Agreement, approved the admission of, and admitted, Stampede as a Substituted Member (as herein defined);

(b)     The Manager so named in the Certificate of Formation resigned as Manager pursuant to and in accordance with Section 5.2(a) of the Company Agreement; and

(c)     the Majority-in-Interest (as herein defined) elected Centurion and Stampede as replacement Managers pursuant to and in accordance with Section 5.3 of the Company Agreement; and

WHEREAS, the parties hereto desire to hereby (i) amend and restate the Company Agreement with this Agreement, and (ii) provide for the regulation and management of the affairs of the Company according to this Agreement and the Code (as herein defined).

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.     Defined Terms. The following definitions, and the definitions set forth in Appendix A to this Agreement, apply to the terms used in this Agreement for all purposes.

MR.133

"Additional Capital Contribution" means the sum of cash and the Fair Value of any property contributed to the Company with respect to a Membership Interest as permitted under this Agreement, but does not include an Initial Capital Contribution.

"Additional Member" means a person who acquires a Membership Interest from the Company in exchange for a Capital Contribution and is admitted to the Company as a Member pursuant to Section 11.2 after the Effective Date.

"Affiliate" means a person who directly or indirectly Controls, is Controlled by, or is under common Control with the person in question.

"Agreement" means this First Amended and Restated Company Agreement, as it may be amended, supplemented, or restated from time to time.

"Assignee" means (a) a person to whom a Membership Interest has been transferred by a Member or Assignee in a Permitted Transfer, or in a Prohibited Transfer that the Company is required by law to recognize, but who has not become a Member, and (b) a former Member as described in Section 12.3.

"Board of Managers" means all of the Managers acting together. The Board of Managers as of the Effective Date is comprised of Centurion and Stampede.

"Capital Contribution" means the sum of the Initial Capital Contribution and Additional Capital Contributions, if any, with respect to a Membership Interest.

"Centurion" means Centurion Logistics LLC, a Texas limited liability company, and a Member of the Company as of the Effective Date.

"Certificate of Formation" means the Certificate of Formation identified in the recitals to this Agreement, as such certificate may be corrected, amended, or restated.

"Certificate of Membership Interest" means a certificate representing a Member's Membership Interest in a form approved by the Board of Managers.

"Code" means the Texas Business Organizations Code.

"Company" means the limited liability company formed pursuant to the Certificate of Formation.

"Company Agreement" means that certain written agreement, dated as of the Formation Date by and between the members of the Company as of such date, providing for the regulation and management of the affairs of the Company.

"Change of Control" means with respect to a Member, that the owners of such Member (as existing as of the date hereof) shall (i) cease to own, directly or indirectly, 51.0% of the outstanding ownership interests of such Member, or (ii) cease to own or exercise voting control over 51.0% of the outstanding voting interests of such Member.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

MR.134

"Damages" means any expense or loss (including any court costs, judgment or settlement payment, penalty, fine, tax, and reasonable attorney's fees or other dispute resolution costs) paid or incurred in connection with or as a consequence of any Proceeding, net of any insurance or other recoveries received by the Indemnified Person with respect to the foregoing.

"Distributable Cash" means the cash and cash equivalents held by the Company from operations reasonably determined by the Board of Managers to be available for distribution to the Members after payment of the Company's debts, expenses, and other obligations, and after establishment and maintenance of such cash reserves as the Board of Managers determines should be retained for the reasonable current and future needs of the Company's business.

"Effective Date" is defined in the introduction to this Agreement.

"Entity" means any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization, or other business entity.

"Fair Value" means, with respect to an asset, its Fair Value determined according to Section 14.1.

"Fiscal Year" is defined in Section 7.2.

"Formation Date" is defined in the recitals to this Agreement.

"Indemnified Person" means (a) a Member or Assignee; (b) a Manager, (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1, provided such person had the status required to be an Indemnified Person at the time of the relevant actions referenced in the Proceeding.

"Index Rate" means the rate specified in Section 302.002 of the Texas Finance Code.

"Initial Capital Contribution" means the sum of any cash and the Fair Value of any property contributed to the Company by a Member with respect to a Membership Interest in connection with the original issuance of the Membership Interest by the Company as set forth on Exhibit A.

"I.R.C." means the Internal Revenue Code of 1986.

"Liquidator" is defined in Section 13.2(b).

"Majority-in-Interest" means one or more Members owning collectively more than 50% of the Percentage Interests owned by all Members entitled to vote on the particular issue.

"Manager" means the person or persons designated as manager of the Company in the Certificate of Formation and any person or persons who become a replacement Manager pursuant to Section 5.3.

MR.135

"Mandatory Distribution" means any distribution that a Member is entitled to receive and as to which the Member has attained the status of a creditor under Section 101.207 of the Code.

"Member" means any person identified as a member on Exhibit A, and any other person who becomes a member of the Company pursuant to this Agreement, who has not ceased to be a Member. "Members" means all persons that are Members, collectively.

"Membership Interest" means a Member's or Assignee's economic interest in the Company. The term includes the Member's or Assignee's right to receive allocations of profits and losses and distributions as described in Article IV, and other rights and obligations under this Agreement or the Code of an Assignee who has not been admitted as a Member, but does not include any right to participate in management or any other right reserved under this Agreement or the Code exclusively to a Member.

"Offering Member" is defined in Section 10.3(c)(i).

"Percentage Interest" means, as to any Member or Assignee, the percentage interest set forth on Exhibit A.

"Permitted Transfer" means any transfer of a Membership Interest that is described in Section 10.2.

"Person" or "person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person," as and where the context so permits or requires.

"Proceeding" means (a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding; and (c) an inquiry or investigation that could lead to any such proceeding.

"Prohibited Transfer" means any transfer of a Membership Interest that is not a Permitted Transfer.

"Redemption Notice" is defined in Section 10.3(c)(i).

"Redemption Option" is defined in Section 10.3(c)(i).

"Stampede" means Stampede Energy, LLC, a Louisiana limited liability company.

"Stampede Capital Contribution Balance" means, with respect to Stampede, the total Capital Contribution of Stampede less the cumulative distributions of cash by the Company to Stampede in return of Stampede's Capital Contribution pursuant to Section 4.2(a)(ii). For purposes of calculating the Stampede Capital Contribution Balance, no deduction shall be made for any tax distributions made to Stampede, whether pursuant to Section 4.2(b) of this Agreement or otherwise.

"Stampede Preferred Return" means, with respect to Stampede an amount equal to an 8% cumulative compounded annual return on the amount of Stampede's unreturned total Capital Contribution accrued as of any date of determination. The Stampede Preferred Return will be calculated by treating all distributions of the Stampede Preferred Return pursuant to Section 4.2(a) as first being a

MR.136

payment of any undistributed accumulated annual return as of the distribution date and then being a repayment of any and all of Stampede's Capital Contributions as of the distribution date.

"Stampede Preferred Return Balance" means, with respect to Stampede, the cumulative accrued Stampede Preferred Return less the cumulative distributions of cash by the Company to Stampede in payment of the Stampede Preferred Return pursuant to Section 4.2(a)(i). For purposes of calculating the Stampede Preferred Return Balance, no deduction shall be made for any tax distributions made to Stampede, whether pursuant to Section 4.2(b) of this Agreement or otherwise.

"Substituted Member" means a person who is admitted as a Member pursuant to Section 11.1 with respect to the transfer of an existing Membership Interest.

"Treasury Regulations" means the Treasury regulations promulgated under the I.R.C.

"Triggering Event" means the first to occur of (a) the date of a Prohibited Transfer, including any transfer to (i) a Member's trustee in bankruptcy, (ii) a purchaser at any creditor's or court sale, (iii) a Member's spouse pursuant to a decree of a divorce court, or (iv) the guardian of an incompetent Member, (b) the date of death of an individual Member, (c) the date of a Change of Control or termination of a Member that is not an individual; (d) the removal of a Member pursuant to Section 12.2; or (e) the voluntary election of a Member that is not an individual to liquidate all or substantially all of its assets and/or dissolve.

"Triggering Event Closing" is defined in Section 10.3(c)(ii).

"Triggering Event Purchase Price" means, in the case of a Membership Interest to be purchased pursuant to Section 10.3(c), the "fair market value" (as defined in this paragraph) of the Membership Interest as of the date of the Triggering Event, determined assuming an arms length sale of all of the Company's assets to a third party (as a going concern and not as a liquidation) for fair market value and the application of the proceeds of the sale according to Section 13.4. The Triggering Event Purchase Price will be determined (a) if there is in effect as of the date of the Triggering Event a valid Certificate of Fair Market Value in substantially the form attached as Schedule A executed by all Members, by reference to the fair market value for such Membership Interest as set forth in such Certificate of Fair Market Value, and (b) if there is no such Certificate of Fair Market Value effective with respect to the Triggering Event, (i) by agreement of the Company and the Offering Member or the Offering Member's successor in interest, as applicable, or (ii) if no such agreement is reached within 30 days after the issuance of the Redemption Notice, by an independent appraiser chosen mutually by the Company and the Offering Member or the Offering Member's successor in interest, as applicable; provided, however, that in determining the fair market value of a Member's Membership Interest, such appraiser shall take into account the Stampede's Capital Contribution Balance and the Stampede Preferred Return Balance and shall increase or decrease Triggering Event Purchase Price of each Member's Membership Interest accordingly. Any fair market value agreed by the Members in a Certificate of Fair Market Value shall be effective until the earlier of (A) 90 days from the date set forth in any such Certificate of Fair Market Value, or (A) the date that a new Certificate of Fair Market Value has been executed by all of the Members.

1.2.    Construction. In this Agreement, unless a clear contrary intention appears:

(a)    the singular number includes the plural number and vice versa;

MR.137

(b)     reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually;

(c)     reference to any gender includes the other gender and the neuter;

(d)     reference to any agreement or other document means such agreement or other document as amended or modified and in effect from time to time;

(e)     reference to any statute, regulation, or other legal requirement means such legal requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)     "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)     "including" (and with its correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)     "or" is used in the inclusive sense of "and/or";

(i)     with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

(j)     references to agreements or other documents refer as well to all addenda, exhibits, schedules, or amendments thereto.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1.     Formation.  The Company was formed pursuant to the Certificate of Formation effective as of the Formation Date.

2.2.     Name.  The Company's name is as set forth in the Certificate of Formation. The Board of Managers may change the Company name at any time without the approval of any Member by filing a certificate of amendment to the Certificate of Formation. The Board of Managers shall provide notice of any such change to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board of Managers. The Board of Managers shall cause to be executed and filed of record all assumed or fictitious name certificates for the Company as are required by law.

2.3.     Registered Office and Agent; Principal Office.

(a)     The street address of the initial registered office of the Company in Texas and the name of the initial registered agent of the Company are as set forth in the Certificate of Formation. The Board of Managers may change the Company's registered office or registered agent at any time by filing

MR.138

a Change of Registered Agent and/or Registered Office as provided in the Code. The Board of Managers shall provide notice of the change to all Members.

(b)     The address of the principal office of the Company in the United States where records are to be kept or made available under Section 101.501 of the Code shall be as determined by the Board of Managers. The Board of Managers may change the Company's principal office in the United States at any time upon notice to the Members. The Company shall keep at its registered office and make available to a Member on reasonable request the street address of the Company's principal office in the United States.

2.4.     Term. The Company will continue until terminated in accordance with Article XIII.

2.5.     Purposes. The purpose for which the Company is organized is for the development and operation of the Project and the transaction of any and all lawful business for which limited liability companies may be organized under the Code.

2.6.     Powers. Subject to any limitations in this Agreement, the Company may exercise the power to do any and all acts reasonably related to its purposes.

2.7.     Company Property.

(a)     All Company property shall be owned in the name of the Company and not in the name of any Member. No Member or Assignee will have any interest in such Company property solely by reason of the Member's status as a Member.

(b)     The Board of Managers shall cause all funds of the Company to be deposited or invested in an account or accounts in the name of the Company. No funds other than the funds of the Company may be deposited therein. The funds in such accounts shall be used exclusively for the business of the Company (including distributions to the Members) and may be withdrawn only by persons approved by the Board of Managers.

2.8.     Consent to Admission of Members. Each person executing this Agreement consents to the admission as members in the Company all of the other persons who are Members as of the date such person executes this Agreement.

2.9.     Status of Managers and Members. Except as otherwise provided by this Agreement, each Manager has the status, rights, and obligations of a manager in a limited liability company as set forth in the Code, and each Member has the status, rights, and obligations of a member in a limited liability company as set forth in the Code.

2.10.     Certificates of Membership Interests. If provided by the Board of Managers, each Member's Membership Interest may be represented by a Certificate of Membership Interest. Each such Certificate of Membership Interest, if any, shall be numbered and registered in the records of the Company as they are issued, and shall be signed by two officers of the Company. The holder of any Certificate of Membership Interest shall promptly notify the Company of any loss or destruction of the certificate, and the Company shall cause a replacement certificate to be issued to the holder upon receipt of satisfactory evidence of the loss, destruction, or mutilation or the certificate and satisfaction of other reasonable conditions established by the Board of Managers.

MR.139

2.11. No State Law Partnership. The Members intend that the Company is not a partnership or joint venture, and that no Manager or Member is a partner or a joint venturer of any other Manager or Member, for any purposes other than income tax purposes. No provision of this Agreement may be construed to suggest otherwise.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1. Initial Capital Contributions. Each Member's Initial Capital Contribution is set forth on Exhibit A.

3.2. Additional Capital Contributions. No Member shall be required to make Additional Capital Contributions. No Member has the right or is permitted to make any other Additional Capital Contributions unless (a) the Board of Managers approves such Additional Capital Contribution after notice to all Members of (i) the amount of the Additional Capital Contribution to be made, (ii) the effect of the Additional Capital Contribution on each Member's Percentage Interest, and (iii) other material information relevant to the proposed Additional Capital Contribution, and (b) all Members are afforded an opportunity to participate in the Additional Capital Contribution according to their relative Percentage Interests.

3.3. Capital Accounts. The Company shall establish a separate Capital Account for each Member and Assignee. The Capital Accounts shall be maintained according to the provisions of Appendix A.

3.4. No Right to Return of or Interest on Capital Account. No Member may demand or receive the return of its Capital Contribution or any portion of its Capital Account, except as provided in this Agreement and the Code. Neither any Manager nor any Member has any personal liability for the repayment of any Capital Contributions of any Member. No interest will accrue or be paid with respect to the Capital Contributions or Capital Account of any Member.

3.5. Member Loans. The Company may borrow money from one or more Members to the extent the Board of Managers deems appropriate to the conduct of the Company business on terms that comply with the requirements of Section 5.8(b)(iii) (relating to related party transactions). The amount of any loan made to the Company by a Member will not constitute a Capital Contribution or otherwise affect such Member's Capital Account or Membership Interest.

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.1. Allocation of Profit or Loss. Company profits and losses shall be allocated among the Members and Assignees in accordance with the provisions of Appendix A. The Members are aware of the income tax consequences of the allocations made by Appendix A and agree to be bound by the provisions of Appendix A in reporting their shares of Company income and loss for income tax purposes.

4.2. Distributions of Distributable Cash.

(a) Except as otherwise provided in Section 4.2(b) (relating to distributions to pay taxes), Section 4.3 (relating to withholding), Section 4.4 (relating to limitations on distributions), or

MR.140

Section 13.4 (relating to liquidating distributions), Distributable Cash shall be distributed to the Members as follows:

  (i) first, to Stampede in payment of the Stampede Preferred Return until the Stampede Preferred Return Balance has been reduced to zero;

  (ii) next, to Stampede in payment of Stampede's Capital Contribution until the Stampede Capital Contribution Balance has been reduced to zero; and

  (iii) finally, to the Members according to their Percentage Interests.

The Board of Managers may provide for a record date with respect to distributions.

  (b) To the extent the Board of Managers determines that any Member or Assignee has an unfunded tax liability as a result of allocations of Company tax items for any tax year, then, to the extent the Company has funds legally available for the payment of distributions to Members, the Board of Managers shall make a special tax distribution to all such Members and Assignees pro rata according to their relative unfunded tax liabilities in the minimum amount necessary to pay any such unfunded tax liabilities. For this purpose, a Member or Assignee is deemed to have an unfunded tax liability for a tax year to the extent (i) the cumulative amount distributed to the Member or Assignee under Section 4.2(a) and advanced to the Member or Assignee under this Section 4.2(b) (and not previously recovered) from the inception of the Company through the end of the such tax year exceeds (ii) the Member's or Assignee's tax liability with respect to such Member's or Assignee's cumulative allocable share of Company tax items for all periods from the inception of the Company through the end of such tax year. Unless the Board of Managers determines otherwise, the taxes due for each Member and Assignee shall be calculated by assuming that the Member or Assignee is an individual taxed at the highest tax rate applicable to the type of income involved. Any such tax distribution shall, to the extent it exceeds the amount the Member or Assignee would otherwise be entitled to receive under Section 4.2(a), be treated as an advance against, and shall be recovered from, amounts subsequently distributable under Section 4.2(a). No interest shall be charged on any such tax distributions, and no Member or Assignee shall be personally liable for the repayment to the Company or the Members of any such tax distribution. The Board of Managers may make special tax distributions during the tax year in accordance with the principles of this Section 4.2(b) to the extent necessary to fund payments by Members and Assignees of estimated tax payments.

  4.3. Withholding. The Company shall withhold from distributions, or pay on behalf of a Member or Assignee, all amounts that the Board of Managers determines the Company is required to withhold or pay on behalf of such person (including federal and state income tax withholding). All amounts so withheld from distributions are deemed to have been distributed to the person otherwise entitled to receive the amount so withheld. To the extent an amount is paid by the Company on behalf of a Member or Assignee but not withheld from a distribution, the amount paid constitutes a loan to such Member or Assignee. Such loan bears interest at the Index Rate and is repayable on demand or, at the election of the Board of Managers, is repayable out of distributions to which such Member or Assignee would otherwise be entitled.

  4.4. Limitation on Distributions.

  (a) The Company may not make a distribution to a Member or Assignee if it would render the Company insolvent, determined in accordance with Section 101.206 of the Code. A Member

MR.141

or Assignee who receives a distribution in violation of Section 101.206 of the Code is not required to return the distribution except as required in Section 101.206 of the Code.

(b)    The Members shall look solely to the assets of the Company for any distributions, including liquidating distributions. If the assets of the Company remaining after the payment or discharge, or the provision for payment or discharge, of the Company liabilities are insufficient to make any distributions, no Member has any recourse against the separate assets of any other Member.

4.5.    No Right to Partition or Distributions in Kind. No Member has any right, and waives any right that it might otherwise have, to cause any Company property to be partitioned and/or distributed in kind. Except as provided in Section 13.4(d) (relating to liquidating distributions), the Company may not make any distributions in kind.

4.6.    Recovery of Erroneous Distributions. If the Company has, pursuant to any clear and manifest accounting or similar error, distributed to any Member an amount in excess of the amount to which the Member is entitled pursuant to this Agreement, the Member shall reimburse the Company to the extent of such excess, without interest, within 30 days after demand by the Company.

## ARTICLE V
## MANAGEMENT; ACTIVITIES OF MANAGERS AND MEMBERS

5.1.    Management and Control of Company Business.

(a)    Subject to the limitations set forth in this Agreement, the Board of Managers has exclusive authority to manage and conduct the Company's business. The Board of Managers shall do all things appropriate to carry out the Company's purpose and the transactions contemplated by this Agreement. Except as otherwise provided in this Agreement, all actions that the Board of Managers may take and all determinations that the Board of Managers may make pursuant to this Agreement may be taken and made in the absolute discretion of the Board of Managers. In the event the Board of Managers cannot reach unanimous agreement on any proposed action before them, the disposition of such proposed action shall be determined by a vote of the Members made in accordance with Section 9.1, and the vote of a Majority-in-Interest in connection with such proposed action shall be determinative as to the Company and binding on the Board of Managers.

(b)    Except as provided in Sections 8.5(a) (relating to tax matters), the Members may not take part in the management or control of the Company business or bind the Company in their capacity as Members. The Members shall not have the right to vote or otherwise consent or withhold consent to any actions taken by the Board of Managers except with respect to such matters as are expressly stated in this Agreement.

5.2.    Resignation, Removal, and Replacement of Managers.

(a)    Resignation. Any Manager may resign as a manager of the Company upon notice to all Members, which resignation shall be effective immediately upon delivery of such notice. A Manager is deemed to have resigned as a manager of the Company effectively immediately upon the following events:

MR.142

(i)       any event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Manager were a general partner;

(ii)       if the Manager is an individual, the Manager's death, the appointment of a guardian or general conservator for the Manager, or a judicial determination that the Manager is incapable of performing the Manager's duties under the Agreement; or

(iii)       if the Manager is an entity, the termination of the Manager's existence or suspension of the Manager's right to do business.

A resignation pursuant to paragraph (ii) is not a violation of this Section 5.2(a), provided the estate or personal representative or other authorized person provides notice of the deemed resignation within 90 days after the event giving rise to the deemed resignation.

(b)       Removal.

(i)       Removal for Cause. Any Manager may be removed as manager of the Company upon the affirmative vote of one or more Members owning collectively at least 75% of the Percentage Interests if there is cause for removal as specified in Section 5.2(b)(ii) and the Company has received a written opinion of counsel that:

(A)       cause for removal as specified in Section 5.2(b)(ii) exists; and

(B)       the removal of the Manager is not prohibited under any loan agreements, contracts, or other applicable legal requirements.

(ii)       Definition of Cause. Cause for removal exists only if one or more of the following conditions has occurred:

(A)       there has been a change in Control of the Manager;

(B)       the Manager has engaged in wrongful conduct described in Section 6.3(a) that adversely and materially affected the Company business or the Members;

(C)       except as permitted by this Agreement, the Manager has engaged in conduct relating to the Company business that has made it not reasonably practicable to carry on the Company business with the Manager;

(D)       the Manager or an Affiliate of the Manager has been convicted of a felony; or

(E)       a final judgment of a court of competent jurisdiction has been entered that the Manager's removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal or state agency or judicial authority or contained in any federal or state statute; or

(F)       the Manager commits a material breach of any provision of this Agreement, which breach is not cured within 30 days of notice thereof.

MR.143

5.3.    Election of Replacement Manager. If the Manager resigns or is removed as the manager of the Company, within 90 days following such resignation or removal a Majority-in-Interest may elect a replacement Manager of the Company effective as of the date of the former Manager's resignation or removal. The replacement Manager shall file any required amendments to this Agreement to reflect the resignation or removal of the former Manager and the election of the replacement Manager. If the Members fail to elect a replacement Manager within 90 days following the resignation or removal of the former Manager, the Company shall be wound-up according to Article XIII.

5.4.    Actions of the Board of Managers.

(a)    Except as set forth herein, meetings of the Board of Managers shall be held in any manner allowed by the Act, including by means of conference telephone or similar communication equipment if each Manager participating in the meeting can hear and be heard by all other Managers participating in the meeting.

(b)    For purposes of establishing a quorum at any such meeting of the Board of Managers, it is necessary that all Managers appointed by the Members be present.

(c)    Approval by the unanimous vote or written consent of the Managers shall be required to approve any action by the Board of Managers. In the event an action is approved by the Board of Managers, the Managers, individually or collectively, shall be authorized to carry out such action on behalf of the Company.

(d)    Any action of the Board of Managers to be taken by written consent must be signed by all of the Managers to be effective.

5.5.    Limitations on Board of Managers' Authority. The Board of Managers may not do any of the following acts without the approval of all Members:

(a)    knowingly do any act in contravention of this Agreement or, when acting on behalf of the Company, engage in, or cause or permit the Company to engage in, any activity that is not consistent with the purposes of the Company;

(b)    except as otherwise provided in this Agreement, knowingly do any act that would make it impossible to carry on the Company business; or

(c)    cause the Company to (i) not be taxable as a partnership for federal income tax purposes, or (ii) take a position inconsistent with such treatment.

(d)    cause the Company to (i) make a general assignment for the benefit of creditors, (ii) file a voluntary bankruptcy petition, or (iii) seek an order for relief or declaration of insolvency in a federal or state bankruptcy or insolvency proceeding;

(e)    file a pleading seeking for the Company, or admitting or failing to contest the material allegations of a petition filed by any other person seeking for the Company, a proceeding of the type described by subparagraph (d) immediately above;

(f)    except as provided in Article XIII, seek, consent to, or acquiesce in the appointment of a trustee, receiver, or liquidator of the Company or of all or a substantial part of the Company's properties;

MR.144

(g)     cause the Company to issue any Membership Interest or admit any Member other than pursuant to Section 2.8 or Article XI;

(h)     cause the Company to acquire any equity or debt securities of any Member or any Affiliate of a Member, or otherwise make loans to any Member or any Affiliate of a Member;

(i)     cause the Company to acquire from any person any equity or debt securities or assets of any corporation, limited liability company, partnership, association, business, or business division, whether by stock purchase, asset purchase, contribution, or other business combination (excluding investments and asset acquisitions in the ordinary course of the Company's business and transactions contemplated by this Agreement);

(j)     cause the Company to participate in any merger, consolidation, transfer, continuance, or conversion of the Company with or into any other person;

(k)     cause the Company to participate in any reorganization in which Membership Interests are exchanged for or converted into cash, securities of any other person, or other property; or

(l)     sell or otherwise dispose of all or substantially all of the Company property, except in connection with winding up the Company as permitted in this Agreement.

5.6.     Delegation of Authority; Officers.

(a)     The Board of Managers may cause the Company to hire such employees and agents as the Board of Managers deems appropriate for the conduct of the Company's business.

(b)     The Board of Managers may establish offices and appoint officers of the Company, and may delegate to such officers any of its authority hereunder, as the Board of Managers deems appropriate. The officers may be appointed for such terms and may exercise such powers and authority and perform such duties as determined by the Board of Manager. An officer need not be a Member of the Company. Any two or more offices may be held by the same person. An officer may be removed, with or without cause, at any time by the Board of Managers. Each officer will hold office until his successor is chosen and is qualified in his stead, or until his death, resignation, or removal from office. Any vacancy in an office because of death, resignation, removal, or otherwise may be filled by a person appointed by the Board of Managers. An officer is subject to the same standards of conduct as apply to a Manager as described in Section 5.9.

5.7.     Reliance. Persons dealing with the Company may rely conclusively on the authority of the Board of Managers as set forth in this Agreement. Every document executed by any Manager with respect to any business or property of the Company is conclusive evidence in favor of any person relying on the document that (a) at the time of the execution and delivery of the document this Agreement was effective, (b) the document was executed in accordance with this Agreement and is binding on the Company, and (c) the Manager was authorized to execute and deliver the document on behalf of the Company.

5.8.     Compensation and Expenses of Members and Managers. Members and Managers are not entitled to any salary, fee, or other remuneration (other than distributions with respect to the Member's Membership Interest) for providing property or services or other consideration to or for the benefit of the Company in their capacity as a Member or Manager, except that each Manager is entitled to

MR.145

reimbursement from the Company for reasonable out-of-pocket expenses paid or incurred on behalf of the Company, including reasonable charges for services provided by employees of the Manager and overhead expenses. The Company shall pay all out-of-pocket costs incurred in organizing the Company. This Section 5.8 does not limit or enlarge a Manager's or a Member's rights to liability protection or indemnification under Article VI, and does not limit the Company's ability to enter into transactions with Members in their capacities other than as Members in accordance with Section 5.9(iii).

5.9. Standards of Manager and Member Conduct.

(a) In General. The Board of Managers shall manage and conduct the Company's business in good faith and in a manner the Managers reasonably believe to be in the Company's best interest. A Manager does not violate this Section 5.8(a) unless the Manager engages in conduct described in Section 6.3(a) (relating to improper conduct).

(b) Outside Activities of Manager and Members; Noncompetition Covenants.

(i) Each Manager shall devote to the Company's affairs only such time and resources as the Manager deems necessary for the conduct and winding up of the Company business.

(ii) Except as provided herein, the Managers and Members or their Assignees may engage in or have an interest in other business ventures of every nature and description, independently or with others, including the ownership and operation of businesses similar to or in competition with, directly or indirectly, the Company, and neither the Company nor any Member or Assignee has, solely as a result of such person's interest in the Company, any right to acquire any rights in or to any such other business venture or to the income or profits derived from any such other business venture. A Manager or Member or Assignee has no duty to disclose any such similar or competing business venture to the Company or any Member or Assignee, or to offer to the Company or any Member or Assignee any prior opportunity to acquire an interest in such other business venture.

(iii) Related Party Transactions. Except as otherwise provided in this Agreement, the Board of Managers, when acting on behalf of the Company, may purchase property from, sell property to, or otherwise deal with any Manager, Member, or Assignee, acting on its own behalf, or any Affiliate of any Manager, Member, or Assignee, but any such transaction shall be on terms that are no less favorable to the Company than if the transaction had been entered into with an independent third party. No provision of this Agreement requires disclosure of any transaction to, and approval of the transaction by, any disinterested governing persons of the Company or the Members as provided in Section 101.255 of the Code.

## ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1. Limitation of Liability. No Member or Manager is liable for any debts, obligations, or liabilities of the Company. Subject to Section 6.3, an Indemnified Person is not liable to the Company or any other Indemnified Person for any Damages arising from any Proceeding relating to the conduct of the Company's business or relating to any act or omission by the Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course

MR.146

of the Company's business, or for any misconduct or negligence on the part of any other person who is an employee or agent of the Company.

6.2.    Indemnification by Company.    To the fullest extent permitted by applicable law and subject to Section 6.3, the Company indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of the Company's business or to any act or omission by such Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of the Company's business or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company. An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred. The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

6.3.    Conduct Not Protected.

(a)    This Article VI does not operate to limit liability or to indemnify a person to the extent the person is found liable pursuant to a final judgment of a court of competent jurisdiction for:

(i)    an act or omission that involves gross negligence, intentional misconduct, or a knowing violation of law;

(ii)    a transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, a Manager's resignation in violation of Section 5.2(a), or a Member ceasing to be a Member in violation of Section 12.1(a);

(iii)    a willful or reckless material breach of this Agreement or any other agreement relating to the Company's business; or

(iv)    an act or omission for which indemnification is prohibited by law.

(b)    No provision of this Agreement requires the Company to pay or incur any amount for which indemnification is not permitted under this Article VI.

(c)    Any payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to the Company. The Company may require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

6.4.    Insurance.    The Company may maintain insurance to protect any person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such person against such expense, liability, or loss under the Code.

6.5.    Survival.    The indemnities provided for in this Agreement survive the transfer of an Indemnified Person's Membership Interest, the termination of the person's status as a Member or other status giving rise to classification as an Indemnified Person, and the termination of this Agreement and the Company.

MR.147

# ARTICLE VII
## BOOKS AND RECORDS; REPORTS

7.1.    <u>Maintenance of and Access to Books and Records</u>.  The Company shall maintain such books and records regarding the Company's business and properties as is reasonable, including all books and records required under the Code.  Each Member shall have access thereto during ordinary business hours to the extent and under the conditions provided in the Code.

7.2.    <u>Fiscal Year</u>.  The Company shall adopt the calendar year as its fiscal year for financial and tax accounting purposes (such fiscal year of the Company being referred to as the "<u>Fiscal Year</u>").

7.3.    <u>Financial and Operating Reports</u>.  As soon as practicable after the end of each Fiscal Year, but in any event not later than 90 days after the end of the Fiscal Year, the Board of Managers shall deliver to each Member an annual report containing the following:

(a)    a Company balance sheet as of the end of such Fiscal Year, and Company statements of income, cash flows, and changes in Members' equity for such Fiscal Year, each in reasonable detail and prepared according to United States generally accepted accounting principles;

(b)    a general description of the Company's activities during such Fiscal Year, including a description of the amount and circumstances of any indemnification payments paid or requested pursuant to <u>Section 6.2</u>, a description of any material insurance claims or recoveries during the fiscal quarter, and a description of any Proceedings involving the Company; and

(c)    a statement of changes in the Member's Capital Account (showing the balance in the Member's Capital Account as of the beginning of the Fiscal Year, contributions or distributions during the year, allocations of profits and losses during the year, any other adjustments to the Capital Account balances during the year, and the balance in the Capital Account as of the end of the year).

7.4.    <u>Tax Reports</u>.

(a)    Not later than the date (including extensions) for filing the Company's tax return with the Internal Revenue Service (Form 1065), the Board of Managers shall deliver to each person who was a Member or Assignee at any time during the period covered by the return all information necessary for the preparation of such person's United States federal income tax returns, including a Form 1065 Schedule K-1 (if applicable).

(b)    Upon the written request of any Member or Assignee, the Board of Managers shall deliver to such person information necessary for the preparation of any tax returns that must be filed by such person, including information necessary for estimating and paying estimated taxes.

7.5.    <u>Transmission of Communications</u>.  Each person who holds a Membership Interest on behalf of, or for the benefit of, another person or persons shall be responsible for conveying any report, notice, or other communication received concerning the Company's affairs to such other person or persons.

MR.148

# ARTICLE VIII
## TAX MATTERS

8.1.    Tax Classification. The Members intend that the Company be classified as a partnership for federal income tax purposes. The Board of Managers shall take all actions reasonably necessary or appropriate to ensure the Company is so classified (including the filing of elections or tax returns). No Manager, officer, or Member shall take any action inconsistent with the classification of the Company as a partnership for federal income tax purposes.

8.2.    Company Returns. The Board of Managers shall cause the Company to file such tax returns as may be required by law.

8.3.    Tax Elections.

(a)    General. Except as otherwise provided in this Agreement, the Board of Managers shall cause the Company to timely make or revoke all elections, and take all tax reporting positions, necessary or desirable for the Company as determined by the Board of Managers. No election shall be made to have the Company excluded from the application of any provision of Subchapter K of the I.R.C. or any equivalent tax provision in any other tax jurisdiction. The Company shall make the election referred to in I.R.C. Section 754 upon the request of any Member in connection with a transfer of the Member's Membership Interest in accordance with this Agreement.

(b)    Safe Harbor Election for Compensatory Membership Interests.   If Proposed Treasury Regulation 1.83-3(l) is adopted as a temporary or final regulation, the Company shall make the safe harbor election described in such regulations, and the Company and each Member (including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the safe harbor with respect to all Membership Interests transferred in connection with the performance of services while the election remains effective. The Board of Managers shall prepare, execute, and file any required documentation to cause the election to be effective. The Board of Managers may terminate the safe harbor election at any time if it determines in good faith that it is in the best interests of the Company and the Members to do so.

8.4.    Consistent Reporting.   Each Member shall, on the Member's tax returns, treat each partnership item (as defined in I.R.C. Section 6231(a)(3)) in a manner consistent with the treatment of the item on the Company's return in all respects, including the amount, timing, and character of the item. No Member shall file a request for an administrative adjustment of partnership items under I.R.C. Section 6227(a) if such request would cause the Member's treatment of the item to be inconsistent with the treatment of the item on the Company's return.

8.5.    Tax Proceedings.

(a)    The Manager shall be the Company's tax matters partner as defined in I.R.C. Section 6231, and shall take such actions as are required to be designated the tax matters partner under applicable Treasury Regulations. The tax matters partner shall represent the Company in connection with all proceedings with any tax authority related to the Company's tax returns and taxes payable, including administrative examinations and appeals and judicial proceedings. Subject to Section 8.5(c), the tax matters partner has the exclusive right to conduct such proceedings and to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest adjustments proposed or imposed by any tax authority. The tax matters partner shall keep the Members

MR.149

informed on a timely basis of all material developments with respect to any such Proceeding. Each Member shall cooperate with the tax matters partner and do or refrain from doing all things reasonably requested by the tax matters partner with respect to the conduct of any Company tax Proceeding.

(b) The tax matters partner may not bind any other Member to a settlement agreement relating to taxes without obtaining the written concurrence of such Member.

(c) Any deficiency for taxes imposed on a Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member and, if paid or required to be paid by the Company, is recoverable from such Member pursuant to Section 4.3 or by other legal means.

8.6. Information and Documents to Company. Each Member shall timely provide to the Company all information and documents that such Member is required to provide by applicable tax requirements, and shall also provide to the Company upon request such additional information and documents as the Board of Managers may reasonably request in connection with the Company's compliance with applicable tax requirements or filing of any permitted tax elections.

8.7. Survival. This Article VIII shall survive the termination of the Company and the termination of any Member's interest in the Company and remain binding for such period of time as is necessary to resolve all tax matters with applicable taxing authorities.

## ARTICLE IX
## MEETINGS AND VOTING OF MEMBERS

9.1. Meetings.

(a) Meetings of the Members may be called at any time by the Board of Managers, or by one or more Members holding at least 25% of the Percentage Interest held by the Members. Meetings shall be held at the Company's principal place of business or at such other reasonable place set forth in the notice of the meeting.

(b) Any action that may be taken at a Members' meeting may be taken without holding a meeting if Members having at least the minimum Percentage Interest that would be necessary to take the action at a meeting, in which each Member entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

(c) Except as otherwise provided in this Agreement, meeting notices and procedures, including procedures for obtaining written consents in lieu of a meeting, shall be in conformity with Chapters 6 and 101(H) of the Code. Sections 101.353 through 101.356 of the Code (relating to quorum and minimum voting requirements) shall not apply to the extent such provisions are inconsistent with this Agreement. The Board of Managers is solely responsible for convening and conducting meetings of the Members, conducting the solicitation of consents, determining the validity and effect of responses to any solicitation of consents, and determining other matters regarding meetings, voting, and consents.

(d) Notice of the results of any vote taken at a meeting, or the results of any solicitation of consents in lieu of a meeting, shall be given to the Members not later than with the delivery of the next following report of financial information given pursuant to Section 7.3.

MR.150

9.2.	Voting. A Member may vote at a meeting in person, or by a proxy executed in writing by the Member and received by the Board of Managers prior to the time when the votes of Members are to be counted. The provisions of the Code pertaining to the validity and use of proxies by shareholders of a corporation govern the validity and use of proxies given by Members. Only Members of record on the date of the meeting (or if the vote is conducted without a meeting then on the date of the notice soliciting the Member consents) may vote.

## ARTICLE X
## TRANSFER OF MEMBERSHIP INTERESTS

10.1.	Limitation on Transfers.

(a)	The term "transfer," when used in this Agreement in reference to a transfer of a Membership Interest, means an assignment (whether voluntarily, involuntarily, or by operation of law and whether or not effective under this Agreement) of all or any portion of a Member's or Assignee's Membership Interest, or any interest therein, to another person, and includes a sale, assignment, conveyance, gift, exchange, abandonment, or other disposition, a transfer by merger or other business combination, a transfer pursuant to bankruptcy, insolvency, incapacity, divorce, or death, and any pledge, hypothecation, or other encumbrance.

(b)	No Member may transfer all or any portion of its Membership Interest unless the transfer is a Permitted Transfer. A transfer of a Membership Interest that is not a Permitted Transfer is a Prohibited Transfer.

10.2.	Permitted Transfer of Membership Interest.

(a)	A transfer of a Membership Interest is a Permitted Transfer only if the transfer satisfies the conditions set forth in Section 10.4 and is described in one of more of the following paragraphs of this Section:

(i)	the transfer is approved by the other Members;

(ii)	the transfer occurs in accordance with the procedures set forth in Section 10.3;

(iii)	if the Member is a corporation, the transfer is to a member of the Member's affiliated group (as defined in I.R.C. Section 1504(a));

(iv)	if the Member is a trustee of one or more employee benefit plans, the transfer is to a co-trustee or a successor trustee to such plans; or

(v)	if the Member is an individual, the transfer is of a community property or other interest from the Member's spouse or former spouse to the Member pursuant to the death of the Member's spouse or termination of the marital relationship of the Member and the spouse.

(b)	Upon a Permitted Transfer by a Member of all of its Membership Interest, the Member ceases to be a Member as of the effective date of the transfer determined according to Section 10.5.

MR.151

10.3.   Right of First Refusal; Tag-Along Rights; Triggering Events.

(a)   In the event a Member desires to sell all or any portion of its Membership Interest to another Person, the selling Member shall first offer to sell such interest to the other Members on the terms on which it is prepared to sell such interest to such Person by sending written notice to each other Member describing the offer and its terms. Additionally, upon receipt of an offer from a third party to purchase all or any portion of a Member's interest in the Company, which such Member desires to accept, such Member shall promptly deliver a copy of the third party offer to each other Member. Each other Member will have 15 business days from the date of receipt of notice of the proposed sale of a Member's Membership Interest or the third party offer, as the case may be, to notify the selling Member in writing that such other Member elects to (i) purchase the selling Member's Membership Interest upon the terms and conditions of the proposed sale or third party offer, or (ii) sell in the contemplated transfer, at the same price in the same form of consideration and on the same terms (including if the transfer is made to another Member making an election under clause (i), Membership Interests representing a Percentage Interest in the Company equal to the product of (A) the quotient determined by dividing the Percentage Interest owned by such party by the aggregate Percentage Interests owned by all parties participating in such transfer, and (B) the aggregate Percentage Interests to be sold in the contemplated transfer, as the case may be. If the other Members fail to give notification within 15 business days of an election to purchase the selling Member's Membership Interest or participate in the contemplated transfer, then the selling Member shall be permitted, for a period of 90 days, to sell all of its Membership Interest to the third party upon the terms and conditions of the proposed sale or third party offer, as the case may be.

(b)   If more than one Member makes an election to purchase the selling Member's Membership Interest under Section 10.3(a)(i), each of the purchasing Members shall purchase a portion of the selling Member's Membership Interest that is proportional to that Member's Percentage Interest.

(c)   (i) Upon the occurrence of a Triggering Event with respect to any Member (the "Offering Member"), Company shall have the right but not the obligation to purchase all of the Offering Member's Membership Interest in the Company at the time of the Triggering Event (the "Redemption Option"). Within 60 days after the Company receives written notice of the occurrence of (and date of) the Triggering Event, the Company shall provide written notice of its election of the Redemption Option to the Offering Member or the Offering Member's successor in interest, as applicable (the "Redemption Notice"). In the event the Company elects to exercise the Redemption Option, the Company shall purchase, and the Offering Member or the Offering Member's successor interest, as applicable, shall sell, all of the Membership Interest owned by the Offering Member at the time of the Triggering Event at a price equal to the Triggering Event Purchase Price.

(ii)   A closing (a "Triggering Event Closing") shall be held 60 days after the later of the date of the Redemption Notice or the date that the Triggering Event Purchase Price has been established.

(iii)   At the Triggering Event Closing, the Offering Member or Offering Member's successor in interest, as applicable, shall deliver to the Company an assignment of Membership Interest owned by the Offering Member, duly endorsed for transfer to the Company.

(iv)   At the Triggering Event Closing, the Company shall pay the Triggering Event Purchase Price to the Offering Member or the Offering Member's successor in interest, as

MR.152

applicable, in immediately available funds (by wire, certified or bank cashier's check or other means acceptable) and the parties shall execute such documentation as may be necessary or desirable, as determined by the Company, in the Company's sole discretion, to effectuate the transfer of such Offering Member's or Offering Member successor in interest's Membership Interest.

10.4. Conditions to Permitted Transfers of Membership Interests. A transfer shall not be a Permitted Transfer unless the Board of Managers determines that all of the following conditions are satisfied:

(a) The transfer complies with all applicable laws, including any applicable securities laws.

(b) The transfer will not cause the Company to be treated as other than a partnership for United States federal income tax purposes.

(c) The transfer will not cause the Company to be subject to regulation under the Investment Company Act of 1940.

(d) The transfer will not cause any assets of the Company to be deemed "plan assets" under the Employee Retirement Income Security Act of 1974.

(e) The transfer will not result in a termination of the Company under I.R.C. Section 708, unless the Board of Managers determines that such termination will not have an adverse impact on the Members.

(f) The transfer will not cause the application of the tax-exempt use property rules of I.R.C. Sections 168(g)(1)(B) and 168(h) to the Company or its Members, unless the Board of Managers determines that such rules will not have an adverse impact on the Members.

(g) The transferor and transferee have delivered to the Company any documents that the Board of Managers requests to confirm that the transfer satisfies the requirements of this Agreement, to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as an Assignee.

(h) If requested by the Board of Managers, the Company has received a transfer fee in an amount determined by the Board of Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with such transfer.

10.5. Effective Date; Distributions.

(a) A Permitted Transfer of a Membership Interest is effective as of the first day of the calendar month following the calendar month during which the Board of Managers receives notice of such transfer (in such form and manner as the Board of Managers may require) unless the Board of Managers determines that the transfer should be effective as of an earlier or later date (for example, on any date the transfer is effective as a matter of state law, or where the notice of transfer specifies that the transfer is to be effective on a future date).

MR.153

(b)     Distributions with respect to a transferred Membership Interest that are made before the effective date of the transfer shall be paid to the transferor, and distributions made after such date shall be paid to the Assignee.

(c)     Effective as of the effective date of a transfer of a Membership Interest, the Board of Managers shall amend Exhibit A to reflect the reduction in the transferor's Percentage Interest and to reflect the Assignee's Percentage Interest.

(d)     Neither the Company nor the Board of Managers has any liability for making allocations and distributions to the Members determined in accordance with this Section 10.5, whether or not the Board of Managers or the Company has knowledge of any transfer of any Membership Interest.

10.6.   Transferor's Obligations.   The transferor of a Membership Interest who ceases to be a Member continues to be obligated with respect to its Membership Interest or its status as a former Member as provided in the Code and applicable law.

10.7.   Assignee's Rights and Obligations.   Unless an Assignee becomes a Member pursuant to Article XI, such Assignee shall not be entitled to any of the rights granted to a Member (other than as required by the Code), and shall have no right to participate in the management of the business of the Company or to become a Member, unless the Members specifically approve the admission of such Assignee as a Member or such assignment or transfer is accomplished in accordance with the permissive provisions of this Agreement.   An Assignee not admitted as a Member hereunder shall have no membership rights and shall not be a Member with regard to the Membership Interests transferred to such Assignee (other than as required by the Code).

10.8.   Effect and Consequences of Prohibited Transfer.

(a)     Except as otherwise required by law, the Company and the Board of Managers shall treat a Prohibited Transfer as void and shall recognize the transferor as continuing to be the owner of the Membership Interest purported to be transferred. If the Company is required by law to recognize a Prohibited Transfer, the transferee shall be treated as an Assignee with respect to the Membership Interest transferred and may not be treated as a Member with respect to the Membership Interest transferred unless admitted as a Member in accordance with Article XI.

(b)     The Company may remove the transferor and Assignee with respect to a Prohibited Transfer as provided in Article XII.

(c)     The transferor and transferee with respect to a Prohibited Transfer shall be jointly and severally liable to the Company for, and shall indemnify and hold the Company harmless against, any expense, liability, or loss incurred by the Company (including reasonable legal fees and expenses) as a result of such transfer, their removal and liquidation of their Membership Interests (if applicable), and the efforts to enforce the indemnity granted in this Section 10.8(c).

MR.154

# ARTICLE XI
## ADMISSION OF NEW MEMBERS

11.1.    Substituted Members.  An Assignee of a Membership Interest shall be admitted as a Substituted Member with respect to such Membership Interest on the date on which all of the following conditions are satisfied:

(a)    The Board of Managers has approved in writing the admission of the Substituted Member.

(b)    The Assignee has delivered to the Company any agreements and other documents that the Board of Managers requests to confirm such Assignee as a Member in the Company and such Assignee's agreement to be bound by this Agreement as a Member.

(c)    If requested by the Board of Managers, the Company has received an admission fee in an amount determined by the Board of Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with the admission of the Assignee as a Substituted Member.

11.2.    Additional Members.  The Board of Managers shall admit a person as an Additional Member upon satisfaction of all of the following conditions.

(a)    A Majority-in-Interest has approved the admission of the Additional Member after notice to all Members of (i) the Initial Capital Contribution to be made by the proposed Additional Member, (ii) the effect of the admission on each Member's Percentage Interest, and (iii) other material information relevant to the proposed admission.

(b)    The admission of the proposed Additional Member satisfies the applicable conditions of Section 10.4.

(c)    The proposed Additional Member has delivered to the Company any agreements and other documents that the Board of Managers requests to confirm the person as a Member in the Company and the person's agreement to be bound by this Agreement as a Member.

11.3.    No Required Capital Contributions.  A person may be admitted as a Member, including as the sole Member, and may acquire a Membership Interest without making a contribution to the Company or assuming an obligation to make a contribution to the Company.

# ARTICLE XII
## WITHDRAWAL OR REMOVAL OF MEMBERS

12.1.    Withdrawal of Members.

(a)    No Member may withdraw from the Company or otherwise cease to be a Member except upon the following events:

(i)    a transfer of all of the Member's Membership Interest in a Permitted Transfer; or

MR.155

(ii)    removal of the Member as a Member as provided in Section 12.2 of this Agreement.

(b)    A Member shall be deemed to withdraw from the Company upon the occurrence of an event specified in Section 12.1(a).

12.2.    Removal of Members.

(a)    A Member may be removed as a Member by the Board of Managers under the following circumstances:

(i)    the Member has transferred or attempted to transfer all or any portion of its Membership Interest in a Prohibited Transfer;

(ii)    the Member has materially breached the terms of this Agreement; ; or

(iii)    the Board of Managers determines that removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any United States federal or state agency or judicial authority or contained in any United States federal or state statute.

(b)    If the Board of Managers proposes to remove a Member pursuant to this Section, the Board of Managers shall notify the Member in writing of the proposed removal, and if applicable shall provide such Member a reasonable opportunity to cure the event giving rise to removal. The removal of the Member is effective at such time as determined by the Board of Managers in accordance with applicable law and taking into account the Member's opportunity to cure the event giving rise to removal.

12.3.    Status of Former Member.    A Member who withdraws or has been removed from the Company or otherwise ceases to be a Member has the status of an Assignee with respect to any Membership Interest held by such former Member. Except as provided in Section 10.3(c) (relating to optional redemption of a Member's Membership Interest upon the occurrence of a Triggering Event) or Article XIII (relating to winding up and termination), such former Member is not entitled to receive any payments under Section 101.205 of the Code.

## ARTICLE XIII
## WINDING UP AND TERMINATION

13.1.    Events Requiring Winding Up.    The Company shall commence winding up procedures in accordance with this Agreement and the Code upon the first to occur of the following events:

(a)    the Members unanimously vote to wind up and terminate the Company;

(b)    a decree by a court requiring the winding up of the Company;

(c)    the termination of membership of the last remaining Member; or

(d)    the resignation or removal of all Managers if the Members fail to appoint any replacement Manager as provided in Section 5.3.

MR.156

13.2. Winding Up Procedures.

(a)    On the occurrence of an event requiring winding up of the Company, unless there is an action to continue the Company without winding up in accordance with Section 13.3, the Board of Managers (or other Liquidator as provided below) shall, as soon as reasonably practicable, wind up the Company's business and affairs (including disposing of the Company's assets and applying the proceeds as provided in Section 13.4) and terminate the Company in accordance with this Agreement and the Code. The Company shall cease to carry on its business (except to the extent necessary to wind up its business), collect and sell its property to the extent the property is not to be transferred or distributed in kind, and perform any other act required to wind up its business and affairs.

(b)    If the Board of Managers has wrongfully caused the winding up of the Company or if there is no Manager, (i) a Majority-in-Interest may vote to elect a person or persons to accomplish the winding up of the Company, or (ii) if the Members fail to elect a person to accomplish winding up the Company, then any Member or Assignee may petition a court to wind up the Company as provided in Section 11.054 of the Code. The person or persons winding up the Company, whether the Board of Managers or an elected or court appointed person or persons, is referred to in this Agreement as the "Liquidator."

(c)    The Liquidator may determine the time, manner, and terms of any sale or sales of Company property pursuant to such winding up. The Liquidator (if not the Board of Managers) is entitled to receive reasonable compensation for its services; may exercise all of the powers conferred upon the Board of Managers under this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties; and with respect to acts taken or omitted while acting in such capacity on behalf of the Company, is entitled to the limitation of liability and indemnification rights set forth in Article VI.

(d)    The Liquidator shall provide quarterly reports to the Members and Assignees during the winding up procedure showing the assets and liabilities of the Company, providing information and documents required by the Members and Assignees to comply with their tax reporting obligations, and such other information as the Liquidator deems appropriate. Within a reasonable time after completing the winding up, the Liquidator shall give each Member and Assignee a final statement setting forth the assets, liabilities, and reserves of the Company as of the date of completion of winding up.

13.3. Continuation Without Winding Up.

(a)    If there is a decision to wind up and terminate the Company as described in Section 13.1(a), the Company may be continued as provided in Section 101.552 of the Code.

(b)    If there is a termination of the continued membership of the last remaining Member as described in Section 13.1(c), then prior to completion of the winding up process but not later than 90 days after the event of termination, the Board of Managers may continue the Company by admitting one or more Members effective as of the occurrence of the event of termination. Any Assignee whose Percentage Interest would be diminished by reason of the admission of an Additional Member under the circumstances described in this Section must approve the admission of the Additional Member.

MR.157

13.4. Liquidation of Assets and Application and Distribution of Proceeds.

(a) In General. On winding up the Company, the Liquidator shall dispose of the Company's properties and apply and distribute the proceeds, or transfer the Company properties, in the following order of priority:

(i) to creditors (including Members who are creditors) in accordance with their relative rights and priorities to satisfy the liabilities of the Company, including expenses associated with the winding up and termination of the Company, but excluding any Company liability for any unpaid Mandatory Distributions;

(ii) to Members, Assignees, and former Members to satisfy the Company's liability for any unpaid Mandatory Distributions; and

(iii) to Members and Assignees as provided in Section 4.2(a).

(b) No Member Deficit Restoration Obligation. No Member is liable to the Company or any other person for the repayment of any deficit in the Member's Capital Account, except as provided in Section 101.206 of the Code.

(c) Reserves. In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made pursuant to Section 13.4(a)(ii) and (iii) may be withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and future expenses, including a reasonable reserve for any claims for indemnification under Article VI and for any future expenses associated with any tax audit or other Proceeding that is pending or may arise.

(d) Payments and Distributions to Members in Kind. The Liquidator may not make any payments or distributions to Members or Assignees pursuant to Section 13.4(a)(ii) or (iii) other than in cash unless all Members and Assignees receiving the property approve the transfer in kind. The Liquidator shall determine the Fair Market Value of any property transferred to Members or Assignees in kind according to the valuation procedures set forth in Article XIV.

(e) Character of Liquidating Distributions. Except as otherwise required by the I.R.C., amounts paid to Members pursuant to this Section 13.4 shall be treated as made in exchange for the interest of the Member in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Member in Company goodwill.

13.5. Certificate of Termination. The Liquidator shall file a Certificate of Termination of a Domestic Entity on the completion of the winding up of the Company.

13.6. Reinstatement. If the Company is terminated, it may be reinstated in the manner provided in the Code.

## ARTICLE XIV
## VALUATION

14.1. Fair Value of Company Property. The Fair Value of property contributed to the Company by a Member as part of such Member's Initial Capital Contribution is the amount of such Member's Initial Capital Contribution, as set forth on Exhibit A, minus the amount of any cash contributed to the Company as part of such Member's Initial Capital Contribution. In all other cases, the

MR.158

Fair Value of an asset as of any date is its fair market value as determined by the Board of Managers in good faith using any reasonable valuation method. If any affected Member does not agree with the valuation set by the Board of Managers, the Fair Value shall be determined using procedures similar to those set forth in Section 14.2, and the cost of any such determination shall be borne entirely by the affected Member unless the Board of Managers or a Majority-in-Interest of all Members other than the affected Member approves an alternative allocation of such costs.

14.2. Purchase Price of Membership Interest.

(a) For purposes of any redemption of a Membership Interest pursuant to Section 10.3(c), the purchase price shall be the Triggering Event Purchase Price.

(b) If the Offering Member and the Company cannot cooperatively designate an appraiser within 15 days following the date of the Redemption Notice, then the Offering Member and the Company shall each select an appraiser, and such two (2) appraisers shall select a third appraiser who shall select the appraiser to perform such appraisal. The cost of each appraisal shall be shared equally by the Company and the Offering Member.

14.3. Valuation of Membership Interests. For all purposes of this Agreement other than the valuation of Membership Interests in connection with a Triggering Event, the fair market value of the Membership Interests shall be determined by the Managers pursuant to an independent third party appraisal of the assets of the Company. The Board of Managers shall no less than annually cause the assets of the Company to be appraised by an independent third party.

## ARTICLE XV
## GENERAL PROVISIONS

15.1. Amendments.

(a) In General. Subject to the following exceptions and limitations, this Agreement may be amended only with the written approval of all Members.

(b) Exceptions and Limitations. The Board of Managers may amend Exhibit A from time to time to reflect the admission and withdrawal of Members, and changes to any Member's Percentage Interest, in accordance with this Agreement. No amendment of Article VI (relating to liability and indemnification) may adversely affect the rights or obligations of any Indemnified Person without the Indemnified Person's prior written approval.

15.2. Notice. Any notice, report, or other communication required or permitted to be made to any person by this Agreement shall be in writing and is deemed given when (a) delivered to the person by hand, (b) the third business day after delivery to the United States Postal Service (or other designated delivery service as defined in I.R.C. Section 7502(f)), postage prepaid, in an envelope properly addressed to the person at the person's address set forth in the Company's records as of the date of delivery, or (c) successfully transmitted by facsimile or electronic message to the person's facsimile phone number or e-mail address (as applicable) set forth in the Company's records as of the date of transmission. Any communication to the Board of Managers or the Company may be delivered to the Company's registered office designated pursuant to Section 2.3.

MR.159

15.3. Governing Law; Consent to Jurisdiction. This Agreement is governed by and shall be construed under the laws of the State of Texas without regard to legal requirements that would require the application of the law of any other jurisdiction. Any Proceeding arising out of or relating to this Agreement or the Company's activities or properties may be brought in the state courts of Dallas County, Texas or, if it has or can acquire jurisdiction, in the United States District Court located in Dallas County, Texas. Each Member and Assignee irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court and agrees not to bring any such Proceeding in any other court. The Company or any Member or Assignee may file a copy of this Agreement with any court as written evidence of the agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the second sentence of this Section may be served on any party anywhere in the world.

15.4. Waiver. Any failure by a party to insist upon the strict performance of any covenant or condition of this Agreement, or to exercise any right or remedy upon a breach of any such covenant or condition, does not constitute waiver of any such covenant or condition or any breach thereof. A party will not be deemed to have waived any right or remedy under this Agreement unless that party has signed a written document to that effect, and any such waiver is applicable only with respect to the specific provision and instance for which it is given.

15.5. Entire Agreement. This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the agreement between the parties with respect to its subject matter.

15.6. Successors and Assigns. No Member or Assignee may assign any of its rights or delegate any of its obligations under this Agreement except as expressly permitted in this Agreement.

15.7. Third-Parties. Other than as provided in Section 5.7 (relating to reliance on authority of the Board of Managers) and Article VI (relating to rights of Indemnified Persons), none of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company or other persons not a party to this Agreement, except such benefits as inure to a successor or permitted assign in accordance with Section 15.6.

15.8. Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

15.9. Construction. The language in this Agreement is to be construed according to its fair meaning and is not to be strictly construed for or against any party. Nothing in this Agreement is to be construed as authorizing or requiring any action that is prohibited by the Code or other applicable law, or as prohibiting any action that is required by the Code or other applicable law.

15.10. Execution of Agreement. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which together constitute one agreement. Any signature to this Agreement evidenced by a facsimile or other electronic transmission of such signature shall be binding on the parties to the same extent as if such signature were an original.

MR.160

15.11. <u>Further Assurances</u>. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

[This Space Left Blank Intentionally. Signature Page Follows.]

MR.161

Executed as of the Effective Date set forth above, by and among the persons signing below.

MEMBERS:

CENTURION LOGISTICS LLC

By: _____
    Marc Marrocco
Title:   Manager

STAMPEDE ENERGY, LLC

By: _____
Name: _____James Hock_____
Title: _____President_____

MANAGERS:

CENTURION LOGISTICS LLC

By: _____
    Marc Marrocco
Title:   Manager

STAMPEDE ENERGY, LLC

By: _____
Name: _____James Hock_____
Title: _____President_____

MR.162

# FIRST AMENDED AND RESTATED
## COMPANY AGREEMENT
### OF
## CENTURION PECOS TERMINAL LLC

### EXHIBIT A
### MEMBERS' CONTRIBUTIONS AND PERCENTAGE INTERESTS

#### Effective as of the Effective Date

| MEMBER NAME AND ADDRESS | Initial Capital Contribution | Initial Percentage Interest |
|---|---|---|
| Centurion Logistics LLC<br>17950 Preston Road<br>Suite 1080<br>Dallas, Texas 75252 | $400.00 | 40.00% |
| Stampede Energy, LLC<br>800 Spring Street<br>Suite 205<br>Shreveport, Louisiana 71101 | $600.00 | 60.00% |

MR.163

# FIRST AMENDED AND RESTATED
## COMPANY AGREEMENT
## OF
## CENTURION PECOS TERMINAL LLC

## APPENDIX A
## PRINCIPLES OF ALLOCATION

A.1    Introduction.  This Appendix sets forth principles under which items of income, gain, loss, deduction and credit shall be allocated among the Members.  This Appendix also provides for the determination and maintenance of Capital Accounts, generally in accordance with Treasury Regulations promulgated under I.R.C. Section 704(b), for purposes of determining such allocations.  For purposes of this Appendix, an Assignee shall be treated in the same manner as a Member.

A.2    Definitions.  Capitalized terms used in this Appendix have the meanings set forth below or in the Agreement.

"Adjusted Capital Account Deficit" means any deficit balance in a Member's Capital Account as of the end of a taxable year, after giving effect to the following adjustments:

     (i)    Credit to the Capital Account any amounts the Member is obligated to restore pursuant to the Agreement or is deemed to be obligated to restore pursuant to (a) Treasury Regulations Section 1.704-1(b)(2)(ii)(c) (relating to obligations to pay partner promissory notes and other obligations to make contributions to the Company), or (b) the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) (relating to partnership minimum gain) and 1.704-2(i)(5) (relating to partner nonrecourse debt minimum gain); and

     (ii)    Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Capital Account" has the meaning set forth in Section A.3.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation is an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis.  If the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"Gross Asset Value" means an asset's adjusted basis for federal income tax purposes, except as follows:

MR.164

(i)    The initial Gross Asset Value of an asset contributed by a Member to the Company is the gross Fair Value of such asset, as determined by the contributing Member and the Board of Managers and as set forth on Exhibit A.

(ii)    The Gross Asset Values of Company assets shall be adjusted to equal their respective gross Fair Values (taking I.R.C. § 7701(g) into account), as determined by the Board of Managers, as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by a Member acting in a member capacity or in anticipation of being a Member.  Adjustments pursuant to clauses (A), (B), and (D) above are required only if the Board of Managers determines that such adjustments are necessary to accurately reflect the relative economic interests of the Members in the Company.

(iii)    The Gross Asset Value of a Company asset distributed to a Member shall be adjusted to equal the gross Fair Value (taking I.R.C. § 7701(g) into account) of such asset on the date of distribution as determined by the distributee and the Board of Managers.

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m). Gross Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment is required pursuant to paragraph (ii).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv) of this definition, the asset's Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

"Net Profit" and "Net Loss" mean, for each taxable year or other relevant period, an amount equal to the Company's taxable income or loss for such taxable year or other relevant period, determined in accordance with I.R.C. Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to I.R.C. Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss.

(ii)    Any expenditures of the Company described in I.R.C. Section 705(a)(2)(B) or treated as I.R.C. Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss.

MR.165

(iii)    If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the Section A.2 definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit and Net Loss.

(iv)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of (unreduced by any liabilities attributable thereto), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation computed in accordance with the definition of Depreciation in Section A.2.

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1) and shall be determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(1) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

A.3    Capital Accounts.    The Company shall determine and maintain Capital Accounts. "Capital Account" means an account of each Member determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the foregoing, the following rules apply:

(a)    The Capital Account of each Member shall be credited with (i) an amount equal to such Member's Capital Contributions and the Fair Value of property contributed (if permitted hereunder) to the Company by such Member, (ii) such Member's share of the Company's Net Profit,

MR.166

and (iii) the amount of any Company liabilities assumed by such Member or that are secured by property distributed to such Member.

(b)     The Capital Account of each Member shall be debited by (i) the amount of cash and the Fair Value of property distributed to such Member, (ii) such Member's share of the Company's Net Loss, and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)     Upon the transfer by a Member of all or part of an interest in the Company after the Effective Date, the Capital Account of the transferor that is attributable to the transferred interest carries over to the transferee and the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)     In determining the amount of any liability for purposes of Sections A.3(a) and A.3(b), I.R.C. Section 752(c) and any other applicable provisions of the I.R.C. and the Treasury Regulations shall be taken into account.

(e)     Except as otherwise required by Treasury Regulations Section 1.704-1(b)(2)(iv), adjustment to Capital Accounts in respect of Company income, gain, loss, deduction, and I.R.C. Section 705(a)(2)(B) expenditures (or items thereof) shall be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to the federal tax treatment of the corresponding tax items) at the Company level, without regard to any mandatory or elective tax treatment of such items at the Member level.

(f)     The provisions of this Appendix and of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Board of Managers may make such modification if it is not likely to have a material effect on the amounts distributed or to be distributed to any Member pursuant to the Agreement. The Board of Managers shall make any adjustments that are necessary or appropriate (i) to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) if unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(g)     The provisions of the proposed Treasury Regulations published on January 22, 2003 (68 Fed. Reg. 2930), as they may subsequently be modified or adopted as temporary or final Treasury Regulations, shall apply with respect to any noncompensatory options issued by the Company.

A.4     Allocations of Net Profit and Net Loss

A.4.1   In General

After giving effect to the special allocations set forth in Sections A.4.2 and A.4.3 hereof, Net Profit and Net Loss (and to the extent necessary, individual items of income, gain, loss, or deduction) for

MR.167

any period shall be allocated to the Members in such amounts as may be necessary to cause each Member's Capital Account (as adjusted through the end of such period) to equal, as nearly as possible, the sum (which may be either a positive or negative amount) of (i) the amount such Member would receive if all Company assets on hand at the end of such period were sold for cash at their Gross Asset Values, all Company liabilities were satisfied in cash according to their terms (limited in the case of any Nonrecourse Liability and Partner Nonrecourse Debt to the Gross Asset Value of the property securing such liabilities), all obligations (if any) of Members to contribute additional capital to the Company were satisfied, and any remaining cash was distributed to the Members under Section 4.2 as of the last day of such period, minus (ii) the Member's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain computed immediately prior to such deemed sale of assets.

A.4.2  Regulatory Allocations. The following special allocations shall be applied in the order in which they are listed. Such ordering is intended to comply with the ordering rules in Treasury Regulations Section 1.704-2(j) and shall be applied consistently therewith.

(a)  Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), anything to the contrary in this Section A.4 notwithstanding, if there is a net decrease in Partnership Minimum Gain during any taxable year, each Member shall be allocated items of income and gain for that taxable year (and, if necessary, subsequent taxable years) equal to that Member's share of the net decrease in Partnership Minimum Gain determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section A.4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for requesting a waiver described in Treasury Regulations Section 1.704-2(f)(4) are met or the requirements for any other exception prescribed by or pursuant to Treasury Regulations Section 1.704-2(f) are met.

(b)  Partner Nonrecourse Debt Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), anything to the contrary in this Section notwithstanding, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year, then, in addition to the amounts, if any, allocated pursuant to paragraph 4.2(a), any Member with a share of that Partner Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the taxable year shall be allocated items of Company income and gain for that taxable year (and, if necessary, for subsequent taxable years) equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section A.4.2(b) is intended to comply with the chargeback of partner nonrecourse debt minimum gain required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for any exceptions provided in Treasury Regulation Section 1.704-2(i)(4) are met.

(c)  Qualified Income Offset. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible. An allocation pursuant to the foregoing sentence shall be made only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in Section A.4 have been tentatively made as if this Section A.4.2(c) were not in this Appendix. This allocation is intended to constitute a "qualified income

MR.168

offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed in accordance with the requirements thereof.

(d)     Gross Income Allocation. If a Member has an Adjusted Capital Account Deficit at the end of any taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this clause shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section A.4 have been made as if this Section A.4.2(d) were not in this Appendix.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any taxable year shall be allocated among the Members in accordance with their Percentage Interests.

(f)     Partner Nonrecourse Deductions. Partner Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b) is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

A.4.3  Curative Allocations. The allocations set forth in Section A.4.2 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section A.4.3. Therefore, any other provisions of this Section A.4 (other than the Regulatory Allocations) notwithstanding, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Board of Managers determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.4.1. In exercising its discretion under this Section A.4.3, the Board of Managers shall take into account future Regulatory Allocations under Sections A.4.2(a) and A.4.2(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections A.4.2(e) and A.4.2(f).

A.4.4  Other Allocation Rules

(a)     Net Profit, Net Loss, and other items shall be allocated to the Members pursuant to this Appendix A as of the last day of each taxable year, and at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b)     If during any taxable year any Member's Percentage Interest changes, each Member's share of Net Profit, Net Loss, and other items for such taxable year shall be determined

MR.169

according to their varying interests and I.R.C. Section 706(d), using any conventions permitted by law and selected by the Board of Managers.

(c)     For purposes of determining a Member's share of Company "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' shares of Company profits shall be deemed to be in proportion to their respective Percentage Interests.

(d)     To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Board of Managers may treat any distribution of the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (that would otherwise be allocable to an increase in Partnership Minimum Gain) as a distribution that is not allocable to an increase in Partnership Minimum Gain to the extent the distribution does not cause or increase an Adjusted Capital Account Deficit for any Member.

A.5     Tax Allocations

(a)     In General. Except as otherwise provided in this Section A.5, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under the Agreement and this Appendix.

(b)     Contributed or Revalued Property. In accordance with I.R.C. Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value. If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value in Section A.2 hereof, subsequent allocations of income, gain, loss, and deductions with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under I.R.C. Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations pursuant to this Section A.5 shall be made by the Board of Managers in any manner that reasonably reflects the purpose and intention of this Appendix and the Agreement.

(c)     Credits. Except as otherwise required by Treasury Regulations Section 1.704-1(b)(4)(ii), items of tax credit and tax credit recapture shall be allocated among the Members in accordance with their Percentage Interests.

(d)     Effect of Tax Allocations. Allocations pursuant to this Section A.5 are solely for purposes of U.S. federal, state, and local taxes and shall not affect any Member's Capital Account or share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Appendix and the Agreement.

MR.170

## SCHEDULE A
## CERTIFICATE OF FAIR MARKET VALUE

In accordance with the provisions of the definition of "Triggering Event Purchase Price" set forth in the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC (the "Company") effective as of November ___, 2014, the liquidating value of the Membership Interests (as defined in such company agreement) is as follows:

| | | |
|---|---|---|
| 1 | Estimated fair market value of Company assets | $ |
| 2 | Less: estimated selling expenses | $ |
| 3 | Less: liabilities | $ |
| 4 | Less: reserves | $ |
| 5 | Equals: total distributable proceeds (sum of lines 1-4) | $ |
| 6 | Less: Stampede Preferred Return Balance | $ |
| 7 | Less: Stampede Capital Contribution Balance | $ |
| 8 | Equals: residual distribution amount (sum of lines 5 – 7) | $ |
| 9 | Residual distribution amount per percentage point of Percentage Interest (line 8 ÷ 100) | $ |
| 10 | **Liquidating Value of Stampede Membership Interest** | |
| 11 | Stampede Preferred Return Balance (line 6) | $ |
| 12 | Stampede Capital Contribution Balance (line 7) | $ |
| 13 | Stampede Percentage Interest (line 9 x 60.00%) | $ |
| 14 | Total (sum of lines 11 – 13) | $ |
| 15 | **Liquidating Value of Centurion Membership Interest** | |
| 16 | Centurion Percentage Interest (line 9 x 40.00%) | |

[This Space Left Blank Intentionally. Signature Page Follows.]

MR.171

IN WITNESS WHEREOF, the Members have executed this Certificate of Fair Market Value as of the date first written above.

MEMBERS:

CENTURION LOGISTICS LLC

By:_____

Name:_____

Title:_____

STAMPEDE ENERGY, LLC

By:_____

Name:_____

Title:_____

MR.172

FILED
DALLAS COUNTY
11/22/2017 1:55 PM
FELICIA PITRE
DISTRICT CLERK

Marissa Pittman

## CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC, JOHN CALCE, | § | DALLAS COUNTY, TEXAS |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP, | § | |
| LLC, CENTURION TERMINALS, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| Nominal Defendant. | § | 44th JUDICIAL DISTRICT |

### DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC

John Calce ("Counter-Plaintiff" or "Calce") files his First Amended Counterclaim complaining of Centurion Logistics LLC ("Centurion Logistics") and Centurion Pecos Terminal LLC ("Centurion Pecos") (collectively, "Counter-Defendants") and, in support thereof, would respectfully show the Court as follows:

### I.
### DISCOVERY LEVEL

1. Discovery in this matter is to be conducted under Texas Rule of Civil Procedure 190.4 (Level 3).

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC** **PAGE 1**
9513752.1/SP/38371/0105/112217

MR.173

## II.
## MONETARY RELIEF

2.      Calce seeks both monetary and non-monetary relief.  The monetary relief sought by Calce is, at this time, over $100,000 but not more than $200,000.  But the monetary relief sought by Calce continues to increase as he is required to incur additional expenses in defending himself against the claims brought against him in this lawsuit.

## III.
## PARTIES

3.      Plaintiff Calce is an individual residing in Collin County, Texas.

4.      Counter-Defendant Centurion Logistics is a limited liability company organized under the laws of the State of Texas with its principal place of business in Dallas, Dallas County, Texas.  Centurion Logistics has made an appearance in this matter.

5.      Counter-Defendant Centurion Pecos is a limited liability company organized under the laws of the State of Texas with its principal place of business in Dallas, Dallas County, Texas.  Centurion Pecos has made an appearance in this matter through Centurion Logistics bringing claims against Calce and the other Defendants derivatively on behalf of Centurion Pecos.

## IV.
## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

7.      Calce asserts that Dallas County is not a proper venue for this lawsuit pursuant to Section 15.011 of the Texas Civil Practice and Remedies Code.  The bases for such assertion are set forth in Calce's Motion to Transfer Venue.  The Motion to Transfer Venue has been denied and is an interlocutory order.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 2**
9513752.1/SP/38371/0105/112217

MR.174

8.     On June 27, 2016, Centurion Logistics, individually and derivatively on behalf of Centurion Pecos, filed its Original Petition complaining of Calce and the other Defendants. Centurion Logistics has brought claims against Calce for (1) breach of fiduciary duty; (2) unjust enrichment; and (3) aiding and abetting fraudulent concealment.

9.     Plaintiff generally claims that Calce and the other Defendants carried out a scheme that resulted in Centurion Pecos and Centurion Logistics losing their interest in the Reeves County Property, thereby allegedly depriving such entities of the opportunity to construct a railway terminal for the shipping of crude oil on the Reeves County Property.[1] Among other things, Plaintiff alleges that Calce breached the fiduciary duties that he allegedly owed Centurion Logistics as a manager of the company. *See* Pl.'s Orig. Pet. ¶¶ 36 – 42. Plaintiff further claims that Calce took various allegedly unauthorized acts on behalf of Centurion Pecos. *See id.* ¶ 24.

10.     On September 20, 2016, Calce filed his Motion to Transfer Venue and Brief in Support Thereof and, Subject Thereto, Original Answer (the "Original Answer"). Since the time of filing his Original Answer, Calce has incurred significant expenses in defending against the claims that have been brought against him in the lawsuit.

**CALCE'S RIGHT TO INDEMNIFICATION/IMMEDIATE REIMBURSEMENT OF EXPENSES FROM CENTURION LOGISTICS**

11.     Calce is a manager of Centurion Logistics. Section 1.1 of the Company Agreement of Centurion Logistics (the "Logistics Agreement") defines an "Indemnified Person" as follows:

---

[1] The term "Reeves County Property," when used herein, should be understood to have the same meaning as the term is used and defined in Plaintiff's Original Petition.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 3**
9513752.1/SP/38371/0105/112217

MR.175

"Indemnified Person" means (a) a Member or Assignee; (b) *a Manager*; (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1.

*See* Section 1.1 of the Logistics Agreement (emphasis added). A true and correct copy of the Logistics Agreement is attached hereto as Exhibit A. Calce, as a manager of the company, is therefore an "Indemnified Person" under the Agreement. *See id.*

12. Section 6.2 of the Logistics Agreement is entitled "Indemnification by Company" and provides as follows:

To the fullest extent permitted by applicable law, and subject to Section 6.3, [Centurion Logistics] indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business or for any misconduct or negligence on the part of any other person that is an employee or agent of [Centurion Logistics]. *An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.* The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

*See* Ex. A § 6.2 (emphasis added). Accordingly, pursuant to Section 6.2, Calce—as an Indemnified Person—is entitled to immediate reimbursement of "expenses paid or incurred in defending [himself] against any Proceeding." *See id.*

13. Section 1.1 of the Agreement defines "Proceeding" as follows: "(a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding, and (c) any

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**     **PAGE 4**
9513752.1/SP/38371/0105/112217

MR.176

inquiry or investigation that could lead to any such proceeding." *See* Ex. A § 1.1. This Lawsuit clearly constitutes a "Proceeding" under the Logistics Agreement.

14. Under the terms of the Logistics Agreement, Centurion Logistics is required to reimburse Calce for any and all expenses paid or incurred by Calce in defending himself in this lawsuit—*as such expenses are paid or incurred*. If it is ultimately determined that Calce is not entitled to such payments, the Logistics Agreement expressly provides Centurion Logistics with an appropriate remedy. *See* Ex. A § 6.3(c) (providing that "[a]ny payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to [Centurion Logistics].").

## CENTURION LOGISTICS' REFUSAL TO REIMBURSE CALCE'S DEFENSE COSTS

15. On August 22, 2017, Calce—through his counsel—requested that Centurion Logistics, pursuant to Section 6.2 of the Agreement, (1) reimburse Calce the full amount of expenses that he had been invoiced as of July 31, 2017, plus an additional $50,000 to be applied to future expenses as they are incurred; and (2) agree to reimburse Calce the additional expenses, in excess of such $50,000 advancement, that he pays or incurs in his defense of the Lawsuit as such expenses are paid or incurred (referred to hereinafter as the "Reimbursement Request").

16. The Reimbursement Request provides that, "[p]ursuant to Section 6.3 of the Agreement, Mr. Calce hereby affirms that it is his good faith belief that he has met the standard of conduct necessary for indemnification under Section 6.3." The Reimbursement Request also provides that "Mr. Calce further agrees to repay any amount that is paid or reimbursed by Centurion Logistics, pursuant to Section 6.2, if it is determined by a court of competent jurisdiction that Mr. Calce did not meet the aforementioned standard or if indemnification is otherwise determined to be prohibited by law."

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 5**
9513752.1/SP/38371/0105/112217

MR.177

17.     Centurion Logistics denied Calce's request for reimbursement.  To date, Centurion Logistics has not reimbursed Calce any amount for the expenses he has paid and incurred in defending himself against the claims brought against him in the Lawsuit.

### CALCE'S RIGHT TO INDEMNIFICATION/IMMEDIATE REIMBURSEMENT OF EXPENSES FROM CENTURION PECOS

18.     When Centurion Pecos was initially formed, Calce was the sole manager of the company.  *See* the Company Agreement of Centurion Pecos (the "Pecos Original Agreement"), which is dated effective September 12, 2014, a true and correct copy of which is attached hereto as Exhibit B.  Calce was also appointed as the president of Centurion Pecos.  Such appointment was effective as of September 11, 2014.

19.     In November 2014, the First Amended and Restated Company Agreement of Centurion Pecos (the "Pecos Amended Agreement") was executed.  A true and correct copy of the Pecos Amended Agreement is attached hereto as Exhibit C.  The First Amended and Restated Company Agreement removed Calce as a manager of Centurion Pecos, but Calce remained the duly appointed president of the company.

20.     Section 1.1 of both the Pecos Original Agreement and the Pecos Amended Agreement defines an "Indemnified Person" as follows:

> "Indemnified Person" means (a) a Member or Assignee; (b) *a Manager*; (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) *any governing person, officer, employee, agent, or owner of the [Centurion Pecos]*, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing.  A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1, provided such person had the status required to be an Indemnified Person at the time of the relevant actions referenced in the Proceeding.

*See* Ex. B § 1.1 (emphasis added); *see also* Ex. C § 1.1 (emphasis added).

DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM
AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC                    PAGE 6
9513752.1/SP/38371/0105/112217

MR.178

21.     Moreover, Section 6.2 of both the Pecos Original Agreement and the Pecos Amended Agreement is entitled "Indemnification by Company" and provides as follows:

> To the fullest extent permitted by applicable law and subject to Section 6.3, [Centurion Pecos] indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Pecos'] business or to any act or omission by such Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of [Centurion Pecos'] business or for any misconduct or negligence on the part of any other person that is an employee or agent of [Centurion Pecos]. ***An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.*** The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, vote of Members, or otherwise.

*See* Ex. B § 6.2 (emphasis added); *see also* Ex. C § 6.2 (emphasis added).

22.     Like the Logistics Agreement, the terms of the Pecos Original Agreement and the Pecos Amended Agreement require Centurion Pecos to reimburse Calce for any and all expenses paid or incurred by Calce in defending himself in this lawsuit, ***as such expenses are paid or incurred***. Furthermore, also like the Logistics Agreement, both the Pecos Original Agreement and the Pecos Amended Agreement provide Centurion Pecos with an adequate remedy if it is ultimately determined that Calce is not entitled to such payments. *See* Exs. B and C § 6.3(c) (providing that "[a]ny payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to [Centurion Pecos].").

23.     To date, Centurion Pecos has not reimbursed Calce any amount for the expenses that he has paid and incurred in defending himself against the claims brought against him in this lawsuit.

24.     The Pecos Amended Agreement identifies Centurion Logistics and Defendant Stampede TX Energy, LLC ("Stampede") as the only members of Centurion Pecos. Pursuant to the Pecos Amended Agreement, Stampede is the majority-in-interest member holding a 60%

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 7**
9513752.1/SP/38371/0105/112217

MR.179

membership interest in Centurion Pecos, and Centurion Logistics holds the remaining 40% membership interest.

25. Stampede—on behalf of Centurion Pecos—has already agreed that Centurion Pecos will reimburse Calce for the amount of expenses that he has paid or incurred (or will pay and incur) in defending himself against the claims brought against him in this lawsuit. But Centurion Logistics claims that Stampede was removed as a manager of Centurion Pecos on June 13, 2016. Stampede disputes the propriety of the alleged removal and does not recognize same. Accordingly, Calce's claim for contractual indemnification and reimbursement/advancement of defense costs against Centurion Pecos is significantly intertwined with and dependent upon the outcome of the competing declaratory judgment claims of Stampede and Centurion Logistics regarding which entity has control of Centurion Pecos.

## VI.
## CAUSES OF ACTION

### COUNT 1: DECLARATORY JUDGMENT

26. Calce restates and incorporates the allegations contained in the preceding paragraphs.

27. As shown by the facts set forth above, Calce is entitled to indemnification from Centurion Logistics and Centurion Pecos pursuant to the terms of such entities' own company agreements. Calce is further entitled to reimbursement of the expenses he has paid and incurred (and those that he will pay and incur in the future), as such expenses are paid and incurred, in defending himself against the claims brought against him in this lawsuit.

28. Calce therefore seeks a judicial determination that:

MR.180

(a) Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit;

(b) Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit;

(c) In the unlikely event that any liability be found on the part of Calce, Centurion Logistics is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Logistics Agreement);

(d) Centurion Pecos is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit;

(e) Centurion Pecos is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit; and

(f) In the unlikely event that any liability be found on the part of Calce, Centurion Pecos is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos (not including any damages arising from any conduct

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC** **PAGE 9**
9513752.1/SP/38371/0105/112217

MR.181

set forth in Section 6.3(a)(i)-(iv) of the Pecos Original Agreement and Pecos Amended Agreement).

## COUNT 2: BREACH OF CONTRACT (CENTURION LOGISTICS)

29. Calce restates and incorporates the allegations contained in the preceding paragraphs.

30. The Logistics Agreement constitutes a valid and enforceable contract. Centurion Logistics breached the Logistics Agreement by failing to reimburse Calce the amount of expenses he has paid and incurred in defending himself against the claims brought against him in this lawsuit. Calce performed, tendered performance of, or was excused from performing any of his obligations under the Logistics Agreement.

31. As a result of Centurion Logistics' breach, Calce has suffered actual damages. Calce is entitled to recover such damages from Centurion Logistics.

## COUNT 3: BREACH OF CONTRACT (CENTURION PECOS)

32. Calce restates and incorporates the allegations contained in the preceding paragraphs.

33. The Pecos Original Agreement and the Pecos Amended Agreement constitute valid and enforceable contracts. Centurion Pecos breached the Pecos Original Agreement and the Pecos Amended Agreement by failing to reimburse Calce the amount of expenses he has paid and incurred in defending himself against the claims brought against him in this lawsuit. Calce performed, tendered performance of, or was excused from performing any of his obligations under the Pecos Original Agreement and the Pecos Amended Agreement.

34. As a result of Centurion Pecos' breach, Calce has suffered actual damages. Calce is entitled to recover such damages from Centurion Pecos.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**     **PAGE 10**
9513752.1/SP/38371/0105/112217

MR.182

## VII.
## ATTORNEYS' FEES

35.     Calce restates and incorporates the allegations contained in the preceding paragraphs.

36.     Pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code, Calce seeks an award of his reasonable and necessary attorneys' fees and costs incurred in prosecuting his declaratory judgment claim and for any appeal.

37.     Calce is further entitled to and hereby requests judgment for his reasonable and necessary attorneys' fees incurred in bringing this counterclaim and for any appeal pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.  Calce either has or will present his claim to Plaintiff or to a duly authorized agent of Plaintiff in accordance with Section 38.002 of the Texas Civil Practice and Remedies Code.

## VIII.
## CONDITIONS PRECEDENT

38.     All conditions precedent to maintaining this action have occurred and been satisfied or have been excused or waived.

## IX.
## PRAYER

Counter-Plaintiff John Calce requests that, upon final hearing, Calce have judgment against Counter-Defendants Centurion Logistics LLC and Centurion Pecos Terminal LLC as follows:

1.     A declaration that Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit;

---

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**               **PAGE 11**
9513752.1/SP/38371/0105/112217

MR.183

2. A declaration that Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit;

3. A declaration that, in the unlikely event that any liability be found on the part of Calce, Centurion Logistics is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Logistics Agreement);

4. A declaration that Centurion Pecos is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit;

5. A declaration that Centurion Pecos is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit;

6. A declaration that, in the unlikely event that any liability be found on the part of Calce, Centurion Pecos is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Pecos Original Agreement and Pecos Amended Agreement);

7. Judgment against Centurion Logistics for the amount of expenses, including attorneys' fees, paid or incurred by Calce in defending himself against the claims brought against him in this lawsuit;

8. Judgment against Centurion Pecos for the amount of expenses, including attorneys' fees, paid or incurred by Calce in defending himself against the claims brought against him in this lawsuit;

9. Judgment against Counter-Defendants for Calce's reasonable and necessary attorneys' fees incurred in pursuing this counterclaim;

10. Judgment against Counter-Defendants for pre- and post-judgment interest as provided by law;

11. Judgment against Counter-Defendants for Calce's costs of suit; and

12. Such other and further relief to which Calce may be justly entitled.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**    **PAGE 12**
9513752.1/SP/38371/0105/112217

MR.184

Respectfully submitted,

/s/ David N. Kitner

**DAVID N. KITNER**
State Bar No. 11541500
david.kitner@strasburger.com
**CHASE J. POTTER**
State Bar No. 24088245
chase.potter@strasburger.com
**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 6000
Dallas, TX 75202-3794
(214) 651-4300
(214) 651-4330 Fax

**ATTORNEYS FOR DEFENDANTS
JOHN CALCE, CENTURION MIDSTREAM
GROUP, LLC, CENTURION TERMINALS,
LLC, AND STAMPEDE TX ENERGY, LLC**

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 22nd day of November, 2017, a true and correct copy of the foregoing was forwarded to all known counsel in compliance with the Texas Rules of Civil Procedure.

/s/ Chase J. Potter

Chase J. Potter

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM
AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**   **PAGE 13**
9513752.1/SP/38371/0105/112217

MR.185

# EXHIBIT A

COMPANY AGREEMENT

OF

Centurion Logistics LLC

a Texas Limited Liability Company

Effective September 16, 2013

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED ABSENT SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE TRANSFER OF MEMBERSHIP INTERESTS IS FURTHER RESTRICTED BY ARTICLE X OF THIS AGREEMENT.

1150848v2 2/13/2014

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **ARTICLE I DEFINITIONS** | | 1 |
| 1.1. | Defined Terms | 1 |
| 1.2. | Usage | 4 |
| **ARTICLE II ORGANIZATIONAL MATTERS** | | 5 |
| 2.1. | Formation | 5 |
| 2.2. | Name | 5 |
| 2.3. | Registered Office and Agent; Principal Office | 5 |
| 2.4. | Term | 5 |
| 2.5. | Purposes | 5 |
| 2.6. | Powers | 5 |
| 2.7. | Company Property | 5 |
| 2.8. | Initial Members | 6 |
| 2.9 | Options to Acquire Additional Units | 6 |
| 2.10 | Consent of Managers | 6 |
| 2.11. | Status of Managers and Members | 6 |
| 2.12. | Unit Certificates | 6 |
| 2.13. | No State Law Partnership | 6 |
| **ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS** | | 6 |
| 3.1. | Initial Capital Contributions | 6 |
| 3.2. | Additional Capital Contributions | 6 |
| 3.3. | Capital Accounts | 7 |
| 3.4. | No Right to Return of or Interest on Capital Account | 7 |
| 3.5. | Member Loans | 7 |
| 3.6. | Member Notes | 7 |
| **ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS** | | 8 |
| 4.1. | Allocation of Profit or Loss | 8 |
| 4.2. | Distributions of Distributable Cash | 8 |
| 4.3. | Withholding | 8 |
| 4.4. | Limitation on Distributions | 8 |
| 4.5. | No Right to Partition or Distributions in Kind | 9 |
| **ARTICLE V MANAGEMENT** | | 9 |
| 5.1. | Management and Control of Company Business | 9 |
| 5.2. | Delegation of Authority | 10 |
| 5.3. | Limitations on Manager Authority | 10 |
| 5.4. | Reliance | 10 |
| 5.5. | Compensation and Expenses of Members and Managers | 10 |
| 5.6. | Standards of Manager and Member Conduct | 10 |

1150848v2 2/12/2014

CALMFR.1489

| 5.7. | Resignation, Removal, and Replacement of Manager | 11 |

### ARTICLE VI LIABILITY AND INDEMNIFICATION ... 13
| 6.1. | Limitation of Liability | 13 |
| 6.2. | Indemnification by Company | 13 |
| 6.3. | Conduct Not Protected | 13 |
| 6.4. | Insurance | 14 |
| 6.5. | Survival | 14 |

### ARTICLE VII BOOKS AND RECORDS; REPORTS ... 14
| 7.1. | Maintenance of and Access to Books and Records | 14 |
| 7.2. | Fiscal Year | 14 |
| 7.3. | Financial and Operating Reports | 14 |
| 7.4. | Tax Reports | 15 |
| 7.5. | Transmission of Communications | 15 |

### ARTICLE VIII TAX MATTERS ... 15
| 8.1. | Tax Classification | 15 |
| 8.2. | Company Returns | 15 |
| 8.3. | Tax Elections | 15 |
| 8.4. | Consistent Reporting | 16 |
| 8.5. | Tax Proceedings | 16 |
| 8.6. | Information and Documents to Company | 16 |

### ARTICLE IX MEETINGS AND VOTING OF MEMBERS ... 17
| 9.1. | Meetings | 17 |
| 9.2. | Voting | 17 |

### ARTICLE X TRANSFER OF MEMBERSHIP INTERESTS ... 17
| 10.1. | Limitation on Transfers | 17 |
| 10.2. | Permitted Transfer of Membership Interest | 18 |
| 10.3. | Conditions to Permitted Transfers of Membership Interests | 19 |
| 10.4. | Effective Date; Distributions | 19 |
| 10.5. | Transferor's Obligations | 20 |
| 10.6. | Assignee's Rights and Obligations | 20 |
| 10.7. | Effect and Consequences of Prohibited Transfer | 20 |
| 10.8. | Agreements of Spouse; Sole Management Community Property | 21 |

### ARTICLE XI ADMISSION OF NEW MEMBERS ... 21
| 11.1. | Substituted Members | 21 |
| 11.2. | Additional Members | 22 |

### ARTICLE XII WITHDRAWAL OR REMOVAL OF MEMBERS ... 22
| 12.1. | Withdrawal of Members | 22 |
| 12.2. | Removal of Members | 23 |

CALVER 1489

12.3.      Optional Redemption of Membership Interest.................................................24
12.4.      Status of Former Member...............................................................................24

**ARTICLE XIII WINDING UP AND TERMINATION..........................................................24**
13.1.      Events Requiring Winding Up .........................................................................24
13.2.      Winding Up Procedures .................................................................................24
13.3.      Continuation Without Winding Up .................................................................25
13.4.      Liquidation of Assets and Application and Distribution of Proceeds.................25
13.5.      Certificate of Termination .............................................................................26
13.6.      Reinstatement ...............................................................................................26

**ARTICLE XIV VALUATION ...........................................................................................26**
14.1.      Fair Value of Company Property .....................................................................26
14.2.      Fair Value of Membership Interest. .................................................................27

**ARTICLE XV GENERAL PROVISIONS ........................................................................28**
15.1.      Amendments...................................................................................................28
15.2.      Notice ............................................................................................................28
15.3.      Governing Law; Consent to Jurisdiction.........................................................29
15.4.      Waiver ...........................................................................................................29
15.5.      Entire Agreement ..........................................................................................29
15.6.      Successors and Assigns ..................................................................................29
15.7.      Third-Parties .................................................................................................29
15.8.      Severability....................................................................................................29
15.9.      Construction ..................................................................................................29
15.10.    Execution of Agreement.................................................................................30
15.11.    Further Assurances ........................................................................................30
15.12.    Power of Attorney .........................................................................................30

**EXHIBIT A MEMBERS' CONTRIBUTIONS AND PERCENTAGE INTERESTS.........32**

**EXHIBIT B SPOUSAL JOINDER AND CONSENT.........................................................1**

**APPENDIX A PRINCIPLES OF ALLOCATION .........................................................A-1**
A.1      Introduction ...................................................................................................A-1
A.2      Definitions .....................................................................................................A-1
A.3      Capital Accounts ...........................................................................................A-4
A.4      Allocations of Net Profit and Net Loss ...........................................................A-5
A.5      Tax Allocations .............................................................................................A-8

1150848\2 2/12/2014

CALDER.11430

# COMPANY AGREEMENT
## OF
## CENTURION LOGISTICS LLC

This agreement ("Agreement") is entered into effective as of September 18, 2013 (the "Effective Date"), by the persons identified on the signature page(s) hereof.

## RECITALS

A.      The Company was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Texas effective as of September 16, 2013.

B.      The parties desire to provide for the regulation and management of the affairs of the Company according to this Agreement and the Code.

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    Defined Terms.

The following definitions and the definitions set forth in Appendix A to this Agreement, apply to the terms used in this Agreement for all purposes.

"Additional Capital Contribution" means the sum of cash and the Fair Value of any property contributed to the Company with respect to a Membership Interest as permitted under this Agreement, but does not include an Initial Capital Contribution.

"Additional Member" means a person who acquires a Membership Interest from the Company in exchange for a Capital Contribution and is admitted to the Company as a Member pursuant to Section 11.2 after the Effective Date.

"Affiliate" means a person who directly or indirectly controls, is controlled by, or is under common control with the person in question.

"Agreement" means this Agreement, as it may be amended, supplemented or restated from time to time.

"Assignee" means a person to whom a Membership Interest has been transferred by a Member or Assignee in a Permitted Transfer, or in a Prohibited Transfer that the Company is required by law to recognize, but who has not become a Member.

"Capital Contribution" means the sum of the Initial Capital Contribution and Additional Capital Contributions, if any, with respect to a Membership Interest.

CAL-VER 1132

"Certificate of Formation" means the certificate of formation filed with respect to the Company as provided in Section 2.1, as such certificate may be corrected, amended, or restated.

"Certificate of Membership Interest" means a certificate representing each Member's Membership Interest in a form approved by the Managers.

"Code" means the Texas Business Organizations Code, as amended from time to time, and any successor law.

"Company" means the limited liability company formed pursuant to the Certificate of Formation.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

"Damages" means any expense or loss (including any court costs, judgment, or settlement payment, penalty, fine, tax, and reasonable attorney's fees or other dispute resolution costs) paid or incurred in connection with or as a consequence of any Proceeding, net of any insurance or other recoveries received by the Indemnified Party with respect to the foregoing.

"Distributable Cash" means the cash and cash equivalents held by the Company (determined in accordance with its accounting policies for reporting cash flows), less any amount of such cash that the Managers determine should be retained for the reasonable current and future needs of the Company business.

"Effective Date" means the effective date of this Agreement as set forth in the introduction to this Agreement.

"Fair Value" means, with respect to an asset, its Fair Value determined according to Article XIV.

"Formation Date" means the effective date of the original Certificate of Formation of the Company.

"Indemnified Person" means (a) a Member or Assignee; (b) a Manager, (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1.

"Index Rate" means the rate specified in section 302.002 of the Texas Finance Code.

CALVER.1132

"Initial Capital Contribution" means the sum of any cash and the Fair Value of any property contributed to the Company by a Member with respect to a Membership Interest in connection with the original issuance of the Membership Interest by the Company as set forth on Exhibit A or determined pursuant to Section 11.2.

"Initial Members" is defined in Section 2.8.

"I.R.C." means the Internal Revenue Code of 1986, as amended, or any successor thereto.

"Liquidator" is defined in Section 13.2(b).

"Manager" means the person designated as manager of the Company in the Certificate of Formation, any person who becomes a Manager hereunder, including a replacement Manager, and the Members when they are acting pursuant to Section 5.7(e), in each case in such person's capacity as Manager and for the period that such person has such capacity. "Managers" means all persons that are designated as a Manager, collectively.

"Mandatory Distribution" means any distribution that a Member is entitled to receive and as to which the Member has attained the status of a creditor under Section 101.207 of the Code.

"Member" means any person identified as a member on Exhibit A, and any other person who becomes a member of the Company pursuant to this Agreement, who has not ceased to be a Member. "Members" means all persons that are Members, collectively.

"Member Notes" is defined in Section 3.6.

"Membership Interest" means a Member's or Assignee's economic interest in the Company. The term includes the Member's or Assignee's right to receive allocations of profits and losses and distributions as described in Article IV, and other rights and obligations under this Agreement or the Code of an Assignee who has not been admitted as a Member, but does not include any right to participate in management or any other right reserved under this Agreement or the Code exclusively to a Member.

"Percentage Interest" means, as to any Member or Assignee, the Membership Interest of the Member or Assignee expressed as a percentage, which percentage shall be determined from time to time by dividing the number of Units held by such Member or Assignee by the Units held by all Members and Assignees.

"Permitted Transfer" means any transfer of a Membership Interest that is described in Section 10.2.

"Proceeding" means (a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding; and (c) an inquiry or investigation that could lead to any such proceeding.

CALVFR.1493

"Prohibited Transfer" means any transfer of a Membership Interest that is not a Permitted Transfer.

"Requisite Percentage" means one or more Members owning more than seventy five percent (75.0%) of the Percentage Interests owned by all Members entitled to vote on the particular issue.

"Substituted Member" means a person who is admitted as a Member to the Company pursuant to Section 11.1 with respect to the transfer of an existing Membership Interest.

"Units" means units of Membership Interest in the Company.

1.2.    Usage.

In this Agreement, unless a clear contrary intention appears:

(a)    the singular number includes the plural number and vice versa;

(b)    reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually;

(c)    reference to any gender includes the other gender and the neuter;

(d)    reference to any agreement or other document means such agreement or other document as amended or modified and in effect from time to time;

(e)    reference to any statute, regulation, or other legal requirement means such legal requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)    "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)    "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)    "or" is used in the inclusive sense of "and/or";

(i)    with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

CALVFR 1194

(j)     references to agreements or other documents refer as well to all addenda, exhibits, schedules, or amendments thereto.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1.    Formation. The Company was formed pursuant to the Certificate of Formation of the Company filed with the Texas Secretary of State effective as of the Formation Date.

2.2.    Name. The Company's name is as set forth in the Certification of Formation. The Managers may change the Company name at any time without the approval of any Member by filing a Certificate of Amendment. The Managers shall provide notice of the change to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Managers. The Managers shall cause to be executed and filed of record all assumed or fictitious name certificates required by law.

2.3.    Registered Office and Agent; Principal Office.

(a)     The street address of the initial registered office of the Company in Texas and the name of the initial registered agent of the Company are as set forth in the Certificate of Formation. The Managers may change the Company's registered office or registered agent at any time by filing a Change of Registered Agent and/or Registered Office as provided in the Code. The Managers shall provide notice of the change to all Members.

(b)     The address of the principal office of the Company in the United States where records are to be kept or made available under Section 101.501 of the Code shall be as determined by the Managers. The Managers may change the Company's principal office in the United States at any time upon notice to the Members. The Company shall keep at its registered office and make available to a Member on reasonable request the street address of the Company's principal office in the United States.

2.4.    Term. The Company will exist perpetually and will continue until terminated in accordance with Article XIII.

2.5.    Purposes. The purposes of the Company are to engage in any activities that are permitted under applicable laws.

2.6.    Powers. Subject to any limitations in this Agreement, the Company may exercise the power to do any and all acts reasonably related to its purposes.

2.7.    Company Property.

(a)     All Company property shall be owned in the name of the Company and not in the name of any Member. No Member or Assignee will have any interest in such Company property solely by reason of the Member's status as a Member.

CALVFR.11835

(b) The Managers shall deposit or invest all funds of the Company in an account or accounts in the name of the Company. No funds other than the funds of the Company may be deposited therein. The funds in such accounts shall be used exclusively for the business of the Company (including distributions to the Members) and may be withdrawn only by persons approved by the Managers.

2.8. Initial Members. In connection with the formation of the Company, the persons executing this Agreement as of the Effective Date ("Initial Members") are admitted to the Company as Members. The number of Units held by each of the Initial Members as of the Effective Date are set forth next to the Initial Members' names on Exhibit "A."

2.9. Consent of Members. Each person executing this Agreement consents to the admission as members in the Company all of the Initial Members and all other persons who are Members as of the date such person executes this Agreement and further consents to the issuance of additional Units as provided in Section 2.9.

2.10. Status of Managers and Members. Except as otherwise provided by this Agreement, the Managers have the status, rights, and obligations of a manager in a limited liability company as set forth in the Code, and each Member has the status, rights, and obligations of a member in a limited liability company as set forth in the Code.

2.11. Unit Certificates. Each Member's Units may be represented by a Unit Certificate. If Unit Certificates are issued, each Unit Certificate shall be numbered and registered in the records of the Company as they are issued, and signed by any of the Managers. The holder of any Unit Certificate shall promptly notify the Company of any loss or destruction of the certificate, and the Managers shall cause a replacement certificate to be issued to the holder upon receipt of satisfactory evidence of the loss, destruction, or mutilation or the certificate and satisfaction of other reasonable conditions.

2.12. No State Law Partnership. The Members intend that the Company is not a partnership or joint venture, and that no Manager or Member is a partner or a joint venturer of any other Manager or Member for any purposes other than income tax purposes. No provision of this Agreement may be construed to suggest otherwise.

## ARTICLE III
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1. Initial Capital Contributions. Each Member's Initial Capital Contribution is set forth on Exhibit A.

3.2. Additional Capital Contributions. A Member is not required to make Additional Capital Contributions to the Company. No Member has the right or is permitted to make Additional Capital Contributions unless (a) all of the Managers and a Requisite Percentage approves such Additional Capital Contribution after notice to all Members of (i) the amount of the Additional Capital Contribution to be made and (ii) other material information relevant to the

CAL VFR 1196

proposed Additional Capital Contribution, and (b) all Members are afforded an opportunity to participate in the Additional Capital Contribution in accordance with their relative Percentage Interests.

3.3.   Capital Accounts. The Company shall establish a separate Capital Account for each Member and Assignee. The Capital Accounts shall be maintained according to the provisions of Appendix A.

3.4.   No Right to Return of or Interest on Capital Account. No Member may demand or receive the return of its Capital Contribution or any portion of its Capital Account, except as provided in this Agreement and the Code. The Managers do not have any personal liability for the repayment of any Capital Contributions of any Member. No interest will accrue or be paid with respect to the Capital Contributions or Capital Account of any Member.

3.5.   Member Loans. Subject to the approval of all of the Managers, the Company may borrow money from one or more Members to the extent the Managers deem appropriate to the conduct of the Company business on terms that comply with the requirements of Section 5.6(c) (relating to related party transactions). The amount of any loan made to the Company by a Member will not constitute a Capital Contribution or otherwise affect such Member's Capital Account or Membership Interest.

3.6.   Member Notes. In connection with the execution of this Agreement, the Company expects to issue promissory notes to certain Members in connection with assets that the Members have transferred to the Company or expenses that the Members have incurred on behalf of the Company ("Member Notes"). For federal income tax purposes, the Members intend that each Member Note be characterized as a preferred membership interest (equity) in the Company, that a holder's right to any interest or original issue discount on the Member Note be characterized as a right to a distributive share of Company income and not as a guaranteed payment under I.R.C. Section 707(c), and that all payments with respect to the Member Note be characterized as a distribution with respect to a membership interest. Allocations of profit or loss and tax items as provided in Section 4.1 and Section A.5 of Appendix A shall be adjusted as necessary, as determined by the Managers, to reflect the preferred membership interest deemed to be held by the holders of the Member Notes. For this purpose, the Members intend that only net profit or net loss, and only net taxable income or loss (rather than items thereof), for any allocation period will be allocated with respect to the Member Notes. For example, if there is net taxable income for the period from the issue date of the Member Notes through the end of 2009, it is intended that such net taxable income will be allocated to the Member Notes holders to the extent of any accrued interest or original issue discount on the Member Notes, and if there is a net taxable loss for such period, it is intended that such net taxable loss will be allocated first to the Members to the extent of their Capital Contributions and then to the holders of the Member Notes.

# ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.1.    Allocation of Profit or Loss. Subject to Section 3.6, Company profits and losses shall be allocated among the Members and Assignees in accordance with the provisions of Appendix A or as is determined by the Managers. The Members are aware of the income tax consequences of the allocations.

4.2.    Distributions of Distributable Cash.

(a)    Except as otherwise provided in Section 4.3 (relating to withholding), Section 4.4 (relating to limitations on distributions), or Section 13.4 (relating to liquidating distributions), any Distributable Cash shall be distributed not later than the 30th day after the end of each fiscal quarter to the Members and Assignees according to their Percentage Interests unless otherwise determined by the Managers. The Managers may provide for a record date with respect to distributions.

(b)    To the extent it may lawfully do so. the Company shall make distributions to Members and Assignees in accordance with Section 4.2(a) and Section 13.4(a)(iii) at such times and in such amounts as the Managers determine is sufficient to enable Members and Assignees to make payments of tax due (including any applicable interest and penalties) with respect to their allocable shares of the Company's taxable income. Unless the Managers determine otherwise. the taxes due for each Member and Assignee shall be calculated by assuming that the Member or Assignee is an individual taxed at the highest tax rate applicable to the type of income involved.

4.3.    Withholding. The Company shall withhold from distributions, or pay on behalf of a Member or Assignee, all amounts that the Managers determine the Company is required to withhold or pay on behalf of such person (including federal and state income tax withholding). All amounts so withheld from distributions are deemed to have been distributed to the person otherwise entitled to receive the amount so withheld. To the extent an amount is paid by the Company on behalf of a Member or Assignee but not withheld from a distribution, the amount paid constitutes a loan to such Member or Assignee. Such loan bears interest at the Index Rate and is repayable on demand or. at the election of the Managers. is repayable out of distributions to which such Member or Assignee would otherwise be entitled.

4.4.    Limitation on Distributions.

(a)    The Company may not make a distribution to a Member or Assignee if it would render the Company insolvent. determined in accordance with Section 101.206 of the Code. A Member or Assignee who receives a distribution in violation of Section 101.206 of the Code is not required to return the distribution except as required in Section 101.206 of the Code.

(b)    The Members shall look solely to the assets of the Company for any distributions, including liquidating distributions. If the assets of the Company remaining after the payment or

discharge, or the provision for payment or discharge, of the Company liabilities are insufficient to make any distributions, no Member has any recourse against the separate assets of any other Member.

4.5.    No Right to Partition or Distributions in Kind. No Member has any right, and waives any right that it might otherwise have, to cause any Company property to be partitioned and/or distributed in kind. Except as provided in Section 13.4(d) (relating to liquidating distributions), the Company may not make any distributions in kind.

# ARTICLE V
# MANAGEMENT

5.1.    Management and Control of Company Business.

(a)    Subject to the limitations set forth in this Agreement, the Managers have exclusive authority to manage and conduct the Company's business. The Managers shall do all things appropriate to carry out the Company's purpose. Except as otherwise provided in this Agreement, all actions that the Managers may take and all determinations that the Managers may make pursuant to this Agreement may be taken and made in the absolute discretion of the Managers.

(b)    The initial Managers of the Company are: John Calce, Antonio Albanese, and Marc Marrocco. Each Manager will serve as a Manager until his successor is appointed pursuant to Section 5.7(f).

(c)    The Members may not take part in the management or control of the Company business or bind the Company in their capacity as Members. A Member may have the status of a Manager or governing person of a Manager or the Company and may possess and exercise the powers and authority associated with such status.

(d)    Meetings of the Managers shall be held from time to time as determined by the Managers. Managers may participate in any meeting by means of video or audio conferencing or similar communications equipment whereby all Managers can hear each other. No notice of any meeting of the Managers is required to be given. At all meetings of Managers, the presence of a majority of the Managers shall be necessary and sufficient to constitute a quorum for the transaction of business unless a greater number is required by this Agreement, law or the Certificate of Formation. Each Manager will have one vote. Except as otherwise provided in this Agreement, the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. If a quorum shall not be present at any meeting of Managers, the Managers present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(e)    Any action required by the Code to be taken at any annual or special meeting of Managers, or any action which may be taken at any annual or special meeting of Managers, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in

CALVFR.1499

writing, setting forth the action so taken, shall be signed by Managers having not fewer than the minimum number of votes required to approve such action under the Code, the Certificate or this Agreement. A facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Managers for purposes of this Section 5.1(e).

5.2. Delegation of Authority.

(a) The Managers may cause the Company to hire employees and agents, and may delegate to such persons any of its authority hereunder, as the Managers deems appropriate for the conduct of the Company's business.

(b) The Managers may appoint officers of the Company as the Managers deem appropriate. The officers may be appointed for such terms and may exercise such powers and authority and perform such duties as determined by the Managers. An officer need not be a Member of the Company. Any two or more offices may be held by the same person. Any officer elected or appointed by the Managers may be removed, with or without cause, at any time by the Managers. Each officer will hold office until his successor is chosen and is qualified in his stead, or until his death, resignation, or removal from office. Any vacancy in an office because of death, resignation, removal, or otherwise may be filled by a person appointed by the Managers. An officer has the same fiduciary duties as a Manager as described in Section 5.6.

5.3. Reliance. Persons dealing with the Company may rely conclusively on the authority of the Managers as set forth in this Agreement. Every document executed by a Manager with respect to any business or property of the Company is conclusive evidence in favor of any person relying on the document that (a) at the time of the execution and delivery of the document this Agreement was effective, (b) the document was executed in accordance with this Agreement and is binding upon the Company, and (c) the Manager was authorized to execute and deliver the document on behalf of the Company.

5.4. Compensation and Expenses of Members and Managers. Members and Managers are not entitled to any salary, fee, or other remuneration (other than distributions with respect to the Member's Membership Interest) for providing property or services or other consideration to or for the benefit of the Company in their capacity as a Member or Manager, except that the Managers are entitled to reimbursement from the Company for reasonable out-of-pocket expenses paid or incurred on behalf of the Company. The Company shall pay all out-of-pocket costs incurred in organizing the Company. This Section 5.5 does not limit or enlarge the Manager's or a Member's rights to liability protection or indemnification under Article VI, and does not limit the Company's ability to enter into transactions with Members in their capacities other than as Members in accordance with Section 5.6(c).

5.5. Standards of Manager and Member Conduct.

(a) In General. Each Manager shall manage and conduct the Company's business in good faith and in a manner the Manager reasonably believes to be in the Company's best

CALVER.1290

interest. A Manager does not violate its obligations under this Section 5.6(a) or the Code unless the Manager engages in conduct described in Section 6.3(a) (relating to improper conduct).

(b) Outside Activities of Managers and Members. Each Manager shall devote to the Company's affairs only such time and resources as the Managers deem necessary for the conduct and winding up of the Company business. The Managers and Members or their Assignees may engage in or have an interest in other business ventures of every nature and description, independently or with others, including the ownership and operation of businesses similar to or in competition with, directly or indirectly, the Company. Neither the Company nor any Member or Assignee has, solely as a result of such person's interest in the Company, any right to acquire any rights in or to any such other business venture or to the income or profits derived from any such other business venture.

(c) Related Party Transactions. Except as otherwise provided in this Agreement, the Managers, when acting on behalf of the Company, may purchase property from, sell property to, or otherwise deal with any Manager, Member, or Assignee, acting on its own behalf, or any Affiliate of any Manager, Member, or Assignee, but any such transaction shall be on terms that are no less favorable to the Company than if the transaction had been entered into with an independent third party. No provision of this Agreement requires disclosure of any transaction to, and approval of the transaction by, any disinterested governing persons of the Company or the Members as provided in Section 101.255 of the Code.

5.6. Resignation, Removal, and Replacement of Manager.

(a) Resignation. A Manager may resign as manager of the Company only upon notice to all Members. If there is no resignation date specified in the notice, or if the specified date is earlier than 90 days following the date the notice is given to Members ("notice date"), the Manager's resignation is effective on the 90th day following the notice date. If the specified resignation date is later than 180 days after the notice date, the Manager's resignation is effective on the 180th day following the notice date. A Manager is deemed to have resigned as manager of the Company upon the following events:

(i) any event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Manager were a general partner;

(ii) if the Manager is an individual, the Manager's death, the appointment of a guardian or general conservator for the Manager, or a judicial determination that the Manager is incapable of performing the Manager's duties under the Agreement; or

(iii) if the Manager is an entity, the termination of the Manager's existence or suspension of the Manager's right to do business.

(b)     Removal for Cause.  A Manager may be removed as manager of the Company only upon the affirmative vote of a Requisite Percentage if there is cause for removal as specified in Section 5.7(c) and the Company has received a written opinion of counsel that:

(i)     cause for removal as specified in Section 5.7(c) exists; and

(ii)     the removal of the Manager is not prohibited under any loan agreements, contracts, or other applicable legal requirements.

(c)     Definition of Cause.  Cause for removal exists only if one or more of the following conditions has occurred:

(i)     there has been a change in Control of the Manager;

(ii)     a final judgment of a court of competent jurisdiction has been entered that the Manager's removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal or state agency or judicial authority or contained in any federal or state statute.

(d)     Status of Former Manager.  A Manager who has resigned in violation of this Agreement or who has been removed has the status of an Assignee with respect to any Membership Interest held by the former Manager.

(e)     Interim Management.  During the period that the Members may elect a replacement Manager as provided in Section 5.7(f) and prior to such election (or an election to wind up the Company), the Members may by vote of a Requisite Percentage appoint an interim manager having authority to manage and conduct the Company's business as the Manager as provided herein.  If an interim Manager is not appointed, the authority to manage and conduct the Company's business is vested in the Members who may act by vote of a Requisite Percentage, and who may by vote of a Requisite Percentage appoint a committee of one or more persons to exercise the authority of the Manager until such time as a replacement Manager is elected or the Company commences winding up.  The Members shall file any required amendments to this Agreement or the Certificate of Formation to reflect the resignation or removal of the former Manager and the appointment of the interim Manager or the conversion of the Company to a member-managed limited liability company, and all Members approve any such amendments.

(f)     Election of Replacement Manager.  If a Manager dies, is disabled, resigns, or is removed as the manager of the Company, within 90 days following such death, disablement, resignation or removal a Requisite Percentage may elect a replacement Manager of the Company effective as of the date of the former Manager's death, disablement, resignation, or removal.  The Managers shall file any required amendments to this Agreement to reflect the death, disablement, resignation, or removal of the former Manager and the election of the replacement Manager.

CAL MR.1292

# ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1.    Limitation of Liability.   No Member or Manager is liable for any debts, obligations, or liabilities of the Company.  Subject to Section 6.3, an Indemnified Person is not liable to the Company or any other Indemnified Person for any Damages arising from any Proceeding relating to the conduct of the Company's business or relating to any act or omission by the Indemnified Person within the scope of the Indemnified Person's authority in the course of the Company's business, including any breach of any fiduciary duties, or for any misconduct or negligence on the part of any other person who is an employee or agent of the Company.

6.2.    Indemnification by Company.   To the fullest extent permitted by applicable law, and subject to Section 6.3, the Company indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of the Company's business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of the Company's business or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company.  An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.  The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

6.3.    Conduct Not Protected.

(a)    This Article VI does not operate to limit liability or to indemnify a person to the extent the person is found liable pursuant to a final judgment of a court of competent jurisdiction for:

(i)    an act or omission that involves gross negligence, intentional misconduct, or a knowing violation of law;

(ii)    a transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, a Manager's resignation in violation of Section 5.7(a), or a Member ceasing to be a Member in violation of Section 12.1(a);

(iii)    a willful or reckless material breach of this Agreement or any other agreement relating to the Company's business; or

(iv)    an act or omission for which indemnification is prohibited by law.

(b)    No provision of this Agreement requires the Company to pay or incur any amount for which indemnification is not permitted under this Article VI.

(c)    Any payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to the Company.  The Company may

require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section 6.3; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

6.4. Insurance. The Company may maintain insurance to protect any person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such person against such expense, liability, or loss under the Code.

6.5. Survival. The indemnities provided for in this Agreement survive the transfer of an Indemnified Person's Membership Interest, the termination of the person's status as a Member or other status giving rise to classification as an Indemnified Person, and the termination of this Agreement and the Company.

## ARTICLE VII
## BOOKS AND RECORDS; REPORTS

7.1. Maintenance of and Access to Books and Records. The Company shall maintain such books and records regarding the Company's business and properties as is reasonable, including all books and records required under the Code. Each Member shall have access thereto during ordinary business hours to the extent and under the conditions provided in the Code.

7.2. Fiscal Year. The Company shall adopt the calendar year as its fiscal year for financial and tax accounting purposes.

7.3. Financial and Operating Reports. As soon as practicable after the end of each fiscal year, but in any event not later than 90 days after the end of the fiscal year, the Managers shall deliver to each Member an annual report containing the following:

(a) a Company balance sheet as of the end of such fiscal year, and Company statements of income, cash flows, and changes in Members' equity for such fiscal year, each in reasonable detail and prepared according to United States generally accepted accounting principles;

(b) a general description of the Company's activities during such fiscal year and business plans for the succeeding year; and

(c) a statement of changes in the Member's Capital Account (showing the balance in the Member's Capital Account as of the beginning of the fiscal year, contributions or distributions during the year, allocations of profits and losses during the year, any other adjustments to the Capital Account balances during the year, and the balance in the Capital Account as of the end of the year).

7.4. Tax Reports.

(a) Not later than the date (including extensions) for filing the Company's tax return with the Internal Revenue Service (Form 1065), the Managers shall deliver to each person who was a Member or Assignee at any time during the period covered by the return all information necessary for the preparation of such person's United States federal income tax returns, including a Form 1065 Schedule K-1 (if applicable).

(b) Upon the written request of any Member or Assignee, the Managers shall deliver to such person information necessary for the preparation of any tax returns that must be filed by such person, including information necessary for estimating and paying estimated taxes.

7.5. Transmission of Communications. Each person who holds a Membership Interest on behalf of, or for the benefit of, another person or persons shall be responsible for conveying any report, notice, or other communication received concerning the Company's affairs to such other person or persons.

## ARTICLE VIII
## TAX MATTERS

8.1. Tax Classification. The Members intend that the Company be classified as a partnership for federal income tax purposes. The Managers shall take all actions as are or may be reasonably necessary or appropriate to ensure the Company is so classified (including the filing of elections or tax returns). No Manager, officer, or Member shall take any action inconsistent with the classification of the Company as a partnership for federal income tax purposes.

8.2. Company Returns. The Managers shall cause the Company to file such tax returns as may be required by law.

8.3. Tax Elections.

(a) General. Except as otherwise provided in this Agreement, the Managers shall cause the Company to timely make or revoke all elections, and take all tax reporting positions, necessary or desirable for the Company and to maximize the tax benefits to the Members. No election shall be made to have the Company excluded from the application of any provision of Subchapter K of the I.R.C. or any equivalent tax provision in any other tax jurisdiction.

(b) Section 754 Election. The Company shall make the election referred to in I.R.C. Section 754 upon the request of any Member in connection with a transfer of the Member's Membership Interest.

(c) Safe Harbor Election for Compensatory Membership Interests. If Proposed Treasury Regulation 1.83-3(l) is adopted as a temporary or final regulation, the Company shall make the safe harbor election described in such regulations, and the Company and each Member

CAL MR.1205

(including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the safe harbor with respect to all Membership Interests transferred in connection with the performance of services while the election remains effective. The Managers shall prepare, execute, and file any required documentation to cause the election to be effective. The Managers may terminate the safe harbor election at any time if it determines in good faith that it is in the best interests of the Company and the Members to do so.

8.4. Consistent Reporting. Each Member shall, on the Member's tax returns, treat each partnership item (as defined in I.R.C. Section 6231(a)(3)) in a manner consistent with the treatment of the item on the Company's return in all respects, including the amount, timing, and character of the item. No Member shall file a request for an administrative adjustment of partnership items under I.R.C. Section 6227(a) if such request would cause the Member's treatment of the item to be inconsistent with the treatment of the item on the Company's return.

8.5. Tax Proceedings.

(a) The Managers shall be the Company's tax matters partner as defined in I.R.C. Section 6231, and shall take such actions as are required to be designated the tax matters partner under applicable Treasury Regulations. The tax matters partner shall represent the Company in connection with all examinations of the Company's tax returns by tax authorities, including administrative and judicial proceedings to contest any proposed adjustments. Subject to Section 8.5(c), the tax matters partner has the exclusive right to conduct Proceedings relating to Company taxes and to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. The tax matters partner shall keep the Members informed on a timely basis of all material developments with respect to any such Proceeding. Each Member shall cooperate with the tax matters partner and do or refrain from doing all things reasonably requested by the tax matters partner with respect to the conduct of any Company tax Proceeding.

(b) The tax matters partner may not bind any other Member to a settlement agreement relating to taxes without obtaining the written concurrence of such Member.

(c) Any deficiency for taxes imposed on a Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member and, if paid or required to be paid by the Company, is recoverable from such Member pursuant to Section 4.3 or by other legal means.

(d) This Section 8.5 and Section 8.6 survive the termination of the Company and the termination of any Member's interest in the Company and remain binding for a period of time necessary to resolve all tax matters with applicable taxing authorities.

8.6. Information and Documents to Company. Each Member shall timely provide to the Company all information and documents that such Member is required to provide by applicable tax requirements, and shall also provide to the Company upon request such additional

CAL MR.1496

information and documents as the Managers may reasonably request in connection with the Company's compliance with applicable tax requirements or filing of any permitted tax elections.

## ARTICLE IX
### MEETINGS AND VOTING OF MEMBERS

9.1.  Meetings.

(a)  Meetings of the Members may be called at any time by the Managers or by one or more Members holding at least 75.0% of the Percentage Interest held by Members. Meetings shall be held at the Company's principal place of business or at such other reasonable place set forth in the notice of the meeting.

(b)  Any action that may be taken at a Members' meeting may be taken without holding a meeting if Members having at least the Requisite Percentage interest that would be necessary to take the action at a meeting, in which each Member entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

(c)  Except as otherwise provided in this Agreement, meeting notices and procedures, including procedures for obtaining written consents in lieu of a meeting, shall be in conformity with Chapters 6 and 101(H) of the Code. Sections 101.353 through 101.356 of the Code (relating to quorum and minimum voting requirements) shall not apply to the extent such provisions are inconsistent with this Agreement. The Managers are solely responsible for convening and conducting meetings of the Members, conducting the solicitation of consents, determining the validity and effect of responses to any solicitation of consents, and determining other matters regarding meetings, voting, and consents.

(d)  Notice of the results of any vote taken at a meeting, or the results of any solicitation of consents in lieu of a meeting, shall be given to the Members not later than with the delivery of the next following report of financial information given pursuant to Section 7.3.

9.2.  Voting. A Member may vote at a meeting in person, or by a proxy executed in writing by the Member and received by the Managers prior to the time when the votes of Members are to be counted. The provisions of the Code pertaining to the validity and use of proxies by shareholders of a corporation govern the validity and use of proxies given by Members. Only Members of record on the date of the meeting (or if the vote is conducted without a meeting then on the date of the notice soliciting the Member consents) may vote.

## ARTICLE X
### TRANSFER OF MEMBERSHIP INTERESTS

10.1.  Limitation on Transfers.

(a)  The term "transfer," when used in reference to a transfer of a Membership Interest, means an assignment (whether voluntarily, involuntarily, or by operation of law and

whether or not effective under this Agreement) of all or any portion of a Member's or Assignee's Membership Interest, or any interest therein, to another person, and includes a sale, assignment, conveyance, gift, exchange, or other disposition, a transfer by merger or other business combination, a transfer pursuant to bankruptcy, insolvency, incapacity, or death, and any pledge, hypothecation, or other encumbrance. A redemption of a Member's or Assignee's Membership Interest pursuant to Section 12.3 is not a transfer of the Membership Interest. A transfer does not include a transfer of a community property or other interest in a Membership Interest from a former spouse of a Member to the Member pursuant to the death of the former spouse or in connection with the termination of the marital relationship.

(b)     No Member may transfer all or any portion of its Membership Interest unless the transfer is a Permitted Transfer. A transfer of a Membership Interest that is not a Permitted Transfer is a Prohibited Transfer.

(c)     A change of Control of any Member constitutes a transfer of the Membership Interest held by such Member.

10.2.   Permitted Transfer of Membership Interest.

(a)     A transfer of a Membership Interest is a Permitted Transfer only if the transfer satisfies the conditions set forth in Section 10.3 and is described in one or more of the following paragraphs of this Section:

(i)     the transfer is approved by all of the Managers;

(ii)    if the Member is a corporation, the transfer is to a member of the Member's affiliated group (as defined in I.R.C. Section 1504(a));

(iii)   if the Member is a trustee of one or more employee benefit plans, the transfer is to a co-trustee or a successor trustee to such plans; or

(iv)    if the Member is an individual, the transfer is to the Member's estate, testamentary trust, or legal representative as a result of the Member's death or adjudication of incapacity in managing its person or affairs, or the transfer is to a member of the Member's family, directly or in trust.

(b)     Upon a Permitted Transfer by a Member of all of its Membership Interest, the Member ceases to be a Member as of the effective date of the transfer determined according to Section 10.4.

(c)     For purposes of Section 10.2(a)(iv), a Member's family means the Member's spouse (excluding a former spouse), children, grandchildren, parents, and grandparents. A person's legally adopted child is treated as his child.

CALVFR.1209

10.3. Conditions to Permitted Transfers of Membership Interests. Without limiting the Managers' authority to withhold approval for the transfer of a Membership Interest, a transfer shall not be a Permitted Transfer unless the Managers determine that all of the following conditions are satisfied:

(a) The transfer complies with all applicable laws, including any applicable securities laws.

(b) The transfer will not cause the Company to be treated as other than a partnership for United States federal income tax purposes.

(c) The transfer will not cause the Company to be subject to regulation under the Investment Company Act of 1940, as amended.

(d) The transfer will not cause any assets of the Company to be deemed "plan assets" under the Employee Retirement Income Security Act of 1974.

(e) The transfer will not result in a termination of the Company under I.R.C. Section 708, unless the Managers determine that such termination will not have an adverse impact on the Members.

(f) The transfer will not cause the application of the tax-exempt use property rules of I.R.C. Sections 168(g)(1)(B) and 168(h) to the Company or its Members, unless the Managers determine that such rules will not have an adverse impact on the Members.

(g) The transferor and transferee have delivered to the Company any documents that the Managers request to confirm that the transfer satisfies the requirements of this Agreement, to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as an Assignee.

(h) If requested by the Managers, the Company has received a transfer fee in an amount determined by the Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with such transfer.

10.4. Effective Date; Distributions.

(a) A Permitted Transfer of a Membership Interest is effective as of the first day of the calendar month following the calendar month during which the Managers receive notice of such transfer (in such form and manner as the Managers may require) unless the Managers determine that the transfer should be effective as of an earlier or later date (for example, on any date the transfer is effective as a matter of state law, or where the notice of transfer specifies that the transfer is to be effective on a future date).

(b)     Distributions with respect to a transferred Membership Interest that are made before the effective date of the transfer shall be paid to the transferor, and distributions made after such date shall be paid to the Assignee.

(c)     Effective as of the effective date of a transfer of a Membership Interest, the Managers shall amend Exhibit A to reflect the reduction in the transferor's Percentage Interest and to reflect the Assignee's Percentage Interest.

(d)     Neither the Company nor the Managers have any liability for making allocations and distributions to the Members determined in accordance with this Section 10.4, whether or not the Company or the Managers have knowledge of any transfer of any Membership Interest.

10.5.   Transferor's Obligations. The transferor of a Membership Interest who ceases to be a Member continues to be obligated with respect to its Membership Interest or its status as a former Member as provided in the Code and applicable law.

10.6.   Assignee's Rights and Obligations.

Unless an Assignee becomes a Member pursuant to Article XI, such Assignee shall not be entitled to any of the rights granted to a Member, other than the rights to receive allocations of profits and losses and distributions as if such Assignee were a Member, to transfer the Assignee's Membership Interest (subject to the conditions of this Article X), and to receive reports and information as specified in Article VII. An Assignee of a Membership Interest shall succeed to the Capital Contribution of the transferor to the extent of the Membership Interest transferred. An Assignee is bound by this Agreement irrespective of whether the Assignee has signed or otherwise adopted this Agreement. An Assignee's Membership Interest may be redeemed at the option of the Managers as provided in Section 12.3.

10.7.   Effect and Consequences of Prohibited Transfer.

(a)     Except as otherwise required by law, the Company and the Managers shall treat a Prohibited Transfer as void and shall recognize the transferor as continuing to be the owner of the Membership Interest purported to be transferred. If the Company is required by law to recognize a Prohibited Transfer, the transferee shall be treated as an Assignee with respect to the Membership Interest transferred and may not be treated as a Member with respect to the Membership Interest transferred unless admitted as a Member in accordance with Article XI.

(b)     The Company may remove the transferor and Assignee with respect to a Prohibited Transfer as provided in Article XII.

(c)     The transferor and transferee with respect to a Prohibited Transfer shall be jointly and severally liable to the Company for, and shall indemnify and hold the Company harmless against, any expense, liability, or loss incurred by the Company (including reasonable legal fees and expenses) as a result of such transfer, their removal and liquidation of their Membership Interests (if applicable), and the efforts to enforce the indemnity granted in this Section 10.7(c).

10.8. Agreements of Spouse: Sole Management Community Property.

(a)     Execution of Spousal Joinder and Consent. The spouse of each Member shall execute and deliver to the Company a Spousal Joinder and Consent in the form of Exhibit B.

(b)     Agreements of Spouse. The spouse of each Member agrees that:

(i)     this Agreement is entirely fair, just and equitable and in his or her best interest;

(ii)     the covenants made in this Agreement are binding on such spouse individually and that such spouse is bound by this Agreement, including insofar as any interest such spouse may have now or hereafter in any Membership Interest by reason of the community property laws of the State of Texas or any other state, or otherwise;

(iii)     whenever, pursuant to the terms of this Agreement, such Member does, or is required to, in any manner transfer, pledge, or encumber his or her Membership Interest, or any interest in such Membership Interest, to the Company or any other person, such transfer, pledge, or encumbrance shall include the community property interest, if any, of such spouse in such Membership Interest so transferred, pledged, or encumbered; and

(iv)     in the event of the death of such spouse, any interest such spouse may have now or hereafter in any Membership Interest which constitutes community property should pass to such Member and, accordingly, such spouse shall will and bequeath such spouse's entire community property interest, if any, in such Membership Interest to such Member.

(c)     Sole Management Community Property. Each Member who is a natural person and his or her spouse agree that such Member's Membership Interest, whether presently owned or hereafter acquired, is, if such Membership Interest is community property, community property subject to the sole management, control, and disposition of such Member.

## ARTICLE XI
## ADMISSION OF NEW MEMBERS

11.1. Substituted Members. An Assignee of a Membership Interest shall be admitted as a Substituted Member with respect to such Membership Interest on the date on which all of the following conditions are satisfied:

(a)     The Managers have approved in writing the admission of the Substituted Member.

(b)     The Assignee has delivered to the Company any agreements and other documents that the Managers request to confirm such Assignee as a Member in the Company and such Assignee's agreement to be bound by this Agreement as a Member.

(c)     If requested by the Managers, the Company has received an admission fee in an amount determined by the Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with the admission of the Assignee as a Substituted Member.

11.2.   Additional Members.

(a)     In General.  The Managers may cause the Company to admit a person as an Additional Member and issue Additional Units to such Additional Member upon satisfaction of all of the following conditions.

(i)     A Requisite Percentage has approved the admission of the Additional Member after notice to all Members of (i) the Initial Capital Contribution to be made by the proposed Additional Member, (ii) the effect of the admission on each Partner's Percentage Interest, and (iii) other material information relevant to the proposed admission.

(ii)    The admission of the proposed Additional Member satisfies the applicable conditions of Section 10.3.

(iii)   The proposed Additional Member has delivered to the Company any agreements and other documents that the Managers request to confirm the person as a Member in the Company and the person's agreement to be bound by this Agreement as a Member.

## ARTICLE XII
## WITHDRAWAL OR REMOVAL OF MEMBERS

12.1.   Withdrawal of Members.

(a)     No Member may withdraw from the Company or otherwise cease to be a Member except upon the following events:

(i)     receipt by the Company of a notice of such Member's withdrawal from the Company;

(ii)    a transfer of all of the Member's Membership Interest in a Permitted Transfer; or

(iii)   removal of the Member as a Member as provided in this Agreement.

(b)     A Member shall be deemed to withdraw from the Company upon the following events:

(i)     an event specified in Section 12.1(a);

CALVFR.1202

(ii)     an event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Member were a general partner;

(iii)    if a Member is an individual, the Member's death, the appointment of a guardian or general conservator for the Member, or a judicial determination that the Member is incapable of performing the Member's duties under this Agreement; or

(iv)    if the Member is an entity, an event requiring the Member's winding up or causing the termination of the Member's existence or suspension of the Member's right to do business.

(c)     If a Member ceases to be a Member in violation of Section 12.1(a), the Company may recover damages from the former Member for breach of this Agreement.

12.2.    Removal of Members.

(a)     A Member may be removed as a Member by the unanimous written consent of the Managers under the following circumstances:

(i)     the Member has transferred or attempted to transfer all or any portion of its Membership Interest in a Prohibited Transfer;

(ii)    in the case of any Member who is also a Manager or an Affiliate of a Manager, the Member or its Affiliate has ceased to be a Manager in violation of Section 5.7(a) or has been removed as a Manager in accordance with Section 5.7(b);

(iii)    the Managers determine, in their sole discretion, that it is in the best interest of the Company to remove a Member;

(iv)    the Member has materially breached the terms of this Agreement or any other material agreement with the Company; or

(v)     the Managers determine that removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any United States federal or state agency or judicial authority or contained in any United States federal or state statute.

(b)     If the Managers propose to remove a Member pursuant to this Section 12.2, the Managers shall notify the Member in writing of the proposed removal, and if applicable shall provide such Member a reasonable opportunity to cure the event giving rise to removal. The removal of the Member is effective at such time as determined by the Managers in accordance with applicable law and taking into account the Member's opportunity to cure the event giving rise to removal.

CALDER.1503